IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ELIDA MAEVE,

                Plaintiff,

        v.

CENTENNIAL SCHOOL DISTRICT NO.
28J,

                Defendant.

Case No. 3:24-cv-01427-SB

**OPINION AND ORDER**

_____

**BECKERMAN, U.S. Magistrate Judge.**

       Elida Maeve ("Maeve") filed this employment action against Centennial School District No. 28J ("Centennial"), alleging claims for violations of Title VII of the Civil Rights Act ("Title VII"), Title I of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and Oregon Revised Statutes ("ORS") chapters 653 and 659A. Centennial moves to dismiss several claims in Maeve's complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6).

       The Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343, and 1367, and the parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). For

the reasons explained below, the Court grants in part and denies in part Centennial's motion to dismiss.

## BACKGROUND[1]

Maeve was "assigned male at birth" but has "legally, socially, and medically transitioned her gender and presently identifies as a woman or transgender woman." (Am. Compl. ¶¶ 7, 14, 17.) At all relevant times, Maeve's "sexual orientation was and is bisexual or pansexual." (*Id.* ¶ 14.)

In September 2020, Centennial, an Oregon public school district, hired Maeve (then known as Stephen Hamilton)[2] to serve as a ninth-grade science teacher at Centennial High

---

[1] The Court draws the facts in this background section from Maeve's amended complaint, and must accept them as true for the purpose of evaluating Centennial's motion to dismiss under Rule 12(b)(6). *See Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1016 n.1 (9th Cir. 2014) (citing *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013)). The Court refers to Maeve using female pronouns in accordance with the preference she has expressed through her pleading and briefing. *See EEOC v. R.G. & R.G. Harris Funeral Homes, Inc.*, 884 F.3d 566-67 & n.1 (6th Cir. 2018) (same); *see also United States v. Rumbo*, No. 24-cv-01527, 2025 WL 66039, at *1 n.1 (7th Cir. Jan. 10, 2024) (using the "pronouns that appear[ed] throughout the record and in the briefs" absent guidance on "preferred pronouns" and "[w]ith no disrespect intended"). The Court, however, recognizes and discusses below that when Maeve began a gender transition in or around late 2021 and early 2022, Maeve's preferred honorific and pronouns were "Mx." and "they" and "them," respectively. (Am. Compl. ¶¶ 14, 19, 30, 36, 120, ECF No. 7.)

[2] The Court refers to this name because it is relevant to, among other things, a comparator theory that Maeve advances and the Court addresses below. The Court, however, recognizes that Maeve identifies as and has legally changed her name to "Elida Stevie Maeve" (Am. Compl. ¶ 117); *see generally* Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. Rev. Discourse 40, 48 n.36 (2020) (refencing a report's "finding[s] [on] 'disturbing patterns of mistreatment and discrimination' against transpersons in every dimension of social life," and stating that to "deadname" a transgender person is "a deviation from the ordinary[] that takes on a new significance because of the social context of discrimination against transfolks" (citing Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 4 (Dec. 2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF [https://perma.cc/594T-6W63])); *EEOC v. Sis-Bro Inc.*, No. 24-cv-00968, 2024 WL 3845359, at *2 n.1 (S.D. Ill. Aug. 16, 2024) (noting that "referring to [a transgender person] by their birth or given name instead of a name they have chosen to align with their identity and have asked others to use is called 'deadnaming'") (citation omitted).

School.[3] (*Id.* ¶¶ 7-8, 20, 106.) Centennial later invited Maeve to return to the same science

teacher role for the 2021-22 school year. (*Id.* ¶ 18.) During both the 2020-21 and 2021-22 school

years, Mairi Scott-Aquirre ("Scott-Aquirre") served as Centennial's principal. (*Id.* ¶¶ 13, 17-18.)

In September 2021, at the start of her second year, Maeve "began altering her gender

expression by wearing feminine-coded clothing, painting her nails, and using makeup," and

"identified as a gender nonconforming cis man." (*Id.* ¶ 19.) On the first day of school, Maeve

informed students that they could address her by using "either 'Mr.' or 'Mx.' . . . [and] explained

that 'Mx.' is a gender-neutral honorific for those who do not wish to be identified by gender."

(*Id.* ¶ 20.)

Also in September 2021, some of the students at Centennial (primarily male students)

began to harass Maeve and a student ("R.A.") "based on their gender identities and gender

expression." (*Id.* ¶ 20.) In mid-September 2021, Maeve emailed two of Centennial's assistant

principals (one of whom also served as Centennial's dean of students), informing them about an

ongoing "harassment and bullying problem in [Maeve's] classroom" involving the student R.A.

(*Id.* ¶ 21.)

In October 2021, a male student "with his phone out" followed Maeve into an "unlocked

secured restroom at Centennial" and refused to comply with Maeve's request to leave. (*Id.* ¶ 23.)

When Maeve exited the restroom, the student "deliberately str[uck] [Maeve's] shoulder with [his

own] shoulder[.]" (*Id.*) Maeve believed that the student "committed an assault and battery" and

reported the incident to a campus security officer, Tarren Sewell ("Sewell"). (*Id.* ¶¶ 9, 23.) Not

long thereafter, a staff member and student informed Maeve that another male student had

created a "false account" on Instagram, which impersonated Maeve, uploaded photos of Maeve

---

[3] Except where otherwise noted, the Court refers to the high school and defendant school
district interchangeably as "Centennial."

and R.A., and "invit[ed] commenters to react negatively to [Maeve's] gender-nonconforming outfit." (*Id.* ¶ 27.) Maeve reported the Instagram account and bathroom incident to the police. (*Id.* ¶¶ 10, 28.)

Also in October 2021, Maeve informed Centennial's human resources department that she and her partner were expecting the birth of their child in early December 2021, and she wanted to take parental leave "start[ing] the Monday after Spring Break." (*Id.* ¶ 25; *see also id.* ¶ 29, describing a later email about "starting parent leave in February and March 2022"). Maeve also planned to use accrued paid leave to "take time off from work immediately after the birth[.]" (*Id.* ¶ 29.)

In January 2022, Maeve "announced to each of her classes that she was officially using 'Mx.' as her honorific and 'they' and 'them' pronouns exclusively." (*Id.* ¶ 30.) Maeve "also began informing staff members of the[se] changes." (*Id.*) Around this time, one of a group of male students walking through the hallway "shouted at [Maeve] the derogatory and homophobic slur 'faggot!'" (*Id.* ¶ 31.) Maeve reported the student's abuse and bias to a campus security officer, Grant Preuitt, who reviewed surveillance footage and identified the student in question. (*Id.*)

In April 2022, after follow-up emails regarding Maeve's parental leave request and whether Centennial received leave paperwork, Centennial approved Maeve's request and designated it as FMLA leave beginning on April 18, 2022, and ending on May 16, 2022. (*Id.* ¶¶ 29, 34-35.) A few days later, Laura Scully ("Scully"), an assistant principal and Maeve's direct "supervisor and evaluator," arranged a same-day, fact-finding meeting with Maeve regarding Maeve's "attendance and punctuality, which could lead to disciplinary action." (*Id.*

¶¶ 9, 21, 50; *see also id.* ¶ 53, referring to the 2021-2022 school year as Maeve's "Probationary 2 Cycle").

During this meeting, Maeve explained to Scully that she suffered from "challenges to her attendance," namely, her "gender transition, difficulties in coordinating childcare, the harassment [she] had experienced at school, and her mental health disability." (*Id.* ¶ 36.) Maeve asked Scully to excuse her absence for these reasons and as a disability accommodation. (*Id.*) When Maeve attempted to correct Scully's repeated misgendering of Maeve, Scully "abruptly ended" the meeting before completing her fact-finding and addressing Maeve's accommodation request. (*Id.*)

The next day, Scully arranged for a follow-up meeting with Maeve regarding her punctuality and attendance and directed Maeve to "leave behind her work computer before starting FMLA leave." (*Id.* ¶ 37.) Also present were Zachary Ramberg, an assistant principal, and Rowena Poirier ("Poirier"), a long-time district employee who served as a witness. (*Id.* ¶¶ 37, 114.) Scully apologized for misgendering Maeve and Maeve reiterated her attendance-related challenges, such as "harassment at school, her mental health disability, and her childcare concerns." (*Id.* ¶ 37.) Scully provided Maeve with a Letter of Expectation addressing Maeve's "arrival time, absence reporting, and meeting participation," and offered to "formally put th[e] process in place" to provide Maeve with the "opportunity to use flex time to cover tardiness and attendance" challenges, which Maeve accepted and believed was a "disability accommodation." (*Id.*)

The next week, on her first day of FMLA leave, Maeve received a call and follow-up email from Metropolitan Family Service's ("MFS") chief human resources officer, Susan Posner ("Posner"), regarding Maeve's temporary, part-time work as a Gender and Sexuality Alliance

("GSA") advisor and activity leader for MFS and Centennial's Schools Uniting Neighborhoods ("SUN") program.[4] (*Id.* ¶¶ 11, 26, 38-39.) Posner advised that Maeve's role was not eligible for leave, remote participation was insufficient, and Maeve needed to resign but could re-apply when she returned to work. (*Id.* ¶¶ 38-39.) During their call, Maeve informed Posner that she wanted to "formally complain" about the SUN program's site supervisor, Roache, who had "an overbearing nature," attempted to speak with Maeve by "follow[ing] her through the halls," interrupted Maeve's instructional time, "consistently misgendered" Maeve, and misgendered another teacher, Aidan Muth ("Mx. Muth"), and students attending GSA meetings. (*Id.* ¶¶ 38, 65, 125.)

While Maeve was away on FMLA leave, Roache advised "other teachers" at Centennial that if Maeve attempted to attend a GSA meeting, the teachers needed to "infom[] [Roache] right away." (*Id.* ¶ 40.) Upon returning from leave in mid-May 2022, Maeve set up a "joint meeting" with Roache and two teachers and "advisors," Mx. Muth and Jade Robinson. (*Id.* ¶¶ 41, 59.) At the meeting, Roache explained that Maeve could attend GSA meetings if she never worked for MFS but "former employees of MFS were not allowed to attended SUN [program] activities." (*Id.* ¶ 41.)

Maeve reported MFS's alleged discrimination to Scott-Aquirre and requested a "facilitated mediation." (*Id.* ¶ 42.) Scott-Aquirre said that Maeve should consider using more FMLA leave and signed a form approving Maeve's use of such leave, because she did "not want [Maeve] to participate (in the GSA) until there ha[d] been a facilitated meeting between [Maeve]

---

[4] MFS is a partner or subcontractor of Centennial that has "employees embedded" at Centennial because of MFS's and Centennial's collaboration on the SUN program, which "extends the school day and turns schools into community centers." (Am. Comp. ¶ 11.) At all relevant times, Posner served in the above described capacity, Desiree Gutierrez ("Gutierrez") served as MFS's regional program manager, and Damein Roache ("Roache") served as the SUN site supervisor. (*Id.*)

and [Roache] . . . [and did not] anticipate being able to get that done before next school year."
(*Id.* ¶¶ 42, 44-45.)

Maeve went out on leave again in early June 2022. (*Id.* ¶¶ 43, 45-48.) That same month,
and while Maeve was away on leave, Scott-Aquirre retired from her role as Centennial's
principal and Scully emailed Maeve about calls that she was receiving from students and parents,
who expressed feelings of "anxiety [that was] complicated by [Maeve's] absence and [an]
inability to talk with [Maeve] about how to improve . . . grades before the semester ends." (*Id.*
¶¶ 49-50.)

On July 1, 2022, Marin Miller ("Miller") began serving as Centennial's new principal.
(*Id.* ¶¶ 13, 50.) Miller also replaced Scully as Maeve's direct "supervisor and evaluator." (*Id.*
¶ 50.)

