**Daniel Snyder, OSB No. 783856**
dansnyder@lawofficeofdanielsnyder.com
**Paul Bastian, OSB No. 062706**
paul@lawofficeofdanielsnyder.com
**LAW OFFICES OF DANIEL SNYDER**
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249
          Attorneys for the Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ELIDA MAEVE** | Case No. 3:24-cv-01427-SB |
| Plaintiff, | |
| | **DECLARATION OF ELIDA MAEVE** |
| v. | |
| **CENTENNIAL SCHOOL DISTRICT NO. 28 J** | |
| Defendant. | |

I, ELIDA MAEVE, declare and state as follows:

1.      I am eighteen years of age or older, and I am otherwise competent to make this declaration. I have personal knowledge of the facts set forth in this declaration.

2.      On October 18, 2022, during my second mini-observation, Mr. Miller observed students harassing me, bullying me, and refusing basic directions. These behaviors were so egregious that administrators, specifically the principal, were contractually obligated under the Collective Bargaining Agreement (CBA) to get involved to assist the teacher in managing the misbehavior. Mr. Miller did not intervene as I was enduring verbal abuse from several students while he was in the room with me. He just blamed me. One student commented about

PAGE 1 – **DECLARATION OF ELIDA MAEVE**

"motorboating" when I leaned over a desk to write something down. Many students were intentionally misgendering me during that period. I handed the relevant pages of the CBA out to my students, Mr. Miller watched and allowed me to do so. See Exhibit 1, pages 48-49 of the 2022 – 2025 Collective Bargaining Agreement, Bates numbered MAEVE.002057-2058. That section of the CBA specifically states that Mr. Miller is responsible for dealing with that type of behavior. Other teachers used this section of the contract anytime they sent a student to the office to see Mr. Miller due to extreme misbehavior.

3.      In the October 19, 2022, meeting before placing me on administrative leave, Mr. Miller told me that I was being "coercive" by informing students that if misbehavior continued, they would need to go see the principal before returning to class.

4.      To my best knowledge, Mr. Miller did not do mini-observations for any other teachers on both December 1 and December 2, 2022. He canceled our Formal Observation the night before we were going to do it on December 15, 2022. His reasoning was that we had not had a pre-observation meeting. However, he gave Aidan Muth a Formal Observation without requiring the same of Aidan Muth. To my best knowledge, Marin Miller knew that Aidan Muth had not done any of the work they needed to do in TalentEd (evaluation platform), and Aidan Muth faced no discipline for this. Aidan Muth did not do any TalentEd work until the very end of the year in 2022, and Mr. Miller said nothing about it.

5.      I was very prepared for that Formal Observation and had a great lesson lined up. He refused to assess me on the basis of an observation that would require him to be in the room for ninety minutes, but felt comfortable disciplining me over his impromptu observations, which were never more than fifteen - twenty minutes.

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

6.    No teacher received five mini-observations in the first three months of school.

Teachers are only supposed to have two mini-observations for the entire year.

7.    Attached as Exhibit 2 is a true and correct copy of a letter I submitted dated

March 3, 2023, Subject: Appeal of "Second Response to Investigation Appeal", Bates numbered

CENTENNIAL000716 - 721.

8.    Attached as Exhibit 3 is a true and correct copy of a letter I submitted dated

March 3, 2023, Subject: Appeal of "Second Response to Investigation Appeal", Bates numbered

CENTENNIAL000726 - 728.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST
OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE
AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

DATED: May 8, 2025

*/s/ Elida Maeve*
ELIDA MAEVE

**Law Offices of Daniel Snyder**
Attorneys at Law
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
(503) 241-3617 Fax (503) 241-2249

### 13.4.3  Disruptive Student

When a student is disrupting the instructional program to the detriment of them self and/or others, the employee will take appropriate action. Any student removed from class at any time by an employee shall be directed by such employee to the principal or other designated person.

Following action by the principal or designee, the student may be returned to the classroom.  If, however, an employee requests a conversation with the principal/designee to discuss the student's behavior, the student's return to the employee's class shall be delayed until after the conversation has taken place.  Providing classroom coverage to allow for such conversation is the responsibility of the principal/designee.