In mid- and late-August 2022, Maeve informed Centennial's human resources
department that she planned on returning that fall and intended to "work[] the entirety" of the
2022-23 school year, and submitted a signed return-to-work authorization from her therapist. (*Id.*
¶¶ 51-52.) Also in late August 2022, Scully sent an email to Miller and Centennial's human
resources department and assistant superintendent, in which Scully stated that she was "[u]nable
to complete" Maeve's "second-year probationary evaluation cycle" because of her "intermittent
absences and two successive leaves that ran through the end of the 2021-22 school year." (*Id.*
¶ 53.) Scully added that she completed a "Summative Evaluation form to the best of her ability
'given the circumstances' and . . . recommend[ed] that [Maeve] 'repeat the Probationary 2
Cycle[.]'" (*Id.*)

In mid-September 2022, near the beginning of the 2022-23 school year, Maeve copied
Miller and Roache on an email to Centennial's dean of students about her exclusion from GSA

meetings. (*Id.* ¶ 55.) Miller visited Maeve's classroom that same day to discuss the email and Maeve reported that her exclusion was the result of Roache's gender bias and discriminatory treatment, and GSA should be a "regular school club," not "under the SUN school umbrella." (*Id.*) Maeve also expressed her concerns that SUN requirements violated the Equal Access Act ("EAA").[5] (*Id.*)

The next day, Miller and an assistant principal met with Maeve, Roache, and MFS's regional program manager, Gutierrez. (*Id.* ¶¶ 11, 56.) Maeve reported that she had sought resolution of her GSA exclusion since May 2022 (i.e., her discussions with Scott-Aquirre) and that Roache had sent an email to Scott-Aquirre, in which he made an unspecified "false claim" about Maeve. (*Id.* ¶ 56; *see also id.* ¶ 66, noting that Maeve later stated that her exclusion was the "result" of unspecified "hearsay," which was "completely false"). After Gutierrez stated that Maeve was "welcome to apply as a volunteer but not as an employee," Miller determined that Maeve could not attend any GSA meetings until MFS received and finalized its processing of Maeve's "volunteer forms" and granted Maeve permission to attend the meetings. (*Id.*)

Shortly thereafter, Maeve learned that on the day of her meeting with Miller, Roache, and Gutierrez, Roache allowed a "cisgender male" teacher to attend a GSA meeting without submitting any volunteer paperwork. (*Id.* ¶ 58.) Maeve does not allege that this cisgender male teacher ever worked as a GSA advisor. (*See id.*) By comparison, Maeve alleges that "Mx. Muth,"

---

[5] "The EAA prohibits public secondary schools that receive federal funds and provide a 'limited open forum' from 'deny[ing] equal access or a fair opportunity to, or discriminat[ing] against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 702 (9th Cir. 2023) (Forrest, J., dissenting) (quoting 20 U.S.C. § 4071(a)). Thus, "a school subject to the EAA is *categorically* prohibited from discriminating based on the content of a group's speech, regardless of whether the school's policy or regulation is reasonable." *Id.* (citing 20 U.S.C. § 4071(a)).

a teacher who Roache also misgendered, advised Miller that during the 2021-22 school year and "*before* Mx. Muth became an advisor," Mx. Muth frequently attended GSA meetings "without ever having to submit a volunteer form or having Mx. Muth's presence questioned[.]" (*Id.* ¶¶ 38, 125) (emphasis added).

Maeve submitted her GSA volunteer paperwork the day after speaking with Miller and engaging in a post-meeting, one-on-one discussion with Roache, who approached Maeve and suggested that Gutierrez's "email approving her attendance" was a formality and thus Maeve could attend meetings immediately after submitting her paperwork and without waiting on Gutierrez's email. (*Id.* ¶¶ 57-59.) When Maeve attempted to attend a GSA meeting, however, Roache, who continued to misgender Maeve and failed to use Maeve's correct pronouns, informed Maeve that she was unable to attend because the paperwork that she submitted was incomplete and she needed to fill out a "missing page." (*Id.* ¶ 59.) Maeve responded that she "made a mistake by overlooking the page" but also repeated her concerns about SUN's EEA compliance and "requirement that advisors and students sign a photo and voice recording release form because involvement in GSA could be a privacy concern for students who had not come out."[6] (*Id.*)

In the days that followed, Maeve completed and delivered the missing page from her volunteer paperwork, Gutierrez visited Maeve's classroom and advised Maeve that she could not participate in GSA until she attended a meeting with Gutierrez and MFS "officially processed" her paperwork, and Miller asked to meet with Maeve regarding her involvement with the GSA. (*Id.* ¶¶ 60-62.) Maeve also emailed Centennial's Title IX coordinator and director of student services, Denise Wright ("Wright"), reporting and asking to meet with Wright about (1) her

---

[6] Maeve's allegations suggests that the "missing page" may have been a signature page authorizing such a release.

"concerns at school, including discrimination and harassment [involving] SUN and the GSA,"
(2) various "bias incidents [that she] had experienced," (3) her "concerns with [Centennial's]
administration's response to [past] reports," (4) the "problems" she had with Centennial's human
resources department "declining [her] request for parental leave," (5) MFS's "retaliat[ion]
against her," and (6) Roache's continued misgendering and use of incorrect pronouns. (*Id.* ¶¶ 35,
62.)

On September 20, 2022, before receiving notice that MFS had officially processed her
volunteer paperwork or meeting with Gutierrez, Miller, or Wright, Maeve asked Roache if she
could attend the GSA's after-school meeting that day and listen to the speaker. (*Id.* ¶¶ 61-63.)
Roache responded that Maeve could not attend the meeting, cited Maeve's failure to "follow the
rules" and "privacy concerns," and "repeatedly directed" Maeve to call Gutierrez, which Maeve
did. (*Id.* ¶ 63.) During their call, Gutierrez confirmed that Maeve was unable to attend GSA for
these reasons and added but did not explain why Maeve presented a "safety concern." (*Id.*)
Maeve emailed Wright the next day, summarizing and complaining about these events. (*Id.*
¶ 64.)

After the end of the school day on September 22, 2022, Maeve was walking toward the
parking lot with an educational assistant and speaking about how MFS had previously lost the
assistant's volunteer paperwork and Roache still allowed her to attend a GSA meeting as a
mentor because he "felt bad for her." (*Id.* ¶ 65.) Maeve and the assistant encountered and began
talking with Mx. Muth in the hallway. (*Id.*) Roache proceeded to interrupt the group's
conversation, asked to speak with Maeve, and "reprimanded [Maeve] for chatting in the hallway
and 'not supervising the students.'" (*Id.*) Gutierrez arrived shortly thereafter and joined Roache
in accusing Maeve of "interfering with [the] SUN meeting and pulling [Mx.] Muth away from

their [GSA] duties," and reminding Maeve that she was "not allowed in the GSA room." (*Id.*) Maeve explained that she was heading to her car because she needed to pick up her son from daycare and she did not "enter[] the classroom where the GSA meeting was occurring" or attempting to do so. (*Id.*) Gutierrez responded that she found Maeve's "repeated requests and attempts" to attend GSA "concerning" and Gutierrez "needed to 'ensure the safety of the students.'" (*Id.*) Gutierrez's and Maeve's back-and-forth argument continued until Roache "shouted, 'Security! [Sewell]!'" (*Id.*)

Sewell, a security officer standing down the hallway, approached and complied with Roache's request to "radio" Miller. (*Id.*) As Roache, Gutierrez, and Maeve argued about whether Maeve was allowed to be in the area or "escalating things" and Gutierrez's need to "ensure the safety of [GSA] students," Miller arrived and "directed [Maeve] outside the building with him," where Maeve explained what occurred and how Roache and Gutierrez were "causing conflict." (*Id.*) Miller asked Maeve to "write an incident report and send it to him" before walking back inside. (*Id.*)

The next day, September 23, 2022, Miller emailed Maeve about arranging a meeting to discuss Roache's and Gutierrez's complaints about Maeve, including a "formal complaint" that Roache filed regarding the September 22, 2022 incident with Maeve. (*Id.* ¶¶ 66, 68.) Maeve responded that she would address Roache's and Gutierrez's concerns and "bring up some of [her] own, including retaliatory behaviors [that] began after [she] resigned from MFS last school year and ha[d] increased in frequency and severity leading up to yesterday's conversation." (*Id.* ¶ 66.) Maeve added that she tried on "multiple occasions to arrange mediation to resolve these problems, which, again, [we]re the result of hearsay and . . . completely false." (*Id.*; *cf. id.* ¶ 56,

alleging that Miller received notice of Roache's "false claim" to Scott-Acquire on September 13, 2022).

On September 25, 2022, the day before meeting with Miller, Maeve received an email and letter attachment from MFS's chief human resource officer, Posner. (*Id.* ¶¶ 11, 67-68.) In her email and letter, Posner explained that MFS rejected Maeve's volunteer application because Maeve violated MFS's code of ethics on September 22, 2022, "falsely claimed" that Maeve "shook her fist and swore" at Roache and Gutierrez, and stated that GSA's "entire purpose" is to "promote a welcoming and safe environment for LGBTQIA2S+ students" and Maeve's actions demonstrated that MFS was unable to "entrust [Maeve] with creating such an environment." (*Id.* ¶ 67.)

Maeve forwarded and spoke with Miller about Posner's email and letter during their meeting on September 26, 2022. (*Id.* ¶ 68.) Miller stated that he received the email and read Posner's letter, and his "primary concern" was "whether or not the person [at issue was] good for kids." (*Id.*) Miller also asked Maeve to sign a form acknowledging that she received a copy of the formal complaint that Roache filed after the September 22, 2022 incident, and explained that he would be investigating the incident and wanted to meet with Maeve again on September 29, 2022. (*Id.*)

Two days later, on September 28, 2022, Maeve met with Wright to discuss the issues that Maeve raised in her September 20 and September 21, 2022 emails and report. (*Id.* ¶¶ 62, 64, 69.) At the meeting, Maeve reported for the first time that "Miller was also retaliating against her." (*Id.* ¶ 69.)

Maeve presented for her follow-up meeting with Miller on September 29, 2022. (*Id.* ¶ 69.) During this meeting, Maeve reported "gender and sex bias incidents and crimes [that] she

had experienced [during] the previous school year, including a student stealing her identity [and creating] a false Instagram account, the homophobic slur [a student] shouted at her . . . , and the assault on her in the bathroom at school." (*See id.* ¶ 70, alleging that Maeve "again made [these] reports"; *but cf. id.* ¶¶ 50-69, addressing the period on and after Miller became principal on July 1, 2022, and reflecting that Maeve does not allege that she previously reported such incidents to Miller).

Miller was "silent," did not "sympathize with [Maeve]," or "validate or deny [Maeve's] reports" but he did take notes and notify Maeve shortly thereafter that Centennial "hired a private investigator to investigate the issues [that she] had raised regarding bias incidents at the school." (*Id.* ¶¶ 70-71.) Similar to September 22, 2022, Miller advised Maeve that she "could file a formal written complaint against any [d]istrict employees involved in those incidents. (*Id.* ¶¶ 70-71.) Miller also addressed his "goals for this investigation" with the president of the Centennial Education Association ("CEA"), who emailed Maeve and relayed that Miller was "concerned that Title IX violations were being committed at school both against students and [Maeve]." (*Id.* ¶ 78.)

On October 5, 2022, Miller completed his investigation regarding Roache's formal complaint and the September 22, 2022 incident. (*Id.* ¶ 73.) Miller provided Maeve with a Letter of Expectation, in which he rejected Roache's claim that Maeve's behavior "constitute[d] harassment or bullying" and stated that he could not "fully substantiate the severity of the concern based on the evidence [that he obtained, but Maeve's] conduct can be considered unprofessional during the interaction." (*Id.*; *cf. id.* ¶ 125, noting that Miller interviewed Sewell, who stated that "all the adults involved in th[e] conversation were behaving unprofessionally").

Miller added that going forward, Maeve need to "stay clear of areas . . . where GSA was meeting." (*Id.* ¶ 73.)

On October 6, 2022, Maeve left work early because her son was ill. (*Id.* ¶ 75.) Maeve was unable to log into Centennial's absence management system (Frontline), and therefore asked a secretary to enter her absence. (*Id.*; *see also* ¶ 37, noting that Scully's April 15, 2022 Letter of Expectation addressed Maeve's "arrival time, absence reporting, and meeting participation"). On October 13, 2022, Miller scheduled a time to meet with Maeve and advised that Maeve was "welcome to bring a union representative, indicating [that] he contemplated disciplining [her]." (*Id.* ¶ 76.) During their meeting a few days later, Miller "criticized" Maeve's punctuality and attendance, and Maeve spoke about "her childcare issues, her need to miss work for her child's illnesses, her disabilities, and how her disabilities contributed to her arrival times to work."[7] (*Id.* ¶ 78.)

On October 14 and 18, 2022, Miller—who replaced Scully as Maeve's direct supervisor and evaluator before the 2022-23 school year and Maeve's "repeat . . . Probationary 2 Cycle"—made brief, unannounced visits to Maeve's classroom to conduct "mini observation[s]." (*Id.* ¶¶ 50, 53, 77, 82.) On October 19, 2022, Miller met with and placed Maeve on administrative leave based in part on his mini observations. (*Id.* ¶ 83.) During their meeting, Miller and Maeve also addressed issues related to Maeve's arrival times at work, which prompted Maeve to "reiterate[] to . . . Miller that her childcare issues and disabilities were contributing factors to her arrival times at work." (*Id.*; *see also id.* ¶¶ 89-91, alleging that Miller investigated his "concerns" while Maeve was on leave and Miller and Maeve continued to discuss leave-related issues

---

[7] Maeve alleges disability based on "one or more long-term and lifetime mental health disabilities that substantially limit or impair one or more of her major life activities." (Am. Compl. ¶ 12.)

involving Maeve's "punctuality and attendance at scheduled work meetings," as well as Miller's mini observations).