### 13.4.4  Seriously Disruptive Students

13.4.4.1    When a student is seriously disrupting the instructional program by engaging in physical or verbal abuse, intimidation, or harm to self or others, immediate action will be taken by the employee.  The employee shall be authorized to send the student to the administrative office, or other location designated by the principal/designee.

13.4.4.2    Before re-admittance to the employee's workstation and/or duty station a parent conference shall be required at which a written behavior plan shall be finalized between the student, parent or guardian, administrator/supervisor and the employee.  This behavior plan shall specify the future behavior expectations of the student.  If a parent or guardian refuses or is unable to attend this conference, the conference may be held in their absence with a copy of the behavior plan sent to them via certified mail.

13.4.4.3    By the end of the teaching day, the employee referring a student shall have either conferred with or provided a written report for the appropriate administrator including:

13.4.4.3.1    A statement of the facts,

13.4.4.3.2    A summary of conditions leading to the referral,

13.4.4.3.3    Steps taken by the employee to remedy the problem and to motivate the student, and

13.4.4.3.4    Any other steps taken prior to the referral.

13.4.4.4    Affected employees shall be notified with all relevant information prior to the placement of a dangerous student in their worksite.  In cases where out-of-district transfers may delay the information, the District shall notify affected employees as soon as the information is known.

Decl. Maeve
Exhibit 1
Page 1 of 2

MAEVE.002057

13.5   The District will follow state and federal laws relative to any individual who physically
       or verbally abuses or intimidates or interferes with any employee performing their duties.

Decl. Maeve
Exhibit 1
Page 2 of 2
MAEVE.002058

To: Melissa Grindle

From: Elida Maeve

Date: 3/3/2023

Subject: Appeal of "Second Response to Investigation Appeal"

---

This letter serves to appeal the response made by Tasha Katsuda on February 9, 2023. Tasha Katsuda's words are in quotes. My responses are in bold.

Response to "Response to Point #1":

"The district-initiated investigation showed that administrators conducted investigations after you reported the incidents of harassment by students during the 2021-22 year."

**The district conducted no such investigations. If they did, then the investigation notes should still exist and should have been made available to Clint Fella to aid in this investigation. I know for a fact that the fake Instagram account was never investigated by the district because I was forced to investigate this incident myself and identify the student(s) responsible. If the district had performed its own investigation of the incident then this was neither made known to me at the time (Nov 2021 - Jan 2022) nor mentioned in the district-initiated report. If any investigations happened then there ought to be a record of it. Per board policy ACB-AR, any mention of a bias incident to any staff member, but particularly to a school administrator (for example, the Instagram account was reported by myself to Principal Mairi Scott-Aguirre), should trigger an immediate investigation.**

"The district did not receive an official appeal or complaint from you regarding the investigations of the 2021-22 incidents…"

**I reported multiple bias incidents to my supervisor at the time, Laura Scully, the principal and other administrators, other more senior staff members including my department head, and not once did any of these individuals recommend or suggest that I file an official complaint or even allude to the existence of the board policies pertaining to complaint procedures. Being a new teacher who was hired during the pandemic, it was the district's responsibility to make me aware of these complaint procedures. I didn't know that formal complaints even existed until September 2022 when they were mentioned by Marin Miller *after* he had begun investigating *me.***

"...but in line with our practice to ensure safety, the district interpreted and responded to your report to Principal Miller as an appeal."

Decl. Maeve
Exhibit 2
Page 1 of 6

CENTENNIAL000716

**Each of the 3 incidents reported were for the most part resolved. The student who intimidated me in the restroom and assaulted me on the way out and myself had a mediation at my request and considerable expense of time. The student who shouted "faggot" at me and I likewise had a mediation at my request. The fake Instagram account and the student who used it to sexually harass and bully me unfortunately did not result in a mediation between myself and that student due to the intense emotional and mental distress it was causing me as I was preparing for the birth of my son in December 2021.**

**The district-initiated investigation did not result in any changes to policy, procedures, or programs or additions thereof meant to prevent these sorts of incidents from occurring to myself or anyone else in the future. All that the report accomplishes is to assert that the district's response to the bias incidents "may have been adequate," which, considering the report's lack of written tangible evidence and reliance instead on witness testimony is an unsubstantiated claim at best. Regardless of the report's conclusions, the report did not help to ensure my or any other queer person's safety.**

"Even after you reported to Principal Miller who offered you the opportunity to file an appeal, you did not."