After completing his investigation on October 27, 2022, Miller met with Maeve and Deena Currie, a guidance counselor and CEA's vice president and building representative, on October 31, 2022. (*Id.* ¶¶ 83, 90.) Miller explained, among other things, that he was "going to fire" Maeve after his October 18, 2022 mini observation but was giving Maeve a "chance to improve" and wanted Maeve to "do restorative work with her classes" because he did not believe Maeve had created a "culture of trust." (*Id.* ¶ 90.) Miller also provided Maeve with (1) a Letter of Reprimand dated October 28, 2022, which addressed Maeve's "punctuality and attendance at scheduled work meetings, falsely alleging that [she] had been late to her [first period class] on multiple occasions," (2) a Letter of Direction dated October 28, 2022, which addressed Miller's mini observations and included "significant inaccuracies" regarding Maeve's usage of approved curriculum, feedback to students, and "time spent grading papers versus providing instruction," and (3) a Letter of Reprimand dated October 28, 2022, which addressed Miller's mini observations and included "significant inaccuracies" and a "false[] claim[]" about a "common behavior[]" for which Centennial's "other teachers [we]re not disciplined." (*Id.* ¶ 90; *see also id.*¶¶ 77, 82, 125, addressing certain underlying events and confirming the October 28, 2022 letter dates).

Also on October 31, 2022, Miller provided "minute-to-minute details" of his observations when he submitted "Task: Mini-Observations and Feedback Collection Tool (Fully Revised Rubric)" on "TalentEd," a platform that Centennial's human resources department oversees and supervisors use for "observation notes and evaluations." (*Id.* ¶¶ 92-93, 120.) The minutes conflict

in unspecified ways with Miller's in-class notes, which Maeve received at a later date. (*Id.* ¶¶ 91, 93, 125.)

In early and mid-November 2022, Maeve missed a day of work and left work early one day because she and her son were ill, notified the information and technology ("IT") department that she could not access the intranet and received an error message (i.e., "Sorry, that username already exists!") when she attempted to log on, continued to participate in Centennial's ongoing investigation into her reported incidents of bias, and received notice from Miller that in the near future, he planned to conduct a mini observation and needed to set up a "first round of formal observations." (*Id.* ¶¶ 70-71, 96-102; *see also id.* ¶ 113, addressing Miller's formal observation of Mx. Muth).

On November 18, 2022, Miller conducted his third mini observation and provided "positive" feedback, and Maeve and Miller's assistant agreed to schedule a formal observation on December 16, 2022, and a pre-observation meeting on December 15, 2022.[8] (*Id.* ¶¶ 105, 112-13.)

///

---

[8] Maeve initially alleges only that when Miller's assistant emailed her about scheduling a time for Miller's formal observation and "required pre- and post-observation meetings," Maeve and Miller's assistant "settled on December 16, 2022, during period [three] for the observation" and "scheduled the pre-observation meeting during period [one]." (*Id.* ¶ 105.) After doing so, however, Maeve alleges that she sent an email confirming a pre-observation meeting with Miller at 11:45 a.m. on December 15, 2022. (*See id.* ¶¶ 112-13, alleging that (1) "[o]n December 15, 2022, at 11:37 a.m., just before the scheduled pre-observation meeting" with Miller "at 11:45 a.m.," Maeve "realized that she would not be able to meet with Miller . . . because she was still teaching," (2) "[o]n December 15, 2022, at 12:24 p.m.," Miller's assistant texted Maeve about missing her pre-observation meeting and asked if Maeve "could check in before [her formal] observation" the next day, (3) at 1:02 p.m., Maeve stated that her "pre-observation meeting[] was scheduled during [her] third period" (i.e., not first period) but she failed to "realize" that she would be teaching "when [she] confirmed it in the email," (4) at 1:12 p.m., Miller's assistant asked Maeve if she could "come by after school" because Miller was "open from 3-3:30 p.m.," and (5) nothing to indicate that Maeve responded before receiving a message from Miller at 9:27 p.m.).

On December 1, 2022, Maeve notified Miller that she would be fifteen minutes late because of "childcare issues." (*Id.* ¶ 108.) Miller responded that he wanted to meet with Maeve later that day to "discuss her arrival time for a staff meeting that had taken place [the previous day]." (*Id.*) With respect to any concerns about "punctuality and attendance," Maeve reiterated that "her childcare issues and . . . disabilities were contributing factors to her arrival times[.]" (*Id.*)

Miller conducted mini observations that same day and the next day, December 2, 2022. (*Id.* ¶ 109.)

On December 14, 2022, Maeve notified Miller that she would be fifteen minutes late "due to her son's daycare being closed." (*Id.* ¶ 111.) When she arrived at work, Maeve "entered the library where staff meetings [are] normally held and realized [that staff was] having a holiday-inspired potluck instead of a staff meeting." (*Id.*) The following morning, Maeve "experienced a panic attack due to her disability" and notified Miller that she would be fifteen minutes late. (*Id.* ¶ 112.)

On December 15, 2022, Maeve missed her pre-observation with Miller because of her scheduling oversight. (*See id.* ¶¶ 112-13.) Maeve does not allege that she responded specifically to Miller's assistant's question about whether Maeve would be able to "check in before [her formal] observation" the next day, or at all to Miller's assistant's question about whether Maeve was able to "come by after school" during Miller's "open[ing] from 3-3:30 [p.m.]" (*Id.* ¶¶ 105, 112-13.) At 9:27 p.m. on December 15, 2022, Miller emailed Maeve and canceled Maeve's formal observation because Maeve had "not filled out the pre-observation form." (*Id.* ¶ 113.) Maeve alleges that Miller attended and provided positive feedback to Mx. Muth during a formal observation, even though Mx. Muth had "not completed that form." (*Id.*) Maeve does not address

whether Mx. Muth attended a pre-observation meeting or submitted a partially completed form. (*See id.*)

On December 16, 2022, Maeve and Poirier attended an after-school meeting with Miller, who wanted Maeve to "double-check his notes" because he was "missing some times" after "pull[ing] the attendance," "match[ing] up" the time and date of Maeve's messages about being late, and "look[ing] at the cameras." (*Id.* ¶ 114.) After Miller "listed some days that he was missing," Maeve reviewed her phone and "corrected" Miller's "claim that [she] had not arrived at school until 8:02 a.m. one day" and explained that she suffered a panic attack after arriving at 7:45 a.m., "which made her later than she intended." (*Id.*) Miller "did not inquire more . . . [but] had heard [Maeve] explain that . . . [she occasionally] missed work meetings or arrived late to work meetings because of her disability." (*Id.*) When Poirier asked if Miller and Maeve had a flex-time arrangement like Maeve and Maeve's previous supervisor, Miller stated that the "directive" was that Maeve needed to be at work "every day at 7:30 [a.m.]" and that he was "collecting data," not denying Maeve a disability-related flex time accommodation "right now." (*Id.*).

On December 28, 2022, Maeve obtained a judgment changing her legal name and gender marker. (*Id.* ¶ 117.) The following day, Miller sent an "email letter" to Maeve in which he recommended Maeve's "immediate dismissal . . . from employment." (*Id.* ¶ 118.) Also on December 29, 2022, Maeve emailed Centennial's human resources department, seeking information on the "formal process for requesting workplace accommodations" under the ADA and having her name changed in Centennial's systems in accordance with the judgment that she obtained. (*Id.*)

///

On December 30, 2022, Centennial's director of human resources and assistant superintendent, Tasha Katsuda, Ph.D. ("Dr. Katsuda"), emailed Maeve a "Pre-Termination Hearing Notice." (*Id.* ¶¶ 35, 119.) Dr. Katsuda attached a "Summary of Concerns" that Miller sent to Maeve and "a formal notice" about a "pre-termination hearing" scheduled on January 5, 2023. (*Id.* ¶ 119.)

On January 1, 2023, Maeve emailed Centennial's IT department about the TalentEd platform. (*Id.* ¶ 120.) Maeve stated that she had "not been receiving emails or notifications from TalentEd" or "been able to access any notes that her evaluator . . . might have been posting," and her "TalentEd account might still be associated with her old email address," not the "new email alias" that she requested at the "start of the school year as part of her gender transition." (*Id.*) IT responded that there can be "issues with automated processes" whenever a "name change occurs" and asked Maeve to contact human resources, which "directly oversee[s]" TalentEd. (*Id.*)

On January 2, 2023, Maeve's therapist drafted a letter verifying Maeve's disability diagnosis and describing potential workplace accommodations, such as flex time, an option to attend staff meetings virtually, receiving materials in advance of staff meetings, and being able to "radio" for bathroom break classroom coverage because Maeve was uncomfortable using the restrooms near her class and preferred a secured staff restroom for "privacy and safety." (*Id.* ¶¶ 22, 121.)

On January 3, 2023, Maeve asked Dr. Katsuda for an update on the result of Centennial's Title IX investigation, if she was going to be able to review the findings before her hearing, and for a postponement if she could not do so. (*Id.* ¶ 122; *see also id.* ¶ 116, demonstrating that on December 22, 2022, Dr. Katsuda notified Maeve that Centennial's counsel received an

"investigative report," which it "would be review[ing] and sen[ding] to [her] sometime after winter break"). Around this time, Maeve learned that Centennial was planning to undertake a "three-day equity audit" based on "issues that [Maeve] brought to [Centennial's] attention." (*Id.* ¶ 124.)

On January 5, 2023, Maeve, Miller, Dr. Katsuda, and Centennial's superintendent, James Owens ("Owens"), attended a pre-dismissal hearing. (*Id.* ¶¶ 18-19, 124-25.) Maeve received several documents: (1) a Pre-Termination Hearing Agenda deadnaming Maeve, (2) Miller's Summary of Concerns and recommendation letter dated December 29, 2022, (3) Miller's Letter of Expectation dated October 5, 2022, and Miller's notes, surveillance footage, Maeve's and a former student's emails, and witnesses' statements that Miller collected when he investigated the September 22, 2022 incident, (4) Miller's Letters of Reprimand and Expectation dated October 28, 2022, and notes that Miller had not provided to Maeve, and (5) Scully's Letter of Expectation dated April 15, 2022. (*Id.* ¶ 125.) Maeve also submitted a "rebuttal letter" opposing Miller's recommendation. (*Id.*)

In a letter dated January 9, 2023, Owens notified Maeve that he "affirmed" Miller's recommendation to terminate Maeve's employment and based his decision on Maeve's "punctuality, failure to adhere to appropriate processes for absence reporting, lack of attendance at schedule[d] work meetings, unprofessional conduct, and insufficient instructional practice." (*Id.* ¶ 126.)

On May 16 and May 25, 2023, respectively, Maeve sent a tort claim notice to Centennial and filed a charge with the Oregon Bureau of Labor and Industries ("BOLI"). (*Id.* ¶¶ 4-5.) BOLI co-filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on July 17, 2023, and Maeve received a ninety-day right-to-sue notice from BOLI on May 31, 2024. (*Id.*)

On August 27, 2024, Maeve filed this action against Centennial, alleging claims for violations of Title VII, Title I of the ADA, the FMLA, and ORS chapters 653 and 659A. (Compl. at 1-54, ECF No. 1.)

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Thus, "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## DISCUSSION

Centennial advances three main arguments in support of its motion to dismiss. (*See* Def.'s Mots. Dismiss ("Def.'s Mot.") at 2-3, ECF No. 10.) First, Centennial argues that the Court should dismiss Maeve's fifth and sixth claims to the extent Maeve seeks compensatory damages, because such damages are not available to a plaintiff bringing retaliation claims under the ADA and Oregon Rehabilitation Act ("ORA"). (*Id.* at 2-3.) Second, Centennial argues that the Court should dismiss Maeve's first and second claims because she fails to state claims of discrimination and retaliation under Title VII. (*Id.* at 2.) Third, Centennial argues that to the extent that Maeve's third, eighth, ninth, and tenth claims are based on actions predating

November 17, 2022 (i.e., 180 days before her tort claim notice), Maeve's claims are untimely because she failed to comply with the Oregon Tort Claim Act's ("OTCA") mandatory notice provisions. (*Id.*)

## I.    AVAILABLE REMEDIES

The Court agrees with Centennial that compensatory damages are not available to a plaintiff like Maeve, who brings retaliation claims under the ADA and ORA. The Court therefore dismisses Maeve's fifth and sixth claims to the extent that she seeks to recover compensatory damages.

### A.    Applicable Law

#### 1.    Compensatory Damages Generally

Compensatory damages "serve 'to compensate for a proven injury or loss[,' and] . . . 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 871 (9th Cir. 2017) (first quoting Damages, *Black's Law Dictionary* (10th ed. 2014); and then quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)). Given that "'compensatory damages are measured by the harm the defendant has caused the plaintiff[,]' . . . their proper measure is that which will 'make good or replace the loss caused by the injury.'" *Id.* at 872 (first quoting *Phillip Morris USA v. Williams*, 549 U.S. 346, 358 (2007) (Stevens, J., dissenting); and then quoting *Berg v. First State Ins. Co.*, 915 F.2d 460, 465 (9th Cir. 1990)). Thus, the "purpose" of compensatory damages is "to return the plaintiff to the position he or she would have occupied had the harm not occurred." *Id.* (quoting *Schneider v. City of San Diego*, 285 F.3d 784, 795 (9th Cir. 2002)).

///

///

**2.    Evaluation of ADA and ORA Claims**

"Claims under the ORA are evaluated using the same legal standard as the federal ADA."