**Principal Miller did not offer me an opportunity to "file an appeal." He told me that I *could* file formal complaints about the incidents from last year if I wanted to but that it was unnecessary after informing me that there would be a private investigator.**

"Despite the fact that the due date for appeal had long passed, the District retained an investigator through its legal counsel and provided you with the investigative report in early January, 2023."

**Again, I never filed a formal complaint of the bias incidents which occurred between September 2021 and June 2022 because I was not aware that this was even a possibility. No administrators ever made these complaint procedures known to me.**

"Both the initiation of the additional investigation by the district and the responses from administration recognize safety and impact of bias."

**The SRO did not perform any investigation. He interviewed the student that I had determined was the culprit and the student confessed. This is not "additional investigation;" this merely a carrying-out of standard disciplinary procedures.**

**Mediation is a tactic for conflict resolution, not a recognition of the need of safety or the impact that bias has on the victims of bias incidents. Furthermore, since it was me who requested the mediations–not the district–the district can hardly take credit for any mediations that occurred. And, lastly, on two separate occasions my supervisor, Laura Scully, asked me "do you really need to be doing all that?" This was her response after**

Decl. Maeve
Exhibit 2
Page 2 of 6

CENTENNIAL000717

I'd informed her of the mental toll that my own investigation and participation in the resolution of these conflicts was having on me. Her response is representative of the district's attitude toward resolution of these bias incidents.

In short, the district was dismissive of the impact that these incidents had on me at the time, was dismissive of the impact that ongoing incidents were having on me up until them moment I was fired, and the district continues to not acknowledge either impact of bias or the unsafe working conditions which I have endured. It's apparent to me that the district is more concerned with reducing the appearance of its own culpability in these incidents, opting instead to shift blame on me (literally victim blaming), which is further evidence that understanding the impact of bias and ensuring the safety of its most vulnerable staff and students is not a top priority for the district.

<u>Response to "Response to Point #2"</u>:

"The district-initiated investigation showed that there was insufficient evidence of the allegation that colleagues engaged in gender bias and discrimination (that harm was done) and lack of administrative response in the 2021-22 school year."

The evidence used in the report was witness testimony. I made written evidence available to Clint Fella throughout the investigation of more recent incidents of gender bias and discrimination but these more recent events were not included in the report. In fact, much of my own evidence and testimony provided to Clint Fella was not used. Two people, a staff member and student, both witnessed Rachel Davidson misgender me repeatedly in the CHS Main Office earlier this school year. The entire staff witnessed Jeremiah Hansen make transphobic comments during a staff meeting in September 2021 but no witness testimony was used to corroborate this fact, nor were the chat logs of the Zoom call used as evidence that it occurred.

I have since provided the district with evidence that Laura Scully, Joe Massey, Conrad Schumacher, and Damein Roche have all either used incorrect pronouns for me or misgendered me in some way. All of this evidence was <u>in writing</u> and is irrefutable. The assertion that there is insufficient evidence that I have experienced gender bias and discrimination from staff is baseless and easily disprovable.

Finally, the inclusion of the words "that harm was done" obviously implies that the district believes that no harm has been done to me by staff or administrators on the basis of my gender, gender expression, or sexuality. This clearly demonstrates that the district does not actually understand the true harm that bias has on people. The hostile work environment, discrimination, harassment, bullying, intimidation, assault, and continuous onslaught of misgenderings and microaggressions from students and staff and associated stressors and trauma made me physically ill to the point of hospitalization and have exacerbated my mental health conditions. Harm was done to me.

CENTENNIAL000718

"In addition, the investigation found that Principal Scott-Aguirre trained staff and students in understanding and responding to bias. Additionally,prior to your reports, she was supporting staff development and coordination of instruction on gender bias, harassment, appropriate use of pronouns, and misgendering."

**If this is in reference to staff training and advisory lesson on "The Culture of Inclusion at CHS: Gender, Neurodiversity, and Race," then Principal Scott-Aguirre had little if anything to do with that. That training and lesson were developed predominantly by myself and the GSA.**

"In fact, Principal Scott-Aguirre observed a teacher teaching those lessons out of her own concern and found that instruction was well facilitated."