*Kelly v. Boeing Co.*, 848 F. App'x 692, 695 n.2 (9th Cir. 2021) (citing *Snead v. Metro. Prop. &*

*Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001)); *see also* OR. REV. STAT. § 659A.139(1)

(addressing construction of ORS §§ 659A.103-.144 and providing that these provisions "shall be

construed to the extent possible in a manner that is consistent with any similar provisions of the

federal [ADA]"). For this reason, courts address "ADA and ORA claims together." *Kelly*, 848 F.

App'x at 695 n.2; *see also Kimmons v. First Transit, Inc.*, No. 3:21-cv-00768-SB, 2023 WL

5836029, at *24 (D. Or. Sept. 8, 2023) (addressing "ADA and ORA discrimination claims

together" and noting that the parties did not dispute that it was appropriate to do so (citing *Kelly*,

848 F. App'x at 695 n.2)); *Hanson v. Or., Legislative Assembly*, No. 3:21-cv-780-SI, 2023 WL

22196, at *12-13 (D. Or. Jan. 3, 2023) (evaluating the plaintiff's "retaliation claims under the

ADA and Oregon law" together and dismissing the claims sua sponte based on federal ADA

precedent).

**3.    Precedential and Persuasive Authorities**

As Centennial notes (*see* Def.'s Mot. at 8), the Court recently addressed whether a former

employee could seek compensatory damages under an ADA retaliation claim. *See Kimmons*,

2023 WL 5836029, at *30-32. Relying on an intradistrict decision and circuit precedent, the

Court held that compensatory damages were not available for ADA retaliation claims and

dismissed sua sponte the plaintiff's ADA retaliation claim to the extent he sought such damages.

*Id.*

In so holding, the Court found instructive the district court's recent decision in *Hanson*.

*See Kimmons*, 2023 WL 5836029, at *30. In *Hanson*, the plaintiff filed a retaliation claim against

her former employer under the ADA and state law. 2023 WL 22196, at *1, *12. In declining to

reach the merits of the employer's summary judgment motion, the district court explained that

the plaintiff's retaliation claims were subject to sua sponte dismissal because she only requested

compensatory damages and circuit precedent demonstrated that compensatory damages were not

available:

> The [c]ourt need not reach the merits of the Legislature's motion against Hanson's retaliation claims. Hanson brings her ADA claim under Title I. In *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261 (9th Cir. 2009), the Ninth Circuit analyzed retaliation claims against an employer under Title I, with the remedies available under 42 U.S.C. § 12117 (the remedy clause for Title I). The Ninth Circuit held that Title I ADA retaliation claims "are redressable only by equitable relief" and thus that "no jury trial is available." *Id.* at 1269-70. The Supreme Court has addressed claims under Title II of the ADA (and its remedy clause, 42 U.S.C. § 12133), concluding that although money damages are available under those provisions, punitive damages are not. *Barnes v. Gorman*, 536 U.S. 181, 185, 188 (2002). The Ninth Circuit, however, has held that "Congress did not intend for Title II to apply to employment" because "[o]btaining or retaining a job is not the receipt of services, nor is employment a program or activity provided by a public entity." *Zimmerman v. Or. Dep't of Just.*, 170 F.3d 1169, 1176 (9th Cir. 1999) (cleaned up). Thus, Hanson's retaliation claim is governed by *Alvarado*, and she may not seek money damages and is not entitled to a jury trial for this claim.
>
> Hanson requests only compensatory money damages as relief for her retaliation claims under the ADA and Oregon law. This relief is unavailable to *Hanson* under Ninth Circuit precedent. Although neither party raised this issue, a court may dismiss claims sua sponte for failure to state a claim under Rule 12(b)(6) . . . . *See Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987). The [c]ourt dismisses Hanson's ADA retaliation claims because she seeks only money damages.

*Id.* at *12-13 (footnote omitted). In a footnote, the district court added that "a plaintiff also must

have standing to assert any appropriate equitable relief," and that this circuit has "reject[ed] that

a former employee ha[s] standing to seek equitable relief such as requiring anti-discriminatory

policies." *Id.* at *12 n.7 (citing *Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1036-37 (9th

Cir. 2006)).

In *Kimmons*, the Court explained that similar to the situation presented in *Hanson*, the

plaintiff was a former employee who asserted an ADA retaliation claim under Title I, and sought

compensatory money damages, as well as equitable relief. 2023 WL 5836029, at *31. Consistent

with the district court's opinion in *Hanson* and the circuit precedent cited and discussed therein,

and to the extent the plaintiff sought compensatory damages, the Court dismissed the plaintiff's

ADA retaliation claim sua sponte for failure to state a claim. *Id.*; *see also Alvarado*, 588 F.3d at

1262-63, 1270 (addressing a former employee's retaliation claim under Title I of the ADA and

holding that "ADA retaliation claims are redressable only by equitable relief, [and] no jury trial

is available"). The Court, however, also held that the plaintiff had standing to seek reinstatement

under Title I:

> To the extent Kimmons seeks equitable relief, however, it appears that
> Kimmons, a former employee who seeks reinstatement (*see* Compl. ¶ 81), has
> standing to pursue a retaliation claim under Title I of the ADA. *See Walsh*, 471
> F.3d at 1037 ("There is no indication in the complaint that Walsh has any interest
> in returning to work for the State or the [State] Department. . . . . Some case law
> in this circuit indicates that a non-employee may have standing to sue for
> injunctive relief against an employer, but those non-employees were in the
> process of seeking reinstatement to their former positions, or seeking work from
> that employer. Walsh, therefore, lacked standing to sue for injunctive relief from
> which she would not likely benefit.") (citations omitted); *see also Alvarado*, 588
> F.3d at 1264, 1270 (holding that Title I ADA retaliation claims are "limited to the
> equitable relief specified in 42 U.S.C. § 2000e-5(g)(1)," i.e., a Title VII statute
> that the ADA's anti-retaliation provision indirectly references and that allows "the
> court [to] enjoin . . . [an] unlawful employment practice, and order such
> affirmative action as may be appropriate, which may include, but is not limited to,
> reinstatement . . . with or without back pay . . . , or any other equitable relief as
> the court deems appropriate") (citation omitted).

*Id.*

## B.    Analysis

### 1.    Compensatory Damages

To the extent Maeve seeks to recover compensatory damages under her ADA and ORA

retaliation claims, the foregoing authorities support the Court's dismissal of Maeve's claims.

Like *Hanson* and *Kimmons*, Maeve is a former employee who asserts retaliation claims

under Title I of the ADA and state law. (*See* Compl. ¶¶ 170-71, 173, seeking "equitable relief,

including, but not limited to, a finding that [Centennial] violated the ADA," "economic damages for past and future wages, past and future benefits, and other expenses," and post-judgment interest on, among other things, "all damages"; *see also id.* ¶¶ 178-182, reflecting that Maeve bases her ORA claim in part on a retaliation theory and seeks the same damages and equitable relief). Maeve "recognizes Ninth Circuit precedent concerning money damages for retaliation claims under Title I" but adds that she also seeks equitable relief in the form of "a finding that [Centennial] violated the ADA." (Pl.'s Resp. Def.'s Mot. Dismiss ("Pl.'s Resp.") at 6, ECF No. 13.)

As discussed, "[c]laims under the ORA are evaluated using the same legal standard as the federal ADA." *Kelly*, 848 F. App'x at 695 n.2 (citing *Snead*, 237 F.3d at 1087); *see also* OR. REV. STAT. § 659A.139(1) (stating that ORS §§ 659A.103-.144 "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal [ADA]"); *see also Kimmons*, 2023 WL 5836029, at *24 (addressing "ADA and ORA discrimination claims together" (citing *Kelly*, 848 F. App'x at 695 n.2)). Consequently, federal ADA precent on compensatory damages applies equally to a retaliation claim under the ORA. *See Hanson*, 2023 WL 22196, at *13 (noting that the plaintiff requested "only compensatory money damages as relief for her retaliation claims under the ADA and Oregon law" and that "[t]his relief [was] unavailable to [the plaintiff] under Ninth Circuit precedent," and thus dismissing the plaintiff's "ADA retaliation *claims*" sua sponte) (emphasis added).

Considering the authorities described above and Maeve's recognition of circuit "precedent concerning money damages for retaliation claims under Title I" (Pl.'s Resp. at 6), the Court finds that to the extent that Maeve seeks compensatory damages, the Court must dismiss Maeve's retaliation claims. *See Alvarado*, 588 F.3d at 1264-65, 1269-70 (explaining that "42

U.S.C. § 1981a expanded the remedies available pursuant to 42 U.S.C. § 2000e-5 by providing for punitive and compensatory damages for specified disability claims" and that "[n]oticeably absent [from § 1981a] is any reference to 42 U.S.C. § 12203, the ADA retaliation provision," and holding that § 1981a's "plain and unambiguous provisions . . . limit the availability of compensatory and punitive damages to those specific ADA claims listed" and that "ADA retaliation is not on the list"). Accordingly, the Court grants Centennial's motion to dismiss on this ground.

### 2.    Declaratory Relief

The remaining issue to address is Maeve's suggestion that her ADA and ORA retaliation claims may proceed to the extent she seeks "equitable relief" in the form of "a finding that [Centennial] violated the ADA." (Pl.'s Resp. at 6, quoting Compl. ¶ 170.) Centennial responds that this is "not the type of equitable relief available to [Maeve] for these claims." (Def.'s Reply Supp. Mots. Dismiss ("Def.'s Reply") at 5, ECF No. 15, citing *Kimmons*, 2023 WL 5836029, at *30-31.)

The Ninth Circuit has recognized that ADA retaliation claims are "limited to the equitable relief specified in 42 U.S.C. § 2000e-5(g)(1)," a Title VII statute that the ADA's anti-retaliation provision indirectly references. *Kimmons*, 2023 WL 5836029, at *31 (quoting *Alvarado*, 588 F.3d at 1264, 1270). Section 2000e-5(g) provides that if a court finds that the defendant "intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint," the court "may enjoin the [defendant] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1).

Given Maeve's recognition of circuit precedent limiting her to the equitable relief specified in § 2000e-5(g)(1), *Alvarado*, 588 F.3d at 1270, the Court construes Maeve's disputed request for "equitable relief"—i.e., "a finding that [Centennial] violated the ADA" (Pl.'s Resp. at 6, quoting Compl. ¶ 170)—as requesting the Court's declaration that Centennial violated the ADA's anti-retaliation provision. *See generally Bayer*, 861 F.3d at 873 (explaining that "§ 2000e-5(g)(1) expressly grants courts discretion to award whatever equitable relief they deem appropriate"); *Alvarado*, 588 F.3d at 1270 (holding that plaintiffs' "ADA retaliation claims are redressable only by equitable relief, [and] no jury trial is available," and noting that "[t]he Seventh Amendment preserves the right to trial by jury of all legal claims, whereas no right to a jury exists for equitable claims" (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001))).

The Ninth Circuit has addressed a comparable request for declaratory relief in an ADA case. *See Bayer*, 861 F.3d at 867-68. In *Bayer*, the Ninth Circuit "consider[ed] the question of what remedies were available" to a plaintiff who alleged that his former employer violated § 12203(b) of the ADA, *id.* at 859, 863, the subsection after the ADA's anti-retaliation provision. *See Alvarado*, 588 F.3d at 1264 (addressing "the ADA, 42 U.S.C. § 12203(a), the anti-retaliation provision"). Section 12203(c) provides that the same "remedies and procedures" are "available to aggrieved persons for violations of subsections (a) and (b)[.]" 42 U.S.C. § 12203(c). In light of this framework, the plaintiff in *Bayer* "concede[d]" that the Ninth Circuit's decision in *Alvarado* "constrain[ed] the remedies available to him to equitable remedies," and argued only that "the district court had discretion to award him any one of several forms of effective equitable relief." 861 F.3d at 863.

///

Before turning to the remedies that the plaintiff claimed the district court had the authority to award him, the Ninth Circuit noted that "[i]n determining whether a requested remedy constitutes equitable relief, [courts] look to the substance or character of the remedy sought, not the label placed upon it." *Id.* at 863-64 (citing *Reynolds Metals Co. v. Ellis*, 202 F.3d 1246, 1248 (9th Cir. 2000)). The Ninth Circuit then turned to the forms of relief that the plaintiff raised on appeal, including the request in his complaint for "a declaration that [the defendant] violated § 12203(b) by insisting that he choose between his job and the exercise of his ADA rights." *Id.* at 867.