**Is there a record of this? Evidence? Because several students reported to me a different story, especially about the way that the advisory lesson was delivered by several staff members. This is not to mention the fact that there was a follow-up staff meeting to address the amount of unprofessional behavior exhibited by staff following the advisory lesson. Furthermore, the report suggested "With respect to the accusations that some teachers were saying the 'Wrong things' during the training, much of that is likely attributable to the training being new, untried and untested, and such errors are to be expected." Speaking from personal experience since I was a contributing member to the Advisory Committee for many months and many lessons, I can safely say that more effort was put into production of the GSA advisory lessons than any other lesson before or after. We had a team of GSA advisors, students, staff, and admin, who worked on that lesson and myself, the GSA President, and another advisor trained staff on the importance of this lesson during a staff meeting the day before this lesson went out school-wide.**

**Jeremiah Hansen said verbatim at the close of that staff meeting "What if I don't feel comfortable teaching this lesson because I don't think we should be encouraging children to be trans." I know that Principal Scott-Aguirre heard him because she stopped him from continuing his comments to remind him that this lesson is mandatory. There were dozens of witnesses to this.**

"In the 2022-23 school year, under a new administrative team, there has been intentional, ongoing professional development, responses to reports, and development of restorative practices to support and promote safety, healing, accountability, and response to bias and harassment."

Response to "Response to Point #3":

"The findings of the Principal Miller's investigation show that you did not adhere to CSD professional standards for professional conduct when engaged in a conflict with MSF/SUN staff…"

Decl. Maeve
Exhibit 2
Page 4 of 6

CENTENNIAL000719

The alleged unprofessional conduct (which was neither adequately explained to me nor was evidence given to me proving that I violated any policies at any time) occurred as a direct result of Principal Miller's failure to resolve the conflict between myself and Damein Roche which was based on hearsay and could have easily been mitigated if appropriate actions had been taken. Furthermore, Principal Scott-Aguirre exacerbated the entire situation by refusing to mediate the conflict during her tenure.

Leading up to the conversation between myself, Damein Roche, and Desiree Gutierrez which resulted in an investigation of me, I reported Roche's incessant usage of incorrect pronouns and frequent misgendering of myself, other staff, and students in the GSA. These concerns were not addressed by Principal Miller after multiple assurances that it would be, even after Roche used my incorrect pronouns in writing following the incident. I also reported concerns about the SUN onboarding procedures for students which requires them to sign several documents and acquire a parent signature. I was concerned that this violates the Equal Access Act, especially in the case of the GSA. This concern was also not addressed by Principal Miller, a fact which directly resulted in the incidental conversation for which I was investigated. When I brought this concern up to Damein Roche himself, specifically asking him about why students in the GSA have to sign away the right to their own image and voice for MFS promotional purposes, all of a sudden I was informed that MFS "no longer has any volunteer opportunities for you."

The reason that SUN/MFS sought to prohibit me from the GSA was retaliation in response to the questions I had regarding civil rights violations–it had nothing to do with my effectiveness as an advisor, mentor, or advocate. Principal Miller co-signed the letter that Susan Posner (MFS HR) wrote alleging that I violated MFS' Code of Ethics while also taking the time to write that, in her opinion, "The entire purpose of GSA is to promote a welcoming and safe environment for LGBTQIA2S+ students. Your actions described above indicate that we cannot entrust you with creating such an environment." In this letter Posner also alleges that I swore at Roche and "shook my fist" at him, both of which are lies. The entire letter is defamatory and Principal Miller used it as evidence in the unwarranted Letter of Expectation. Miller's letter alleged that "I pointed my finger" at Gutierrez, but Miller failed to provide any evidence in support of his assertion and failed to adequately explain how my behavior constitutes "unprofessional conduct."

Until evidence is provided to the contrary, I maintain that I never acted in an unprofessional manner toward any student or staff member. However Damein Roche absolutely, provably, and continuously used incorrect pronouns to address me, other staff, as well as students and he retaliated against me after I complained to MFS HR about his conduct. Rather than attempt to resolve the conflict between myself and Roche or investigate and put a stop to the Roche's conduct thus ensuring the safety and comfort of queer students and staff at CHS, Principal Miller instead cosigned the defamatory letter written by Susan Posner, prohibited me from accessing a queer space,

Decl. Maeve
Exhibit 2
Page 5 of 6

CENTENNIAL000720

and subsequently undermined future efforts of mine to serve our queer students with his own retaliatory actions.