With respect to this request for relief, the plaintiff argued that "the district court erred in concluding it lacked the power to issue such relief," and the defendant "counter[ed] that the district court was powerless to issue a declaration that it violated § 12203(b), as under the circumstances of th[e] case a declaration to that effect could in no way affect the relationship between the parties and would have been merely advisory." *Id.* The Ninth Circuit observed that "[a] particular declaratory judgment draws its equitable or legal substance from the nature of the underlying controversy[,]' . . . [and] [a]ssum[ed] without deciding that the declaratory relief [that the plaintiff] sought was truly equitable in nature[.]" *Id.* The Ninth Circuit concluded that the plaintiff's "claim for declaratory relief [was] nonetheless moot." *Id.* In so concluding, the Ninth Circuit explained that (1) "a declaratory judgment merely adjudicating past violations of federal law—as opposed to continuing or future violations of federal law—is not an appropriate exercise of federal jurisdiction," and (2) "[t]he 'value of the judicial pronouncement—what makes it a proper judicial resolution of a case or controversy rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*.'" *Id.* at 868 (first citing *Green v. Mansour*, 474 U.S. 64, 74 (1985); and then quoting *Hewitt v. Helms*,

482 U.S. 755, 761 (1987)). To that end, the Ninth Circuit noted that the plaintiff "provided no basis upon which to conclude declaratory relief might affect [the defendant's] behavior towards him," the parties had "no relationship beyond th[at] litigation," there was "no evidence to suggest [that the plaintiff] can reasonably be expected to work for or bring suit against [the defendant] in the future," and the plaintiff "produced no evidence to show the conduct complained of in th[e] action presently affect[ed] him or can reasonably be expected to affect him in the future." *Id.* For all of these reasons, the Ninth Circuit held that the plaintiff's "claim for declaratory relief [was] moot." *Id.*

*Bayer* controls here. To be sure, the "declaratory relief" that the former employee sought in *Bayer* was "a declaration that [his former employer] violated § 12203(b) by insisting that he choose between his job and the exercise of his ADA rights." 861 F.3d at 865. Maeve similarly seeks this Court's "finding" or declaration that her former employer, Centennial, "violated the ADA." (Pl.'s Resp. at 6, quoting Compl. ¶ 170; *see also* Compl. ¶¶ 7, 72); *cf. Alvarado,* 588 F.3d at 1270 (holding that "ADA retaliation claims are redressable only by equitable relief, [and] no jury trial is available," as "[t]he Seventh Amendment preserves the right to trial by jury of all legal claims, whereas no right to a jury exists for equitable claims" (quoting *Danjaq LLC,* 263 F.3d at 962)).

Like *Bayer,* there appears to be no meaningful dispute that "the circumstances prevailing since [Maeve] filed this action have forestalled any occasion to award [her the] declaratory relief [at issue]." 861 F.3d at 868. Maeve presents no allegations or arguments from which the Court could infer that its "finding" or declaration that Centennial previously violated the ADA's anti-retaliation provision might affect Centennial's behavior toward Maeve or impact the parties' relationship beyond this litigation, that Maeve has any reasonable expectation of working for

Centennial in the future, or that there is a reasonable expectation that Centennial's challenged conduct—i.e., retaliating against Maeve for pursuing her rights under the ADA and making related reports—will affect her in the future. (*See* Pl.'s Resp. at 6, noting only that Maeve seeks this form of relief).

For all of these reasons, the Court finds that Maeve's challenged request for declaratory relief is moot.[9]

## II.     TITLE VII

Centennial argues that the Court should dismiss Maeve's first and second claims because she fails to state plausible claims of discrimination or retaliation under Title VII. (Def.'s Mot. at 2.) The Court turns first to whether Maeve has stated a plausible Title VII discrimination claim.

---

[9] The Court's opinion is limited to the forms of relief that the parties raised in their motion papers, and as a result, does not address issues related to other forms of equitable relief, such as nominal damages. *See generally Bain v. Cal. Tchrs. Assoc.*, 891 F.3d 1206, 1213-14 (9th Cir. 2018) (distinguishing *Bayer* in part on the ground that the plaintiff in *Bayer* "'explicitly argued he was entitled to nominal damages' before the district court," which meant that "*Bayer* was 'not a case in which the defendant lacked notice that [certain] damages were sought until the plaintiff . . . [raised the issue for] the first time on appeal'" (quoting *Bayer*, 861 F.3d at 869)).

The Court also notes that the district court in *Bayer* granted summary judgment and dismissed the "action for mootness," which meant that the Ninth Circuit needed to review the summary judgment "decision regarding subject matter jurisdiction[.]" 861 F.3d at 861. In a past decision, the Ninth Circuit explained that "[b]ecause standing and mootness pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under . . . [Rule] 12(b)(1), not Rule 12(b)(6)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citations omitted). Even if Centennial was required to raise its challenge to Maeve's request for declaratory relief under Rule 12(b)(1), the Court may raise the issue of mootness sua sponte and apply the Rule 12(b)(6) rubric in these circumstances. *See Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1149-50 (9th Cir. 2024) (considering sua sponte standing elements that the district court did not address and "under the 12(b)(6) rubric, which [courts] apply to a facial challenge to jurisdiction," because the defendants "did not submit evidence in support of their Rule 12(b)(1) motion," and finding that the plaintiff "plausibly allege[d]" the remaining standing elements; *Calio v. Camden Cnty. Bd. of Chosen Freeholders*, No. 22-2261, 2023 WL 3674664, at *1 n.2 (3d Cir. May 26, 2023) ("Even if the [d]istrict [c]ourt's analysis did not implicate the mootness doctrine, we would raise the issue sua sponte because it implicates our jurisdiction.") (simplified).

### A.    Discrimination

#### 1.    Applicable Law

In her first claim, Maeve asserts a "gender and sex" discrimination claim against Centennial under Title VII, 42 U.S.C. § 2000e-2. (*See* Am. Compl. at 42-45, alleging that Centennial violated § 2000e-2 by discriminating against Maeve "with respect to the terms and conditions of her employment" and "ultimately discharg[ing] [her]") (simplified). Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). "The Supreme Court and the lower courts have interpreted this language as giving rise to at least three types of sex discrimination claims[, including] disparate treatment (adverse employment actions motivated by sex)[.]" *Maner v. Dignity Health*, 9 F.4th 1114, 1116 (9th Cir. 2021) (first citing *Bostock v. Clayton County*, 590 U.S. 644, 658-60 (2020); then citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); and then citing *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)).

A Title VII plaintiff can establish a claim of discrimination several different ways. "The plaintiff may do so either 'by using the *McDonnell Douglas* framework, or alternatively, may simply produce [allegations of] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated' the employer." *Opara v. Yellen*, 57 F.4th 709, 722, 728-29 (9th Cir. 2023) (footnote omitted) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)); *see also Liu v. Uber Techs., Inc.*, No. 22-16507, 2024 WL 3102801, at *1 (9th Cir. June 24, 2024) ("Because there are alternative ways to establish a claim of . . . discrimination, no particular method of establishing a discrimination claim—such as the prima-facie-case framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973)—is mandatory at the pleading stage." (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002))).

2.    **Analysis**

Centennial moves to dismiss Maeve's sex discrimination claim. (Def.'s Mot. at 3-4; Def.'s Reply at 2-3.) Centennial argues that Maeve presents no allegations of direct evidence establishing that any decisionmaker acted with a discriminatory motive or circumstantial evidence suggesting that similarly situated individuals outside of her protected class received more favorable treatment. (Def.'s Mot. at 3-4; *see also* Def.'s Reply at 2-3, addressing Maeve's "similarly situated comparator" theory and failure to "draw out how her allegations set out direct evidence of bias").

a.    **Direct and Indirect Approaches**

Although the "line" between allegations of "direct and circumstantial evidence can be elusive," courts have defined allegations of "direct evidence" as allegations of "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude."' *Opara*, 57 F.4th at 722-73 (first citing *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 851-54 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003); and then quoting *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004)); *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (noting that allegations of "[d]irect evidence [are those] 'which, if believed, prove[] the fact of discriminatory animus without inference or presumption'" (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998))). Allegations of "[d]irect evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan*, 413 F.3d at 1095 (citations omitted); *see also Godwin*, 150 F.3d at 1221 (finding that a supervisor's

statement that he "did not want to deal with another female" amounted to "evidence of direct discrimination").

By contrast, courts have defined allegations of "circumstantial evidence" as allegations of "evidence that require[] an additional inferential step to demonstrate discrimination." *Coghlan*, 413 F.3d at 1095. A plaintiff, for example, could allege (1) an "affirmative case that the employer is biased" by citing "statistical evidence," which is "circumstantial evidence that could, if sufficiently probative, point to bias," or (2) a "case negatively[] by showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'" *Id.* (first citing *Aragon v. Rep. Silver State Disposal, Inc.*, 292 F.3d 654, 663 (9th Cir. 2002); and then quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)); *see also Opara*, 57 F.4th at 723 (addressing indirect showings like an employer's proffered explanation is unworthy of credence).

Plaintiffs may "establish a prima facie case based on [allegations of] circumstantial evidence" by pleading facts showing that: (1) "they are members of a protected class," (2) "they were qualified for their positions and performing their jobs satisfactorily," (3) "they experienced adverse employment actions," and (4) "similarly situated individuals outside [their] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination[.]'" *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)); *cf. Leake v. Raytheon Techs. Corp.*, No. 23-15320, 2024 WL 1854287, at *1 (9th Cir. Apr. 29, 2024) (noting that the plaintiffs needed to "plead facts showing" that they met these elements because they "rel[ied] solely on the contention that they pleaded sufficient facts to establish a prima facie case of disparate treatment under the framework set forth in *McDonnell*

*Douglas*," and holding that the plaintiffs "wholly fail[ed] to plead the fourth element," which they based on a similarly situated comparator theory).

       **b.**      **Maeve's Approaches**

The Court concludes that Maeve fails plausibly to allege a sex discrimination claim under Title VII.

In opposing Centennial's motion, Maeve argues that her allegations of discrimination are sufficient "under either rubric," which she describes as alleging (1) "animus directly on the part of the decision maker," or (2) that Centennial treated her differently than "similarly situated" employees outside of her protected class, or "circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination." (Pl.'s Resp. at 2-3) (simplified). The Court disagrees.

Although she suggests that her allegations of discrimination satisfy either approach, Maeve effectively acknowledges that she does not allege direct evidence of discrimination: "[Maeve's] allegations . . . are sufficient to given rise to the *inference* of discrimination under either [approach]." (*Id.* at 3) (emphasis added). After all, allegations of circumstantial evidence "require[] an additional inferential step to demonstrate discrimination," whereas allegations of direct evidence "prove[] the fact of discriminatory animus without inference or presumption."[10] *Coghlan*, 413 F.3d at 1095 (quoting *Godwin*, 150 F.3d at 1221); *see also id.* at n.8 (explaining that "confusion may arise because the terms 'direct' and 'indirect' have occasionally been used,

---

[10] The Ninth Circuit has recognized that "strictly speaking, little other than an employer's own admission could establish discriminatory intent without any inference whatsoever," because in many cases, an "employer's statements . . . do not directly concern the plaintiff" and thus "*some* inference is necessary to establish discrimination with regard to the plaintiff." *Coghlan*, 413 F.3d at 1095 n.6. Nevertheless, the Ninth Circuit has found that "when evidence establishes the employer's animus toward the class to which the plaintiff belongs, the inference to the fact of discrimination against the plaintiff is sufficiently small that [it has] treated the evidence as direct." *Id.*

even by the Supreme Court, to distinguish . . . varieties of circumstantial evidence," but this circuit has "made clear . . . 'direct' evidence refers only to evidence (such as racist or sexist statements) that proves the fact of discriminatory animus without the need for substantial inference") (simplified); *Hittle v. City of Stockton*, 101 F.4th 1000, 1015 (9th Cir. 2024) (noting evidence was "within the ambit of circumstantial evidence" because it "require[d] an additional logical leap" (citing *Coghlan*, 413 F.3d at 1095)), *petition for cert. docketed*, No. 24-427 (U.S. Oct. 16, 2024).

Even if the Court accepts Maeve's theory that she has pled direct evidence of discrimination, her factual allegations, which the Court details below, fail to support a plausible inference that there was nexus between a decision-maker's conduct or statements and any discriminatory employment action. *See Miller v. Graham County*, 635 F. App'x 362, 364 (9th Cir. 2015) ("Assuming, *arguendo*, that the comments constitute direct evidence of discrimination, [the plaintiff] fails to allege any nexus between the comments and any discriminatory employment action." (citing *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003)); *Opara*, 57 F.4th at 722-73 (noting that allegations of "'direct evidence' has been 'defined as [allegations of] evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude'" (quoting *Enlow*, 389 F.3d at 812)). Thus, the plausibility of Maeve's sex discrimination claim turns on her allegations falling within the ambit of circumstantial evidence. *See Rutila v. Buttigieg*, No. 23-6157, 2024 WL 5153942, at *2 (10th Cir. Dec. 18, 2024) (addressing a Title VII sex discrimination claim under Rule 12(b)(6) and stating that the plaintiff "did not allege direct evidence of discrimination, so [the court] evaluate[d] his complaint in light of the prima facie case he would need to establish using circumstantial evidence").

In arguing that she has stated a claim, Maeve focuses on her similarly situated comparator theory. (Pl.'s Resp. at 4.) In addition to her comparator theory, Maeve directs the Court to her claims that "[i]t was only after her gender expression changed that she was targeted as a victim of bias crimes and discouraged from complaining about them . . . , subjected to 'mini observations,' and ultimately terminated from employment." (*Id.*, citing Am. Compl. ¶¶ 28, 31-33.)