<u>In Summary</u>

1) The district did not adequately respond to the bias incidents which I reported or complained about, either by the standards set by the district's board policies or by Oregon or U.S. Law.

2) After verbal reports and complaints of bias incidents, neither the district nor administration made me aware of pertinent complaint procedures that I might utilize. I was never made aware of any formal investigation by the district nor was there any follow up with me in accordance with the district's procedures.

3) The district failed to aid in the resolution of a conflict between myself and Damein Roche which resulted in an escalation of informal attempts at resolution. The initial reason for Roche/SUN/MFS prohibiting me from returning to GSA was retaliatory. With full knowledge that I suspected retaliation along with a number of other civil rights concerns, the district continued to prohibit me from the GSA and disciplined me without cause.

Decl. Maeve
Exhibit 2
Page 6 of 6

CENTENNIAL000721

To: Melissa Grindle

From: Elida Maeve

Date: 3/6/2023

Subject: Appeal of Superintendent Owens' response to Elida Maeve's claim of retaliation.

Leading up to the beginning of this school year I experienced a number of panic attacks, mainly due to the trauma and stress of what I'd experience at CHS the year prior. I was worried that things wouldn't get better, that students would continue to harm me mentally and perhaps physically and that the administration would once again fail to support me. My worries were unfortunately proven to be warranted, and after a year of enduring the ugly reactions from people that invariably accompany an individual's choice to transition, my own gender journey has now cost me my career.

This all began when I asked Principal Miller for help mediating a conflict between myself and Damein Roche, the SUN Site Coordinator at CHS responsible for overseeing the GSA. Instead of helping me resolve the conflict and supporting me in my advocacy for our queer students, Miller ultimately sided with MFS/SUN's retaliatory and defamatory characterization of me as a person who is unfit to provide a safe and welcoming environment for queer youth. Miller also ignored my many complaints and reports of Roche's repeated misgendering of myself, other staff, and students. Miller also ignored my concern for queer students' safety, specifically with regard to Roche's access to student information and the high likelihood that he might out students to their parents who are unaware and unsupportive of their children's identities. Miller also ignored my concern that SUN may be violating the Equal Access Act by requiring more of barrier for admission to its programs than other ASB clubs. In the absence of assistance from Miller in resolving the issue between myself and Roche, the conflict naturally escalated as I was unwilling to stand idle while my students' well being was at risk. Roche refused to answer reasonable questions I had about the above issues and responded by writing a formal complaint about me and my alleged harassment of him and Desiree Gutierrez. Instead of investigating Roche, Miller investigated me, thus beginning a pattern of increased scrutiny, unfair treatment, and ultimately my dismissal for, allegedly: 1) instructional performance, 2) attendance and punctuality, and 3) not following board policies.

1) Instructional Performance

Summary:

Principal Miller observed me on Oct 14, Oct 18, Nov 18, Dec 1, and Dec 2. I received poor feedback on my Oct 14 and Oct 18 observations which resulted in being placed on paid administrative leave. In the disciplinary letters received following this leave I was informed that I had until December 2nd to improve on Danielson Components listed in a Letter of Direction. I

Decl. Maeve
Exhibit 3
Page 1 of 7

CENTENNIAL000722

received mostly positive feedback on my November 18th observation and met many of not all of Miller's instructional standards. Miller then observed me
on December 1st and 2nd which were the last two days of the trimester. Students were either taking tests, responding to feedback on their grades, or using class time for other educational purposes. I received mostly negative feedback on these two days and the explanations given by Miller for the poor feedback are either factually incorrect (not using CSD curriculum, "no science learning" happening, etc) or don't make sense such as "teacher observed grading and not interacting with students" which is something that every teacher in the building was doing that day. Miller used the Dec 1 and 2 observations as evidence that I had not met his expectations rather than the much more accurate representation of my instructional performance which he recorded in the November 18th observation.