The allegations upon which Maeve relies fail to state a plausible sex discrimination claim under Title VII. In support of this claim, Maeve refers explicitly to one adverse employment action: Centennial's decision to terminate her. (*See* Am. Compl. ¶¶ 129-30, alleging that Centennial engaged in "unlawful employment actions" by discriminating against Maeve "with respect to the terms and conditions of her employment" because of her "gender and sex," and "ultimately discharg[ing] [her] from employment"); *cf.* 42 U.S.C. § 2000e-2(a)(1) (prohibiting a covered employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex").

With respect to this adverse action, Maeve alleges that Miller, a "cisgender, heterosexual male," did not begin serving as Centennial's principal and Maeve's supervisor and evaluator until July 1, 2022, nearly a year into Maeve's employment, and that Miller did not recommend terminating Maeve until December 29, 2022. (Am. Compl. ¶¶ 13, 17-18, 50, 118.) Maeve also alleges that the record that Centennial offered in support of Miller's recommendation consisted primarily of (1) Miller's October 5, 2022 Letter of Expectation on Maeve's behavior during her September 22, 2022 encounter with Roache and Gutierrez, (2) Miller's notes, timeline, and interview summaries and surveillance footage that Miller obtained when he investigated the

September 2022 incident, (3) Miller's October 28, 2022 Letter of Reprimand regarding Miller's punctuality and attendance, (4) Miller's October 28, 2022 Letter of Direction regarding Maeve's instructional performance, and (5) in-class observation notes and feedback that Miller submitted to Centennial's teacher observation and evaluation platform, TalentEd, on the same day that he provided Maeve his October 28, 2022 Letters of Reprimand and Letter of Direction. (*Id.* ¶¶ 73, 91-93, 120, 125.)

Further, the record that Centennial offered in support of Miller's recommendation included (1) Maeve's former supervisor's April 15, 2022 Letter of Expectation expressing "concerns about [Maeve's] arrival time, absence reporting, and meeting participation," (2) a statement from Sewell, a campus security officer who responded to Roache's call for "Security!" on September 22, 2022, and believed that "all the adults involved in that conversation" (i.e., Maeve, Roache, and Gutierrez) "were behaving unprofessionally," (3) Maeve's email providing Miller with "a fuller account of her perspective" on the September 2022 incident, (4) a "list of concerns" that Maeve brought to Miller's attention after the September 2022 incident, and (5) a former student's email in which the student expressed concerns about Roache's "patterns of discriminatory behavior . . . towards LGBTQ students who were trying to become peer tutors compared to cisgender, heterosexual students who tried to become peer tutors." (*Id.* ¶¶ 37, 65-68, 70, 125.)

Maeve alleges that Centennial's superintendent, Owens, ultimately affirmed Miller's recommendation to terminate her employment. (*Id.* ¶ 126.) In a letter dated January 9, 2023, Owens informed Maeve about his decision to do so and suggested that he relied largely on Miller's letters, summary of concerns, and findings. (*See id.*, alleging that Owens's letter cited Maeve's "punctuality, failure to adhere to appropriate processes for absence reporting, lack of

attendance at schedule[d] work meetings, unprofessional conduct, and insufficient instructional practice").

Outside of these allegations pertaining to Miller's recommendation and Centennial's termination decision, Maeve's complaint does not suggest that Miller engaged in any allegedly unlawful action until September 28, 2022. (*See id.* ¶¶ 50-69, addressing the period spanning from July 1, 2022, when Miller began serving as the principal, through September 28, 2022). On this date, Maeve told Wright, a Title IX coordinator and director of student services, that Roache and Posner "retaliated against her," and "Miller was also retaliating against her." (*Id.* ¶¶ 9, 69.) Although Maeve references this report about Miller, Maeve also alleges the following noteworthy facts:

- Immediately after the September 22, 2022 incident, Miller advised Maeve to "write an incident report and send it to him" before walking back inside. (*Id.* ¶ 65.)

- Miller investigated the September 22, 2022 incident because Gutierrez complained and Roache filed a "formal complaint" about Maeve. (*Id.* ¶¶ 66, 68.)

- Miller also received and reviewed the letter from MFS's chief human resource officer, Posner, which, according to Maeve, "falsely claimed" that she "shook her fist and swore" at Roache and Gutierrez on September 22, 2022. (*Id.* ¶¶ 11, 67-68.)

- On September 29, 2022, Maeve informed Miller for the first time about the "gender and sex bias incidents and crimes [that] she had experienced in the previous school year, including a student stealing her identity with a false

Instagram account, the homophobic slur [a student] shouted at her . . . , and the assault on her in the bathroom at school." (*See id.* ¶¶ 69-70, alleging that Maeve "again made [these] reports"; *but cf. id.* ¶¶ 50-69, addressing the time period on and after Miller became principal on July 1, 2022, and reflecting that Maeve does not allege that she previously reported such incidents to Miller).

- Miller took notes on these incidents and notified Maeve a few days later that Centennial "hired a private investigator to investigate the issues [that she] had raised regarding bias incidents at the school." (*Id.* ¶¶ 70-71, 74.) Similar to September 22, 2022, Miller advised Maeve that she "could file a formal written complaint against any [d]istrict employees involved in those incidents. (*Id.* ¶¶ 70-71.) Miller also addressed his investigation "goals" with CEA's president, who told Maeve that Miller was "concerned that Title IX violations were being committed at school both against students and [Maeve]." (*Id.* ¶ 78.)

- In his Letter of Expectation dated October 5, 2022, Miller rejected Roache's claim that Maeve engaged in "harassment or bullying," stated that he could not "fully substantiate the severity of the concern based on the evidence" he obtained, and relied on Sewell's report in finding that Maeve's "conduct can be considered unprofessional during the interaction." (*Id.*; *cf. id.* ¶ 125, noting that during his witness interview, Sewell stated that everyone was "behaving unprofessionally").

- Following Maeve's reports to Miller, an outside consultant and investigator (1) conducted several multi-hour interviews of Maeve, (2) interviewed "other staff and students," (3) received a contemporaneous report and photos from Maeve about the removal of a "Queers and Allies" school club poster hanging outside of her classroom, and (4) submitted an "investigation report" to Centennial's legal counsel not long before Centennial reportedly engaged in a "three-day equity audit" "because of some of the issues that [Maeve] brought to [Miller's and Centennial's] attention." (*Id.* ¶¶ 74, 79, 81, 88, 101, 103-04, 116.)

Maeve's alleged timeline of events fails to support a plausible inference that in recommending and affirming Maeve's termination, Miller and Owens discriminated against Maeve on the basis of sex. Maeve's allegations suggest that Miller immediately acted on Maeve's reports of bias incidents predating his time as principal and played a role in initiating an outside consultant's investigation, which resulted in a multi-day equity audit addressing issues that Maeve raised. Maeve's allegations also suggest that Miller's recommendation and Owens's affirmance were based in part on (1) conduct that Maeve's previous supervisor (Scully) raised and deemed problematic months before Miller became Maeve's supervisor (i.e., absence reporting, meeting participation, etc.) and was beyond the scope of Maeve's flex-time arrangement with Scully, (2) conduct that Maeve appears largely to attribute to childcare and mental health issues, and (3) a statement from a security guard who witnessed and responded to

the September 22, 2022 incident and believed that Maeve, Roache, and Gutierrez all behaved unprofessionally.[11]

"A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). Maeve's discrimination allegations fail to support a plausible inference that Miller and Owens had a discriminatory intent or motive for recommending and affirming Maeve's termination. *See Griffin v. Los Angeles*, No. 21-55716, 2022 WL 17099125, at *1 (9th Cir. Nov. 17, 2022) (affirming the district court's dismissal of the plaintiff's Title VII discrimination because she "failed to allege facts sufficient to state a plausible claim," and noting that the "protected characteristic must be a motivating factor for the employment decision for a Title VII discrimination claim" (citing *Costa*, 299 F.3d at 847-48)).

For these reasons, Maeve fails to state a plausible sex discrimination claim under Title VII. Maeve's similarly situated comparator theory (addressed below) does not convince the Court otherwise.

Maeve argues (but cites no authority supporting) that she can serve as her own comparator. (Pl.'s Resp. at 3.) In support, Maeve argues her "own experience is greater than that of any alleged comparator, [as] her job was in fact the same job, and her conduct had not changed in the time she was invited back to teach science the following year." (*Id.*) Centennial responds that it conducted a "reasonable search" and was "unable to locate" any authority supporting Maeve's claim that she can serve as her own similarly situated comparator. (Def.'s Reply at 3.)

_____

[11] Maeve's allegations do not address whether MFS or Centennial disciplined Roache or Gutierrez.

As the Ninth Circuit has explained, "employees are similarly situated to the plaintiff when they 'have similar jobs and display similar conduct.'" *Earl v. Nielsen Media Rsch., Inc.,* 658 F.3d 1108, 1114 (9th Cir. 2011) (quoting *Vasquez,* 349 F.3d at 641). "The employees need not be identical, but must be similar in material respects." *Id.* "Materiality depends on the context and . . . 'cannot be mechanically resolved.'" *Id.* (quoting *Hawn,* 615 F.3d at 1158); *see also Fried,* 2021 WL 5408678, at *1 (addressing the "proper comparator" on summary judgment and noting that "[t]he similarly situated inquiry is 'not an unyielding, inflexible requirement that requires near one-to-one mapping between employees because one can always find distinctions in performance histories or the nature of the alleged transgressions'" (quoting *Earl,* 658 F.3d at 1114)).

The Court located one decision referring but declining to reach a similar comparator argument. In *Kilpatrick v. HCA Human Resources, LLC,* No. 22-5307, 2023 WL 1961223, at *3 (6th Cir. Feb. 13, 2023), the plaintiff argued that he "represent[ed] his own comparator because he was treated well before he came out as gay." *Id.* The Sixth Circuit did not need to "reach the comparator issue because even if [the plaintiff] ha[d] pled a prima facie case, [the defendant] ha[d] offered a valid non-discriminatory reason for his termination: altered educational documents." *Id.* Thus, the plaintiff needed to "identify evidence from which a reasonable jury could conclude that the proffered reason [was] actually a pretext for unlawful discrimination." *Id.* (simplified). The plaintiff, however, failed to "raise a genuine issue of material fact on pretext." *Id.*

As in *Kilpatrick,* the Court need not reach the comparator issue because Maeve fails to allege facts that support a plausible inference that the protected characteristic of sex was a motivating factor for the employment decision. *See Griffin,* 2022 WL 17099125, at *1 (citing

*Costa*, 299 F.3d at 847-48)). Accordingly, the Court grants Centennial's motion to dismiss Maeve's Title VII sex discrimination claim, with leave to amend. *See Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) ("In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.") (simplified).

### B.    Retaliation

#### 1.    Applicable Law

In her second claim, Maeve asserts a "gender retaliation" claim against Centennial under Title VII. (*See* Am. Compl. at 43-45, alleging that Centennial violated 42 U.S.C. § 2000e-3) (simplified). It is well settled that "[e]mployers may not retaliate against employees who have 'opposed any practice made an unlawful employment practice' by Title VII." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093 (9th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, a plaintiff must prove three elements: "(1) the [plaintiff] engaged in a protected activity, (2) [the plaintiff] suffered an adverse employment action, and (3) there was a causal link between the protected activity and the [defendant's] adverse employment action." *Id.* at 1093-94 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002)).

"It is not sufficient to show that the protected activities were a motivating factor in the employer's decision." *Green v. City of Phoenix*, 823 F. App'x 549, 550 (9th Cir. 2020) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). Rather, "[t]he causal link required for a retaliation claim under Title VII is that the plaintiff's 'protected activity was a but-for cause of the alleged adverse action by the employer.'" *Leake*, 2024 WL 1854287, at *2 (quoting *Nassar*, 570 U.S. at 352)); *see also Mooney v. Fife*, 118 F.4th 1081, 1090 (9th Cir. 2024) (noting that a "higher burden of causation [is] applicable to Title VII retaliation claims

under [Supreme Court precedent]," which has recognized that "the 'because [of]' language generally requires 'but-for caus[ation]'" (quoting *Nassar*, 570 U.S. at 352)). Thus, a plaintiff must plead facts that plausibly establish but-for causation between the defendant's adverse actions and the plaintiff's protected activity. *See Leake*, 2024 WL 1854287, at *2 ("Plaintiffs failed led to plead any facts plausibly establishing but-for causation between the alleged adverse actions and [their] alleged protected activity of asserting religious objections to [the employer's] 'vaccine directives.'").

2.    **Analysis**

Centennial argues that the Court should dismiss Maeve's second claim because she fails to state a plausible claim of retaliation under Title VII. (Def.'s Mot. at 2.) As explained below, the Court agrees.

In support of her retaliation claim, Maeve alleges that Centennial "discriminated and retaliated against [her] with respect to the terms and conditions of her employment because [she] opposed unlawful gender and sex discrimination." (Am. Compl. ¶ 139.) Maeve also incorporates by reference the same allegations that she cites in support of her discrimination claim, and alleges that as a result of Centennial's retaliation, she is entitled to back pay, "lost benefits," and compensation for "lost employment opportunities," including "promotions and raises." (*Id.* ¶¶ 127, 137, 141.)