Oct 14 Observation Detail:

The assignment which students were working on during the October 14 lesson was an assignment that asked students to interpret the patterns on motion graphs. The worksheet was not created or developed by my department, but I have never been told by either my supervisor, other teachers, or my department head that using formative data to inform future lessons is not only acceptable and standard practice, but is in fact encouraged because it allows the class an opportunity to develop important skills and address misunderstandings. The worksheet which Principal Miller contends is "not official CSD curriculum" is absolutely in line with the Patterns Approach curriculum and in my professional judgment was an excellent teaching tool. Contrary to Miller's opinion, students utilized their mostly independent work time well during this lesson and by the end of that period most were about half-way done with the assignment. By the end of the following day, most students were finished. Miller was only in the room on October 14th for a short time, did not witness my instruction at the beginning of class, and his assertion that I wasn't using approved curriculum and that no science learning occurred is easily disproved if one were to simply look at the the pipes of completed worksheets, one of which was provided to Superintendent Owens during my pre-dismissal hearing.

It's important to remember that I did not have access to TalentEd at this time. My former supervisor, Laura Scully, was very helpful in guiding me through the evaluation process in the previous 2 years. Principal Miller, on the contrary, did not once over the course of 5 mini-observations attempt to conference with me or discuss my instructional performance. Scully was very supportive throughout the evaluation process, ensuring that I had completed necessary tasks in TalentEd and was very obviously interested in helping me grow from feedback. Scully also knew about my personal circumstances as well as my ADHD and understood that the essential goal of evaluation is growth as an educator and that my value as a teacher is not measured by my ability to remember the due date of a TalentEd task. Principal Miller never once inquired with me as to why I had not accessed TalentEd and the only feedback I ever received from him with regards to my instructional performance was in disciplinary letters.

Oct 18 observation detail:

Decl. Maeve
Exhibit 3
Page 2 of 7

CENTENNIAL000723

On October 18, my 5th period class was being so disruptive that I was unable to get more than a few words out before disruptions resumed. I have demonstrated in my time as a teacher both a strong desire and ability to practice restorative justice. Last school year, following an even more chaotic period where I deescalated and prevented two fights from breaking out in my classroom, I held restorative circles in each of my class periods. As a very visibly trans and non-binary teacher, I encounter harassing and bullying behavior even from my own students on a daily basis. This 5th period was no exception, and Principal Miller was present for many of the derogatory comments and misgenderings which occurred. For example, while Miller was in attendance several students called me "Mr." instead of "Mx.," another said "I'm beginning to think **he** doesn't like me" after I asked him to change seats, and one student made an offensive "motorboating" remark about my breasts. Rather than assist me at the time or be supportive afterward, Miller decided that the methods I used to restore order and have a productive lesson were "misconduct" requiring my removal from campus for a period of 2 weeks and a series of disciplinary letters. When I asked why he didn't attempt to help me in the moment while I was clearly dealing with a crisis, he said that he didn't want to "disempower" me as a teacher. With full knowledge that I was having difficulty managing the classroom, Miller sat back and continued observing me struggle. Instead of intervening in some small way with the possibility of "disempowering" me, Miller's subsequent response to the situation resulted in my progress with all of my classes being undermined. Relationships I had built with these students were negatively impacted and even more distressing to me was the fact the immediately following the launch of the Queers and Allies Club the following two meetings were canceled in my absence resulting in significantly diminished turnout in subsequent meetings. Finally, my sudden inexplicable absence from class for the next two weeks led to rumors being spread about it possibly having to do with me "predatory" or "creepy," which are transphobic tropes that I specifically warned Miller about prior to my leave. He dismissed my concerns and, upon my return, told me that the problems with misbehavior were due to his assertion that students don't "trust" me. Not only is this assertion in and of itself a transphobic trope of trans people and transfeminine individuals specifically (that we are inherently untrustworthy or deceitfully), but it offended me considering the numerous times that I've been the trusting adult that students turn to when they need support. This especially true of our queer students who by Principal Miller's choices have been robbed of their strongest advocate.

Conclusion:

Despite receiving the only feedback I would ever get from Principal Miller in a disciplinary meeting, I succeeded in meeting most if not all of Miller's expectations. The positive Nov 18 observation notes are evidence of this. The negative observation notes received on Dec 1 and Dec 2 are either false or unreasonable and should not have been used as the basis for my dismissal. I have demonstrated that my instructional skills either meet or exceed expectations in the evaluations I received in the previous 2 years from a different supervisor. Any shortcomings in my instructional performance are attributable to me being a beginning teacher who faces additional challenges due to documented and formerly accommodated disabilities and treatment due to protected status as a transfeminine and non-binary individual.