In opposing Centennial's motion to dismiss, Maeve emphasizes that a plaintiff may base a Title VII retaliation claim on an employer's knowledge that the plaintiff engaged in protected activity and "[a] three-month period between [that] activity and retaliatory action," all of which supports an inference of retaliation. (Pl.'s Resp. at 5) (simplified). Maeve in turn argues that she plausibly alleges a "sufficient temporal proximity between [her] termination on January 9, 2023,

and the complaint [that she made] to Miller on September 29, 2022." (*Id.*, citing Am. Compl. ¶ 55.)

In a Title VII retaliation case, "[i]t is not sufficient [for a plaintiff] to show that the protected activities were a motivating factor in the employer's decision[,]" *Green*, 823 F. App'x at 550 (citing *Nassar*, 570 U.S. at 362-63), and "[e]ven cases involving very close temporal proximity have generally featured independent evidence of discrimination or retaliation." *Kama*, 107 F.4th at 1060 (first citing *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 870-71 (9th Cir. 1996); then citing *Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th Cir. 2011); then citing *Bell*, 341 F.3d at 866; and then citing *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732-33 (9th Cir. 1986)).

Consistent with the discussion above, the Court concludes that Maeve fails to plead facts that support a plausible inference that her allegedly protected activity was a but-for cause of Miller's recommendation and Owens's affirmance of Maeve's termination. *See Leake*, 2024 WL 1854287, at *2 (affirming the district court's dismissal of the plaintiffs' Title VII retaliation claims under Rule 12(b)(6) and explaining that the "[p]laintiffs failed to plead any facts plausibly establishing but-for causation between the alleged adverse actions and [their] alleged protected activity").

Maeve relies on the alleged protected activity of reporting incidents of bias and crimes during a meeting with Miller on September 29, 2022. (Pl.'s Resp. at 5, citing Am. Compl. ¶ 55.) As discussed above, Maeve alleges that at this meeting, she informed Miller for the first time about "gender and sex bias incidents and crimes [that] she had experienced in the previous school year, including a student stealing her identity with a false Instagram account, the homophobic slur [a student] shouted at her . . . , and the assault on her in the bathroom at

school." (*See* Am. Compl. ¶¶ 69-70, alleging that Maeve "again made [these] reports"; *but cf. id.* ¶¶ 50-69, addressing the period on and after Miller became principal on July 1, 2022, and failing to allege that Maeve previously reported these incidents to Miller). Furthermore, Maeve alleges that these incidents predated Miller's time as principal and Maeve's supervisor and evaluator, and that Miller responded to Maeve's reports by taking notes, notifying Maeve a few days later that Centennial "hired a private investigator to investigate the issues [that she] had raised regarding bias incidents at the school," advising Maeve to "file a formal written complaint against any [d]istrict employees involved in those incidents," and addressing his investigation "goals" with CEA's president, who told Maeve that Miller was "concerned that Title IX violations were being committed at school both against students and [Maeve]." (*Id.* ¶¶ 21, 50, 70-71, 74, 78.)

These allegations fail plausibly to establish but-for causation between Maeve's September 29, 2022 meeting and Miller's December 29, 2022 recommendation and Owens's January 9, 2023 affirmance of Maeve's termination. Nor do the other allegations that Maeve cites.

In addition to her September 29, 2022 reports, Maeve notes that she alleges that Miller's in-class "mini observations" were "very short" and "approximately ten minutes each," Miller later stated that Maeve should "'stop looking for external reasons' for why she was being disciplined, put his hand in her face and told her the discussion was over," and in his Letter of Direction dated October 28, 2022, Miller stated that if Maeve failed to improve her usage of approved curriculum, student feedback, and time grading papers versus providing in-class instruction, the next step would be to develop a "Plan Improvement," which never occurred.

(Pl.'s Resp. at 4, citing Am. Compl. ¶¶ 90-91.) These allegations do not support a plausible retaliation claim.

Maeve raised issues related to transphobia during her meeting with Miller on October 31, 2022, but Maeve and Miller agreed to meet on this date because Miller had recently "finished investigating the [work performance] concerns that had led to [Maeve] being placed on administrative leave," and wanted to (and did) discuss those concerns with Maeve. (Am. Compl. ¶¶ 83, 89-91.) Currie, a guidance counselor and CEA vice president, also attended the meeting, presumably because of Centennial's ongoing investigation into Miller's reported incidents of bias. (*See id.*) As discussed, however, Maeve's allegations suggest that Miller's actions and concerns resulted in Centennial hiring an outside consultant to conduct this investigation. (*See id.* ¶ 70, alleging that only Miller and Maeve attended the meeting at which Maeve first raised these issues with Miller; *see also id.* ¶¶ 74, 78-79, 81, 88, 101, 103-04, 116, addressing Miller's concerns and the investigation). Additionally, although Maeve alleges that she and Miller never developed a Plan of Improvement, Maeve alleges that she received not only a Letter of Expectation on October 31, 2022, but two Letters of Reprimand, including one covering the same or similar issues as an April 15, 2022 Letter of Expectation that Maeve received from her previous supervisor.

Even accepting Maeve's allegations as true, as the Court must as this stage, Maeve fails to plead facts that support a plausible inference that her allegedly protected activity was a but-for cause of Miller's recommendation and Owens's affirmance of Maeve's termination. *See Leake,* 2024 WL 1854287, at *2 (affirming the district court's dismissal of Title VII retaliation claim on similar grounds). Thus, the Court grants Centennial's motion to dismiss Maeve's retaliation claim, with leave to amend. *See Doe,* 58 F.3d at 497 (addressing leave to amend).

### III.    OTCA

In her third, eighth, ninth, and tenth claims, Maeve alleges that Centennial violated the

Oregon Employment Practices Act, OR. REV. STAT. § 659A.030, Oregon Family Medical Leave

Act ("OFLA"), OR. REV. STAT. §§ 659A.150-.186, Oregon Sick Leave Act ("OSLA"), OR. REV.

STAT. § 653.641, and an Oregon whistleblower statute, OR. REV. STAT. § 659A.199.[12] (Am.

Compl. at 45, 51-54.) Maeve also alleges that she mailed a tort claim notice to Centennial on

May 16, 2023. (Am. Compl. ¶ 4.) Accounting for the 180-day period preceding Maeve's mailing

of her tort claim notice, Centennial argues that to the extent that Maeve's third, eighth, ninth, and

tenth claims are based on actions that occurred before November 17, 2022, Maeve's claims are

untimely because she failed to comply with the OTCA's mandatory notice requirements. (Def.'s

Mot. at 2.)

### A.    Applicable Law

"Under the OTCA, a party may bring a tort claim against a public body or an officer or

employee of a public body, but the party must give advance notice of the party's intent to assert

the claim[.]" *Moore v. Portland Pub. Schs.*, 537 P.3d 544, 551 (Or. Ct. App. 2023) (citing OR.

REV. STAT. § 30.275(1)); *see also* OR. REV. STAT. § 30.275(1) (providing that "[n]o action

arising from any act or omission of a public body or an officer, employee or agent of a public

body . . . shall be maintained unless notice of claim is given as required by this section"). "For

---

[12] The Oregon Court of Appeals has explained that "ORS 659A.199 reflects the [Oregon]
legislature's intent 'both to provide protections against retaliation to the employees of private
employers' who are not covered by [Oregon's public employee whistleblowing statute,] ORS
659A.203, and 'to supply additional protections to employees of public employers' by allowing
for another cause of action to be available for a broader range of protected conduct than afforded
by ORS 659A.203." *McClusky v. City of North Bend*, 549 P.3d 557, 520 (Or. Ct. App. 2024)
(quoting *Burley v. Clackamas County*, 446 P.3d 564, 567 (Or. Ct. App. 2019)); *see also Burley*,
446 P.3d at 567 (finding "nothing in the legislative history of ORS 659A.199 indicating that the
[Oregon] legislature intended that ORS 659A.199 would not also apply to employees of public
employers").

torts other than wrongful death, the party must give the public body notice of claim 'within 180 days after the alleged loss or injury.'" *Moore*, 537 P.3d at 551 (quoting OR. REV. STAT. § 30.275(2)(b)). "Failure to give timely notice of claim is fatal to a plaintiff's tort claim against a public body." *Denucci v. Henningsen*, 273 P.3d 148, 154 (Or. Ct. App. 2012) (citing OR. REV. STAT. § 30.275(1)).

Parties can satisfy the OTCA's notice requirement "several different ways, including by giving a formal notice of claim, and by '[c]ommencement of an action on the claim by or on behalf of the claimant within the applicable period of time provided in subsection (2)[.]'" *Moore*, 537 P.3d at 551 (first citing OR. REV. STAT. § 30.275(3)(a); and then quoting OR. REV. STAT. § 30.275(3)(c)). ORS § 30.275(4) sets forth the "substantive requirements for a formal tort claims notice[.]" *Id.* Ultimately, a plaintiff bears the burden of pleading and proving that she satisfied the OTCA's requirements. *See Urb. Renewal Agency of City of Coos Bay v. Lackey*, 549 P.2d 657, 660 (Or. 1976) (explaining that "[t]he pleading and proof of notice sufficient to satisfy the requirements of ORS 30.275 is a mandatory requirement and a condition [p]recedent to recovery under the [OTCA.]") (citations omitted); *Moore*, 537 P.3d at 551 ("Plaintiffs bear 'the burden of proving that notice of claim was given as required.'" (quoting OR. REV. STAT. § 30.275(7)).

### B.    Analysis

Centennial moves to dismiss Maeve's third, eighth, ninth, and tenth claims, arguing that to the extent these claims are based on actions that occurred before November 17, 2022 (i.e., more than 180 days before Maeve's tort claims notice), Maeve's claims are untimely and must be dismissed. (Def.'s Mot. at 2, 6-10; Def.'s Reply at 2, 4-6.) As explained below, the Court disagrees.

///

PAGE 50 – OPINION AND ORDER

1.    **Preliminary Matters**

a.    **Public Body**

For purposes of ORS § 30.275, a "public body" means "state government bodies, local government bodies and special government bodies." *See Moore*, 537 P.3d at 551 n.1 (explaining that "ORS 30.260(4)(a) . . . defin[es] a 'public body' for purposes of ORS 30.275 by reference to ORS 174.109, which defines a 'public body' as 'state government bodies, local government bodies and special government bodies'"). There is no dispute that Centennial is a "public body" for purposes of ORS § 30.275. *See id.* (noting as much about the defendant, Portland Public Schools).

b.    **Statutory Claims**

There is also no dispute that the OTCA's 180-day notice requirement applies to Maeve's statutory claims under the (1) Oregon Employment Practices Act, OR. REV. STAT. § 659A.030 (third claim), (2) OFLA, OR. REV. STAT. §§ 659A.150-.186 (eighth claim), (3) OSLA, OR. REV. STAT. § 653.641 (ninth claim), and (4) Oregon whistleblower statute, OR. REV. STAT. § 659A.199 (tenth claim). Case law also supports that the OTCA's notice requirement applies to these claims.

For example, in *Reyna v. City of Portland*, No. 02-cv-00980-JO, 2005 WL 708344, at *2 (D. Or. Mar. 28, 2005), the district court held that the "[p]laintiff's ORS Chapter 659A state law claims (sex discrimination, retaliation, whistleblowing, disability discrimination) all [we]re subject to the 180-day notice requirement of the [OTCA], ORS 30.275(2)(b)." *Id.* (citing *Brinkley v. Or. Health Scis. Univ.*, 766 P.2d 1045, 1048 (Or. Ct. App. 1988)); *see also Mendoza v. Wasco County*, No. 09-cv-01300-HU, 2010 WL 4641679, at *7 (D. Or. Nov. 8, 2010) (holding that the OTCA's notice requirements applied to the plaintiff's hostile work environment,

disparate treatment, and retaliation claims under ORS § 659A.030 (citing *Reyna*, 2005 WL 708344, at *2)).

Similarly, in *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 957 (D. Or. 2011) , the district court noted that it was "undisputed that the OTCA govern[ed] [the] plaintiff's Oregon statutory claims for violations of the OFLA, injured worker discrimination, disability discrimination, and whistleblower retaliation." *Id.*; *see also Rabkin v. Or. Health Scis. Univ.*, 350 F.3d 967, 972 (9th Cir. 2003) (noting that "[a] statutory unlawful employment or civil rights claim is a 'tort' within the meaning of the OTCA," *Brinkley* involved "unlawful employment practices set forth in [ORS] chapter 659. . . , and held that the OTCA applied," and the Oregon Court of Appeals has also held that the OTCA applied to an employment discrimination action brought under chapter 659 against a state correctional institution" (first citing *Griffin ex rel. Stanley v. Tri–Cnty. Metro. Transp. Dist.*, 870 P.2d 808, 811 (Or. 1994); then citing *Brinkley*, 766 P.2d at 1048-49; and then citing *Anglin v. Dep't of Corr.*, 982 P.2d 547, 554-55 (Or. Ct. App. 1999))).