CENTENNIAL000724

2) <u>Attendance and Punctuality</u>

I informed principal Miller of my ADHD diagnosis, the fact that it was medicated, as well as the fact that mornings are particularly difficult for me because of the delayed onset of symptom relief from medication as well as the  logistics of being a single parent. I informed Miller of these issues casually in our conversations regarding my attendance and punctuality on multiple occasions. My former supervisor, Laura Scully, was also well aware of the personal issues which affected my ability to do my job. After I received a Letter of Expectation from Scully regarding my punctuality and attendance, she offered me a flex-time arrangement with a 7:45 arrival time and 3:45 departure time so long as I didn't miss work meetings. She offered this to me and both Rowena Poirier and Zachary Ramberg were in attendance at this meeting. I knew prior to this meeting that flex time was an arrangement that could be made in writing to one supervisor. Scully insisted at the conclusion of this meeting where I received the letter of expectation that she would "arrange" this for me.

The topic of flex time came up again at the beginning of this school year. When one morning I was running late I texted Scully, still assuming that she was my supervisor, to inform her that I would be running late. She responded and told me that she was not my supervisor anymore and that any flex time arrangements would need to be made with principal Miller. She also stated in this text message that she would forward this conversation to my new supervisor, principal Miller, to presumably keep him apprised. It is unknown whether or not she actually followed up on this. Given the fact that there appears to be no record of a written arrangement for flex time, I have no guarantee that she followed through on keeping principal Miller in the loop. Scully's propensity for not sharing or keeping record of vital information was most recently demonstrated to me when I came by an email communication between her, human resources, and principal Miller, wherein she discussed the fact that she had tried to complete my evaluation from the 2021-2022 year but was unsure what to do. Namely, she wasn't sure if I had technically completed my second at CHS or not, due to several extended FMLA absences. Neither Scully, nor human resources, nor my new supervisor, principal Miller, ever made it known to me that the decision had been made that I was to "repeat [my] second [probationary] year." It is also relevant to state that in this email Laura Scully misgendered me several times. As far as I am aware, neither human resources nor principal Miller ever attempted to correct Scully or point out the bias inherent in the way she addressed me.

I am troubled by the fact that it has been mentioned in writing several times that my extended absences last year have been used as evidence of a pattern of poor attendance and punctuality. Both my extended absences were FMLA, the first being approximately four weeks long due to the birth of my child, and delayed 30 days past what I had six months prior requested due to unknown reasons, and the second being the last two weeks of last school year due to a serious medical condition. My second FMLA leave was verified by a medical provider and in this medical verification my healthcare provider explained that this health condition was in part due to work-related stressors. This work-related stress was due to the cumulative effect of nearly a full school year of bias incidents, discrimination, harassment, bullying, cyber bullying,

Decl. Maeve
Exhibit 3
Page 4 of 7

CENTENNIAL000725

intimidation, assault, and a general hostile work environment that I have been experiencing. It was also due to the fact that I suffer from general anxiety disorder, as well as depression and gender dysphoria. I also just recently received a preliminary diagnosis of autism spectrum disorder.

Common practice In human resources and management is the recommendation that if any employee mentions that they may have a disability which could require accommodation that an interactive conversation is warranted. Not only were my disabilities to some extent documented and possessed by human resources prior to discussions of flex time with principal Miller, my previous arrangement of flex time with Laura Scully can easily be interpreted as a de facto accommodation. Principal Miller, again, was informed by me that I have ADHD which is medicated And adds to the difficulty of preparing for work in the morning especially when the logistics of childcare as a single parent are taken into account. I requested that my flex time arrangement be honored on every occasion in which the issue of my attendance and punctuality was discussed. Principal Miller repeatedly denied me flextime despite knowing how much it could help me meet his expectations for punctuality to work. Despite my pleas and to the bewilderment of my union representative Rowena Poirier, who informed Miller that she had never heard of a teacher being denied flex time who requested it, Miller denied my request. On December 15, he failed to adequately explain on what basis he was denying it, and instead informed me that he was holding me to the exact same expectation that he has for other staff members. But my insistence on the request for flex time in conjunction with the documentation of my mental illnesses should have prompted principal Miller to take my request more seriously.