### 2.    Disposition

The Court declines to dismiss Maeve's third, eighth, ninth, and tenth claims to the extent these claims are based on actions predating November 17, 2022, because at a minimum, evidence of such actions may be appropriate to consider as background information supporting Maeve's timely claims.

As a threshold matter, Centennial fails adequately to demonstrate that it is entitled to dismissal of Maeve's claims, in their entirety, because Maeve failed to comply with the OTCA's notice requirements. *See Denucci*, 273 P.3d at 154 (recognizing that failure to give timely notice required under the OTCA is "fatal" to a plaintiff's claims). In the introduction of its motion, Centennial suggested that these claims are "all premised[] either entirely or in part[] on actions"

predating November 17, 2022, which makes them untimely under the OTCA. (Def.'s Mot. at 2.) Centennial, however, subsequently clarified that it is actually unsure if these claims are even "in part untimely" under the OTCA. For example, Centennial explains that because of Maeve's "tremendously detailed" fifty-four page complaint, which "contains 231 paragraphs," "it is unclear whether [Maeve] presents claims that are in part untimely under the [OTCA]," and given Centennial's lack of clarity, Centennial "seeks to have several of [the] claims dismissed to the extent they are premised on untimely alleged acts as adverse employment actions." (Def.'s Reply at 2.) Centennial then reiterates that it is unclear if Maeve "seeks to cast any actions outside the 180-day limitations period as adverse employment actions and bases her claims on them," and that it is "unclear from the [amended complaint] or [Maeve's response brief] whether [she] considers only her discharge as an adverse employment action or if any of the alleged actions outside the limitations period are, in her view, actionable adverse employment actions." (*Id.* at 5-6.)

Given this lack of clarity, the Court finds that Centennial failed to satisfy its burden of demonstrating that Maeve's claims should be dismissed in their entirety. *See generally Shay v. Apple Inc.*, 512 F. Supp. 3d 1066, 1071 (S.D. Cal. 2021) (agreeing that the defendants "failed to address the allegations and theories of liability" upon which the plaintiff relied, and explaining that "[o]n a motion to dismiss, it is the defendant's burden to demonstrate that plaintiff has failed to state a claim") (citations omitted); *see also Potter v. Cozen & O'Connor*, 46 F.4th 148, 155 (3d Cir. 2022) (noting that "the defendant bringing a Rule 12(b)(6) motion must show that the plaintiff has not stated a claim"); *Davis v. Wells Fargo*, 824 F.3d 333, 349-50 (3d Cir. 2016) (stating that "[w]hen presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim," and holding that the district court "shifted to [the

plaintiff] the burden of persuasion that properly falls on [the defendant] on a motion to dismiss under Rule 12(b)(6)"); *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) ("The defendant has the burden of showing that the plaintiff has failed to state a claim for relief.") (citation omitted).

The remaining question, then, is whether the Court should dismiss Maeve's claims in part because they refer to actions predating November 17, 2022. The Court declines to dismiss on this ground.

The district court addressed a similar situation in *O'Brien v. Josephine County Sheriff's Office*, No. 1:19-cv-01053-CL, 2024 WL 1705668, at *4-6 (D. Or. Jan. 9, 2024), *findings and recommendation adopted*, 2024 WL 1701938, at *1 (D. Or. Apr. 19, 2024). In that case, the plaintiff asserted hostile work environment, disparate treatment, and retaliation claims under ORS § 659A.030 and whistleblowing claims under ORS §§ 659A.199 and 659A.203. *Id.* at *4. At the summary judgment stage, the defendants argued that the plaintiff's "state law claims f[ell] outside the time limits set by the tort claim notice requirements." *Id.* at *5. The district court explained that a limited portion of the "events that occurred outside of the statute of limitations and OTCA period [were] time-barred as to [the] [p]aintiff's retaliation and whistleblowing claims," but these events were "not time-barred as to [the plaintiff's] claim for hostile work-environment" and "evidence of those acts may [still] be considered as background information in support of *all* of [the] [p]laintiff's timely claims." *Id.* at *6 (emphasis added) (citing *Reyna*, 2005 WL 708344, at *3). Thus, the district court denied the defendants' motion "based on timeliness of notice[.]" *Id.*

The district court reached a similar result in *Folkema v. City of Tillamook*, No. 3:23-cv-00122-AN, 2023 WL 7220559, at *7-9 (D. Or. Nov. 2, 2023). In that case, the "defendants

argue[d] that certain allegations in the complaint [we]re untimely under the OTCA and should be struck from the complaint." *Id.* at *7. In denying the defendants' motion to strike under Rule 12(f), the district court found that the issue of whether the plaintiff's complaint "foreclose[d] a continuing violation theory" was "not material to the instant motions." *Id.* at *8. In so finding, the district court explained that the plaintiff had "pled, at minimum, the occurrence of discrete adverse employment actions that occurred within the statutory notice period." *Id.* Notably, the district court also emphasized that although the plaintiff's "complaint discusse[d] events" that predated the statutory notice period, these "allegations provide[d] background information relating to [the] plaintiff's claims of employment discrimination and retaliation as a result of making complaints against [another employee]," and "[a] notice period such as that imposed by the OTCA does not 'bar an employee from using the prior acts as background evidence in support of a timely claim.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Similarly here, Maeve argues that she is "not seeking damages [based on events] outside the statute of limitations period." (Pl.'s Resp. at 5; *see also id.* at 6-7, addressing Maeve's eight, ninth, and tenth claims and incorporating by reference the same portion of her response brief). Rather, Maeve claims that evidence of such events is "relevant to support [her] timely claims." (*Id.* at 5.)

*O'Brien* and *Folkema* support the position that Maeve advances here. Centennial also effectively acknowledges that such allegations and events are relevant and not subject to dismissal at the pleading stage. (*See* Def.'s Reply at 5, stating that Centennial "does not seek to have [the] allegations stricken" that Maeve references on page five of her response brief; *cf.* Pl.'s Resp. at 5, arguing that Maeve is "not seeking damages [based on facts] outside the statute of

limitations period," evidence outside this period is "relevant to support [Maeve's] timely claims" and may be used "as indirect proof of [an] employer's intent to discriminate" and to cast doubt on an employer's justifications for taking adverse employment actions against the plaintiff, and the Court "should not strike" such facts because they "make [her] claims for relief more probable than not").

In short, Maeve's complaint includes allegations regarding events that predated November 17, 2022, but it is clear that at a minimum, Maeve may present evidence of such events as background information relating to her employment discrimination and retaliation, OFLA, and whistleblowing claims. Nothing more is required to defeat Centennial's motion at the pleading stage. *See Folkema*, 2023 WL 7220559, at *8-9 (denying a Rule 12(f) motion on similar grounds); *O'Brien*, 2024 WL 1705668, at *6 (denying a motion for summary judgment on similar grounds).

### 3.    Remaining Issues

Centennial also argues that the Court should dismiss Maeve's third, eight, ninth, and tenth claims on the ground that Maeve fails to state a claim. (*See* Def.'s Mot. at 2, 7-10; Def.'s Reply at 4-6.)

#### a.    Maeve's Third Claim

Maeve alleges that Centennial violated ORS § 659A.030 by discriminating and retaliating against her on the basis of her gender, sex, and sexual orientation. (Am. Compl. ¶¶ 147-153.) Maeve bases her third claim on the same allegations and theories as her first and second claims for discrimination and retaliation claims under Title VII. (*Compare id.*, *with id.* ¶¶ 127, 129-31, 137, 139-41.) Maeve also concedes that she does "not seek damages outside the [OTCA] period." (Pl.'s Resp. at 5.)

///

Oregon courts analyze claims of discrimination and retaliation under Title VII and ORS § 659A.030 together because they are subject to similar standards. *See Dawson*, 630 F.3d at 935-37 (discrimination claims); *Cornwell*, 439 F.3d at 1034-36 (retaliation claims); *see also Kimmons*, 2023 WL 5836029, at *33 ("The Court concludes that [the defendant] is also entitled to summary judgment on [the plaintiff's] race-based discrimination and retaliation claims, which the Court may address together.") (citation omitted). Consistent with this understanding and its Title VII analysis above, the Court finds that Maeve fails to state a discrimination and retaliation under ORS § 659A.030 and thus grants Centennial's motion to dismiss Maeve's third claim, with leave to amend.

### b.    Maeve's Eighth and Ninth Claims

In her eighth and ninth claims, Maeve asserts that Centennial violated the OFLA and OSLA, respectively. (Am. Compl. ¶¶ 201-27.) Centennial addressed the plausibility of each of these claims in a single sentence and without addressing the pleading requirements or relevant allegations postdating the agreed-upon OTCA cutoff of November 17, 2022. (*See* Def.'s Mot. at 9-10.)

Centennial fails to demonstrate that it is entitled to dismissal of Maeve's OFLA and OSLA claims under Rule 12(b)(6). *See, e.g.*, *Shay*, 512 F. Supp. 3d at 1071 (agreeing that the defendants "failed to address the allegations and theories of liability" upon which the plaintiff relied, and noting that it was the defendants' "burden to demonstrate that plaintiff has failed to state a claim"). The Court also notes that Centennial does not seek dismissal of Maeve's FMLA claim (*see* Def.'s Mot. at 2), which is subject to the same analysis. *See Munger v. Cascade Steel Rolling Mills, Inc.*, No. 21-35573, 2023 WL 128616, at *1 (9th Cir. Jan. 9, 2023) (recognizing that Oregon courts "analyze FMLA and OFLA claims together because OFLA claims are to 'be construed to the extent possible in a manner that is consistent with any similar provisions of the

[FMLA]'" (first quoting OR. REV. STAT. § 659A.186(2); and then citing *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011))); *see also Kelly*, 848 F. App'x at 695 n.2 (discussing "FMLA and OFLA claims together" for the same reason). Furthermore, unlike the Title VII theories that the Court addressed above, Maeve's amended complaint presents no comparable allegations undercutting her unchallenged leave and disability theories of liability.

For these reasons, the Court denies Centennial's motion to dismiss Maeve's eighth and ninth claims.

### c.    Maeve's Tenth Claim

In her tenth and final claim, Maeve asserts that Centennial violated ORS § 659A.199 by discriminating and retaliating against her for whistleblowing and reporting "information that [she] believed was in violation of state and federal laws." (Am. Compl. ¶¶ 228-31.) Centennial argues that Maeve's tenth claim fails in part for the same reasons as Maeve's Title VII retaliation claim, and "[t]o the extent" that it is premised on actions predating the OTCA cutoff. (Def.'s Reply at 6; *cf.* Def.'s Mot. at 10, arguing this claim is based only on "allegations predating November 17, 2022").

Maeve's tenth claim is premised in part on Maeve's and Miller's meeting on September 29, 2022, at which Maeve told Miller for the first time about "gender and sex bias incidents and crimes [that] she had experienced in the previous school year[.]" (*See, e.g.*, Am. Compl. ¶ 228, citing Am. Compl. ¶ 70.) For the reasons discussed above, Maeve fails to state a whistleblower claim to the extent it is based on this meeting and report and Miller's recommendation and Owens's affirmance of Maeve's termination. *See generally Rohrer v. Oswego Cove, LLC*, 482 P.3d 811, 816 (Or. Ct. App. 2021) ("To prove a violation [under ORS § 659A.199], a plaintiff must 'establish a causal link between her complaints about the violation of a law, rule, or regulation, on the one hand, and [the] defendant's adverse employment actions, on the other."

PAGE 58 – OPINION AND ORDER

(simplified) (quoting *Ossanna v. Nike*, 415 P.3d 55, 62 (Or. Ct. App. 2018), *aff'd*, 445 P.3d 281 (Or. 2019))). Thus, the Court grants Centennial's motion on this ground, with leave to amend.

The Court otherwise denies Centennial's motion because it fails adequately to address Maeve's other potentially relevant allegations and legal theories. According to Centennial, this is due in part to Centennial's lack of clarity about the extent to which Maeve relies on any actions predating the OTCA. (*See* Def.'s Reply at 6, first citing Am. Compl. ¶ 228; and then citing Pl.'s Resp. at 7; *see also* Pl.'s Resp. at 7, presenting an uncontested claim about potentially relevant evidence). The Court order the parties to confer on these issues if Maeve attempts to amend her pleading.

## CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART Centennial's motion to dismiss (ECF No. 10), and GRANTS Maeve fourteen days' leave to amend her complaint if she is able to cure the pleading deficiencies discussed herein. If Maeve elects not to file a second amended complaint, the case will proceed on Maeve's claims under the ADA, FMLA, OFLA, OSLA, and ORS § 659A.199 (claims four and seven through ten). If Maeve does not file a second amended complaint, Centennial's answer is due in twenty-eight days.

**IT IS SO ORDERED.**

DATED this 11th day of February, 2025.

*Stacie F. Beckerman*

—————————————————
HON. STACIE F. BECKERMAN
United States Magistrate Judge