3)  <u>Not following board policy</u>

Failure to follow board policy was another rationale listed as grounds for my dismissal. Several key examples of this included leaving the students in the classroom, showing a movie without prior approval, and failure to write referrals for several incidents in my classroom.

While formal board policy may instruct teachers not to leave students unattended, it is nonetheless common practice throughout the building for teachers to leave the classroom briefly to make copies, use the restroom, speak in the hall with individual or small groups of students, or confer briefly with another teacher. These are widespread practices, and in many teacher education programs, the option of sending a student out into the hall for a moment and then stepping out to speak with them individually is taught as a method of classroom management. To the best of my knowledge, no other teacher at CHS has faced disciplinary action for engaging in this behavior.

Furthermore, as one of the only out trans staff members at CHS, I face unique challenges in accessing restroom facilities. There are very limited gender-neutral restroom options at CHS, and they are all single-occupancy, meaning if the one I go to is in use during passing time, I will not have an opportunity to use the restroom again for 70 minutes, and even then there is no guarantee that the restroom will be open. As a result, I have several times had no choice but to use the restroom during class time. When I was informed by Principal Miller that I needed to

Decl. Maeve
Exhibit 3
Page 5 of 7

CENTENNIAL000726

have another staff member provide supervision if I used the restroom during class time, I began to consistently flag down a security staff member or ask one of my neighboring teachers with a radio to have someone sent to my room. I also requested a radio for my own classroom in order to be able to streamline this process, but was never provided with one.

Once I received clear instructions to provide for alternative supervision if I had to leave the classroom, I made every effort to do so, and showed significant improvement in this area based on the feedback I had been given by Miller.

The day that I showed an unapproved movie in class was the last day of school before winter break. I was not fully aware of the stringency of board policy regarding films shown in class, in large part because this once again flew in the face of what I observed to be common practice in the school. On the last day before break, many teachers showed movies or TV shows that they had not received authorization for, including one, Vivian Ngo, who had plans for her sub to let students choose the movie they would watch that day, a plan that would make it literally impossible to get any prior permission for said film. As an early-career teacher, I have made some of my decisions based on what I was able to observe from more experienced veteran teachers around me. In this case, it seems clear that I have once again been held to a different standard than other teachers in the building.

Finally, on the subject of referrals: over the course of this school year, new systems for differentiating and writing minor and major referrals have been rolled out. These changes have been confusing for many teachers, not just myself. Additionally, some of the reasons for referrals, such as inappropriate language, are so common that writing a referral for every individual incident would be virtually impossible, and certainly impractical given the many other pressures and competing priorities of a teacher's day. Furthermore, my prior experiences detailed above had left me with concerns about whether referrals were being taken seriously by the administration, and whether any meaningful follow up would actually occur. As a result, I focused my efforts on the most serious cases. This, again, aligns with the experiences I have heard from other CHS staff, and are not unique to me. It therefore provides another example wherein I am held to a different standard than my colleagues.

<u>Conclusion</u>

The EEOC website states that "The standard for proving a retaliation claim requires showing that the manager's action might deter a reasonable person from opposing discrimination or participating in the EEOC complaint process." I have evidence that other staff members at Centennial high school who I approached for help after learning that principal Miller would be recommending my immediate dismissal were potentially fearful of repercussions to either their career or mental and emotional well being if they were to help me. I have been a very outspoken proponent for social Justice at Centennial High School, in particular for the queer community. Many of my former colleagues who, in private, would expound on the indignities and inequities experienced by our most marginalized students, are not as outspoken as I am with regards to these matters, particularly to administration. There is a long-standing fear among

Decl. Maeve
Exhibit 3
Page 6 of 7

CENTENNIAL000727

staff that the administration will either not listen to their concerns or will punish staff who make them. Given the consequences that I have had to face, I do not blame other staff for their apprehension to supporting me throuought this process, or raising concerns of their own. I'm the span of a few months my career has been damaged, I am unemployed, without health insurance, receiving supplemental nutrition assistance, and mental health conditions for which I've needed help, not punishment, have been seriously exacerbated. No reasonable person would ever oppose discrimination at CHS knowing what has become of me.

Sincerely,
Elida Maeve

CENTENNIAL000728