IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ELIDA MAEVE,                                          Case No. 3:24-cv-01427-SB

               Plaintiff,                        **OPINION AND ORDER**

       v.

CENTENNIAL SCHOOL DISTRICT NO. 28J,

               Defendant.

**BECKERMAN, U.S. Magistrate Judge.**

       Elida Maeve ("Maeve") filed this employment action against Centennial School District No. 28J ("Centennial"), alleging claims for wrongful discharge and violations of Title VII of the Civil Rights Act ("Title VII"), Title I of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and Oregon Revised Statutes ("ORS") chapters 653 and 659A. Centennial now moves under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for partial dismissal of Maeve's second amended complaint. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. For the reasons explained below, the Court denies Centennial's motion.

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

### I.    FACTS

The Court must accept Maeve's second amended "complaint's well-pleaded factual allegations as true, and construe all inferences in [her] . . . favor for the purposes of evaluating a motion to dismiss under [Rule] 12(b)(6)."[1] *Hawkins v. Kroger Co.*, 906 F.3d 763, 767 n.2 (9th Cir. 2018) (quoting *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016)).

#### A.    The Parties

Maeve was assigned male at birth but has "legally, socially, and medically transitioned her gender and presently identifies as a woman or transgender woman." (SAC ¶¶ 7, 14.) At all times relevant to this litigation, Maeve's "sexual orientation was and is bisexual or pansexual." (*Id.* ¶ 14.)

In September 2020, Centennial, an Oregon public school district, hired Maeve (then known as Stephen Hamilton)[2] to serve as a ninth-grade science teacher at Centennial High

---

[1] In the second amended complaint, Maeve appended "additional factual allegations" to paragraphs 1 through 126 of her amended complaint and added a claim for wrongful discharge. (*Compare* First Am. Compl. ("FAC") ¶¶ 1-127, 228-31, ECF No. 7, *and* Second Am. Compl. ("SAC") ¶¶ 127-38, 240-49, ECF No. 27) (simplified). Thus, the Court necessarily repeats the background facts from its previous opinion. *See Maeve v. Centennial Sch. Dist. No. 28J*, No. 3:24-cv-01427-SB, 2025 WL 458826, at *1-10 (D. Or. Feb. 11, 2025). The Court refers to Maeve using female pronouns based on the preference she has expressed through her papers and recognizes that when she began a gender transition, her preferred honorific and pronouns were "Mx." and "they" and "them," respectively. *Id.* at *1 n.1.

[2] This name is relevant to Maeve's claims, but the Court recognizes that Maeve identifies as and has legally changed her name to "Elida Stevie Maeve." (SAC ¶¶ 117-18); *see also Maeve*, 2025 WL 458826, at *1 n.2 (providing background information on "deadnaming") (simplified).

School.[3] (*Id.* ¶¶ 7-8, 17, 20, 106.) Centennial later invited Maeve to return to the same role for the 2021-22 school year. (*Id.* ¶ 18.) During both the 2020-21 and 2021-22 school years, Mairi Scott-Aquirre ("Scott-Aquirre") served as Centennial's principal. (*Id.* ¶¶ 13, 17-18.) When Scott-Aquirre retired at the end of the 2021-22 school year, Marin Miller ("Miller"), a "cisgender, heterosexual male," succeeded Scott-Aquirre as Centennial's principal. (*Id.* ¶ 50.) Miller also replaced Laura Scully ("Scully"), an assistant principal, as Maeve's "supervisor and evaluator." (*Id.*)

### B.    Maeve's Second Year

In September 2021, at the start of her second year, Maeve "began altering her gender expression by wearing feminine-coded clothing, painting her nails, and using makeup," and "identified as a gender nonconforming cis man." (*Id.* ¶ 19.) On the first day of school, Maeve informed students that they could address her by using "either 'Mr.' or 'Mx.' . . . [and] explained that 'Mx.' is a gender-neutral honorific for those who do not wish to be identified by gender." (*Id.*)

Later that month, some of the students at Centennial (primarily male students) began to harass Maeve and a student ("R.A.") "based on their gender identities and gender expression." (*Id.* ¶ 20.) After learning about the extent to which students harassed R.A., Maeve emailed two of Centennial's assistant principals (one who also served as Centennial's dean of students), informing them about an ongoing "harassment and bullying problem in her classroom." (*Id.* ¶ 21.)

///

---

[3] Except where noted, the Court refers to the district and high school interchangeably as "Centennial."

The following month, a male student "with his phone out" followed Maeve into an "unlocked secured restroom" and refused to comply with Maeve's request to leave. (*Id.* ¶ 23.) When Maeve exited the restroom, the student "deliberately str[uck] [Maeve's] shoulder with [his own] shoulder[.]" (*Id.*) Maeve believed that the student "committed an assault and battery" and reported the incident to Tarren Sewell ("Sewell"), a campus security officer. (*Id.* ¶¶ 9, 23.) Not long thereafter, a staff member and student informed Maeve that another male student had created a "false account" on Instagram, which impersonated Maeve, uploaded photos of Maeve and R.A., and "invit[ed] commenters to react negatively to [Maeve's] gender-nonconforming outfit." (*Id.* ¶ 27.) Maeve reported the Instagram account and bathroom incident to the police. (*Id.* ¶¶ 10, 28.)

Also in October 2021, Maeve informed Centennial's human resources department that she and her partner were expecting the birth of their child in early December 2021, and she wanted to take parental leave "start[ing] the Monday after Spring Break." (*Id.* ¶ 25; *see also id.* ¶ 29, describing a later email about "starting parent leave in February and March 2022"). Maeve also wanted to use accrued paid leave to "take time off from work immediately after the birth[.]" (*Id.* ¶ 29.)

In January 2022, Maeve "announced to each of her classes that she was officially using 'Mx.' as her honorific and 'they' and 'them' pronouns exclusively." (*Id.* ¶ 30.) Maeve "also began informing staff members of the[se] changes." (*Id.*) Around this time, a member of a group of male students walking through the hallway "shouted at [Maeve] the derogatory and homophobic slur 'faggot!'" (*Id.* ¶ 31.) Maeve reported the student's abuse and bias to a campus security officer, Grant Preuitt, who reviewed surveillance footage and identified the student in question. (*Id.*)

On April 10, 2022, after follow-up emails regarding Maeve's parental leave request and whether Centennial received leave paperwork, Centennial approved Maeve's request and designated Maeve's leave as FMLA leave beginning on April 18, 2022, and ending on May 16, 2022. (*Id.* ¶¶ 29, 34-35.) A few days later, Scully, an assistant principal and Maeve's then-direct "supervisor and evaluator," arranged a same-day, fact-finding meeting with Maeve regarding Maeve's "attendance and punctuality, which could lead to disciplinary action." (*Id.* ¶¶ 9, 21, 50; *see also id.* ¶ 53, identifying Maeve's initial "Probationary 2 Cycle" as the 2021-2022 school year).

During their meeting on April 14, 2022, Maeve informed Scully that she suffered from "challenges to her attendance" (i.e., her "gender transition, difficulties in coordinating childcare, the harassment [she] had experienced at school, and her mental health disability"), and asked Scully to excuse her absences for these reasons and as a disability accommodation. (*Id.* ¶ 36.) When Maeve attempted to correct Scully's repeated misgendering of Maeve, Scully "abruptly ended" the meeting before completing her fact-finding and addressing Maeve's accommodation request. (*Id.*)

The next day, Scully arranged for a follow-up meeting regarding Maeve's punctuality and attendance and directed Maeve to "leave behind her work computer before starting FMLA leave." (*Id.* ¶ 37.) Also present were Zachary Ramberg, an assistant principal, and Rowena Poirier ("Poirier"), a long-time district employee who served as a witness. (*Id.* ¶¶ 37, 114.) Scully apologized for misgendering Maeve, who repeated her attendance-related challenges, such as "harassment at school, her mental health disability, and her childcare concerns." (*Id.* ¶ 37.) Scully provided Maeve with a Letter of Expectation addressing Maeve's "arrival time, absence reporting, and meeting participation," and offered to "formally put th[e] process in

place" to provide Maeve with the "opportunity to use flex time to cover tardiness and attendance" challenges, which Maeve accepted and believed was a "disability accommodation." (*Id.*)

On April 18, 2022, the first day of her FMLA leave, Maeve received a call and email from Metropolitan Family Service's ("MFS") chief human resources officer, Susan Posner ("Posner"), regarding her temporary, part-time work as a Gender and Sexuality Alliance ("GSA") advisor and activity leader for MFS and Centennial's Schools Uniting Neighborhoods ("SUN") program.[4] (*Id.* ¶¶ 11, 26, 38-39.) Posner advised that Maeve's role was not eligible for leave, remote participation was insufficient, and Maeve needed to resign but could re-apply when she returned to work. (*Id.* ¶¶ 38-39.) During their call, Maeve informed Posner that she wanted to "formally complain" about the SUN program's site supervisor, Roache, who had "an overbearing nature," attempted to speak with Maeve by "follow[ing] her through the halls," interrupted Maeve's instructional time, "consistently misgendered" Maeve, and misgendered another teacher, Aidan Muth ("Mx. Muth"), and students attending GSA meetings. (*Id.* ¶¶ 38, 65, 125.)

While Maeve was away on FMLA leave, Roache advised "other teachers" at Centennial that if Maeve attempted to attend a GSA meeting, the teachers needed to inform Roache "right away." (*Id.* ¶ 40.) Upon returning from leave in mid-May 2022, Maeve set up a "joint meeting" with Roache and two teachers and "advisors," Mx. Muth and Jade Robinson. (*Id.* ¶¶ 41, 59.) At

---

[4] MFS is a partner or subcontractor of Centennial that has "employees embedded" at the school because of MFS's and Centennial's collaboration on the SUN program, which "extends the school day and turns schools into community centers." (SAC ¶ 11.) At all relevant times, Posner served in the above described capacity, Desiree Gutierrez ("Gutierrez") served as MFS's regional program manager, and Damein Roache ("Roache") served as the SUN site supervisor. (*Id.*)

the meeting, Roache explained that Maeve could attend GSA meetings if she had never worked

for MFS but "former employees of MFS were not allowed to attended SUN [program]

activities." (*Id.* ¶ 41.)

Maeve reported MFS's alleged discrimination to Scott-Aquirre and requested a

"facilitated mediation." (*Id.* ¶ 42.) Scott-Aquirre said that Maeve should consider using more

FMLA leave and signed a form approving Maeve's use of such leave because she did "not want

[Maeve] to participate (in the GSA) until there ha[d] been a facilitated meeting" between Maeve

and Roache, and did not "anticipate being able to get that done before next school year."

(*Id.* ¶¶ 42, 44-45.)

Maeve went out on leave again in early June 2022. (*Id.* ¶¶ 43, 45-48.) Later that same

month, and while Maeve was out on leave, Scott-Aquirre retired from her role as Centennial's

principal, and Scully emailed Maeve about calls that she was receiving from students and

parents, who expressed feelings of "anxiety [that was] complicated by [Maeve's] absence and

[an] inability to talk with [Maeve] about how to improve . . . grades before the semester ends."

(*Id.* ¶¶ 49-50.)

On July 1, 2022, Centennial hired Miller to serve as its new principal. (*Id.* ¶¶ 13, 50.)

Miller also replaced Scully as Maeve's direct "supervisor and evaluator." (*Id.* ¶ 50; *see also*

*id.* ¶ 132, reflecting that nearly three months later, Maeve learned for the "first time" that Miller

replaced Scully).

In mid- and late-August 2022, Maeve informed Centennial's human resources

department that she planned on returning that fall and intended to "work[] the entirety" of the

2022-23 school year, and submitted a signed return-to-work authorization from her therapist.

(*Id.* ¶¶ 51-52.) Also in late August 2022, Scully sent an email to Miller and Centennial's human

resources department and assistant superintendent, in which Scully stated that she was "[u]nable to complete" Maeve's "second-year probationary evaluation cycle" because of her "intermittent absences and two successive leaves that ran through the end of the 2021-22 school year." (*Id.* ¶ 53.) Scully added that she completed a "Summative Evaluation form to the best of her ability 'given the circumstances' and . . . recommend[ed] that [Maeve] 'repeat the Probationary 2 Cycle[.]'" (*Id.*)

### C.     Maeve's Third Year

In mid-September 2022, near the beginning of the 2022-23 school year, Maeve copied Miller and Roache on an email to Centennial's dean of students about her exclusion from GSA meetings. (*Id.* ¶ 55.) Miller visited Maeve's classroom that same day to discuss the email and Maeve reported that her exclusion was the result of Roache's gender bias and discriminatory treatment, and GSA should be a "regular school club," not "under the SUN school umbrella." (*Id.*) Maeve also expressed her concerns that SUN requirements violated the Equal Access Act ("EAA").[5] (*Id.*)

One day later, Miller and an assistant principal met with Maeve, Roache, and MFS's regional program manager, Gutierrez. (*Id.* ¶¶ 11, 56.) Maeve reported that she had sought resolution of her GSA exclusion since May 2022 (i.e., her discussions with Scott-Aquirre) and that Roache had sent an email to Scott-Aquirre, in which he made an unspecified "false claim"

---

[5] "The EAA prohibits public secondary schools that receive federal funds and provide a 'limited open forum' from 'deny[ing] equal access or a fair opportunity to, or discriminat[ing] against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 702 (9th Cir. 2023) (Forrest, J., dissenting) (quoting 20 U.S.C. § 4071(a)). Thus, "a school subject to the EAA is categorically prohibited from discriminating based on the content of a group's speech, regardless of whether the school's policy or regulation is reasonable." *Id.* (citing 20 U.S.C. § 4071(a)).

about Maeve. (*Id.* ¶ 56; *see also id.* ¶ 66, noting that Maeve subsequently stated that her exclusion was the "result" of unspecified "hearsay," which was "completely false"). After Gutierrez stated that Maeve was "welcome to apply as a volunteer but not as an employee," Miller decided that Maeve could not attend any GSA meetings until MFS received and finalized its processing of Maeve's "volunteer forms" and granted Maeve permission to attend the meetings. (*Id.*)

Shortly thereafter, Maeve learned that on the same day that she met with Miller, Roache, and Gutierrez, Roache allowed a "cisgender male" teacher, who had not submitted volunteer paperwork, to attend a GSA meeting. (*Id.* ¶ 58.) Maeve does not allege that this cisgender male teacher ever worked as a GSA advisor. (*See id.*) By comparison, Maeve alleges that "Mx. Muth," who Roache also misgendered, advised Miller that before becoming a GSA advisor, Mx Muth often attended GAS meetings without submitting a volunteer form or eliciting any complaints. (*Id.* ¶¶ 38, 125.)

Maeve submitted her GSA volunteer paperwork the day after speaking with Miller and engaging in a post-meeting, one-on-one discussion with Roache, who approached Maeve and suggested that Gutierrez's "email approving her attendance" was merely a formality and thus she could attend meetings immediately after submitting her paperwork and without waiting on Gutierrez's email. (*Id.* ¶¶ 57-59.) When Maeve attempted to attend a GSA meeting, however, Roache, who continued to misgender Maeve and failed to use Maeve's correct pronouns, informed Maeve that she was unable to attend because the paperwork that she submitted was incomplete and she needed to fill out a "missing page." (*Id.* ¶ 59.) Maeve responded that she "made a mistake by overlooking the page" but also repeated her concerns about SUN's EEA compliance and "requirement that advisors and students sign a photo and voice recording release

form because involvement in GSA could be a privacy concern for students who had not come out." (*Id.*)

In the days that followed, Maeve completed and delivered the missing page from her volunteer paperwork, Gutierrez visited Maeve's classroom and advised Maeve that she could not participate in GSA until she attended a meeting with Gutierrez and MFS "officially processed" her paperwork, and Miller asked to meet with Maeve regarding her involvement with GSA. (*Id.* ¶¶ 60-62.) Maeve also emailed Centennial's Title IX coordinator and director of student services, Denise Wright ("Wright"). (*Id.* ¶¶ 35, 62.) Maeve asked to meet with Wright about (1) her "concerns at school, including discrimination and harassment [involving] SUN and the GSA," (2) various "bias incidents [she] had experienced," (3) her "concerns with [Centennial's] administration's response to [past] reports," (4) the "problems" she had with Centennial's human resources department "declining [her] request for parental leave," (5) MFS's "retaliat[ion] against her," and (6) Roache's continued misgendering and use of incorrect pronouns. (*Id.* ¶¶ 35, 62.)

On September 20, 2022, before receiving notice that MFS officially processed her volunteer paperwork or meeting with Gutierrez, Miller, or Wright, Maeve asked Roache if she could attend the GSA's after-school meeting and listen to the speaker. (*Id.* ¶¶ 61-63.) Roache responded that Maeve could not attend the meeting, cited Maeve's failure to "follow the rules" and "privacy concerns," and "repeatedly directed" Maeve to call Gutierrez, which Maeve did. (*Id.* ¶ 63.) During their call, Gutierrez confirmed that Maeve was unable to attend GSA meetings for these reasons and added but did not explain why Maeve presented a "safety concern." (*Id.*) Maeve emailed Wright the following day, summarizing and complaining about these events. (*Id.* ¶ 64.)

After the end of the school day on September 22, 2022, Maeve and an educational assistant were heading toward the parking lot and speaking about how MFS previously lost the assistant's volunteer paperwork and Roache still allowed the assistant to attend a GSA meeting as a mentor because he "felt bad for her." (*Id.* ¶ 65.) Maeve and the assistant encountered and began talking with Mx. Muth in the hallway. (*Id.*) Roache proceeded to interrupt the group's conversation, asked to speak with Maeve, and "reprimanded [Maeve] for chatting in the hallway and 'not supervising the students.'" (*Id.*) Gutierrez arrived shortly thereafter and joined Roache in accusing Maeve of "interfering with [the] SUN meeting and pulling [Mx.] Muth away from their [GSA] duties," and reminding Maeve that she was "not allowed in the GSA room." (*Id.*) Maeve explained that she was heading to her car because she needed to pick up her son from daycare and she did not "enter[] the classroom where the GSA meeting was occurring" or attempt to do so. (*Id.*) Gutierrez said that she found Maeve's "repeated requests and attempts" to attend GSA "concerning" and Gutierrez "needed to 'ensure the safety of the students.'" (*Id.*) Gutierrez's and Maeve's back-and-forth argument continued until Roache "shouted, 'Security! [Sewell]!'" (*Id.*)

Sewell, a security officer standing down the hallway, approached and complied with Roache's request to "radio" Miller. (*Id.*) As Roache, Gutierrez, and Maeve argued about whether Maeve was allowed to be in the area or was "escalating things" and Gutierrez's need to "ensure the safety of [GSA] students," Miller arrived and "directed [Maeve] outside the building with him," where Maeve explained what occurred and how Roache and Gutierrez were "causing conflict." (*Id.*) Miller asked Maeve to "write an incident report and send it to him" before walking back inside. (*Id.*)

///

The following day, September 23, 2022, Miller emailed to arrange a meeting with Maeve regarding Roache's and Gutierrez's complaints, including a "formal complaint" that Roache filed regarding the September 22, 2022 incident with Maeve. (*Id.* ¶¶ 66, 68.) Maeve responded that she would address Roache's and Gutierrez's concerns and "bring up some of [her] own, including retaliatory behaviors [that] began after [she] resigned from MFS last school year and ha[d] increased in frequency and severity leading up to yesterday's conversation." (*Id.* ¶ 66.) Maeve added that she tried on "multiple occasions to arrange mediation to resolve these problems, which, again, [we]re the result of hearsay and . . . completely false." (*Id.*; *cf. id.* ¶ 56, alleging that Miller received notice of Roache's "false claim" to Scott-Acquire on September 13, 2022).

On September 25, 2022, Maeve received an email and letter from MFS's chief human resource officer, Posner. (*Id.* ¶¶ 11, 67-68.) Posner explained that MFS rejected Maeve's volunteer application because Maeve violated MFS's code of ethics on September 22, 2022, "falsely claimed" that Maeve "shook her fist and swore" at Roache and Gutierrez, and stated that GSA's "entire purpose" is to "promote a welcoming and safe environment for LGBTQIA2S+ students" and MFS was unable to "entrust [Maeve] with creating such an environment." (*Id.* ¶ 67.)

Maeve forwarded and spoke with Miller about Posner's email and letter during their meeting on September 26, 2022. (*Id.* ¶ 68.) Miller stated that he received the email and read Posner's letter, and his "primary concern" was "whether or not the person [at issue was] good for kids." (*Id.*) Miller also asked Maeve to sign a form acknowledging that she received a copy of the formal complaint that Roache filed after the September 22, 2022 incident, and explained that

he would be investigating the incident and wanted to meet with Maeve again on September 29, 2022. (*Id.*)

On September 27, 2022, Maeve sent a text message to Scully about her flex-time arrangement and arrival times. (*Id.* ¶ 132.) Scully responded that she planned on "sharing this [message] with . . . [Miller] so that he [was] aware of this communication[, and to] [p]lease work out any flex time [arrangement] with [Miller] as he is [now Maeve's] evaluator." (*Id.*) Scully's "text was the first time [Maeve] learned that . . . Miller [had replaced Scully as] her evaluator." (*Id.*)

Two days later, on September 28, 2022, Maeve met with Wright to discuss the issues that Maeve raised in her September 20 and September 21, 2022 emails and report. (*Id.* ¶¶ 62, 64, 69.) At the meeting, Maeve reported for the first time that "Miller was also retaliating against her." (*Id.* ¶ 69.)

Maeve presented for her follow-up meeting with Miller on September 29, 2022. (*Id.* ¶ 69.) During this meeting, Maeve reported "gender and sex bias incidents and crimes [that] she had experienced [during] the previous school year, including a student stealing her identity [and creating] a false Instagram account, the homophobic slur [a student] shouted at her . . . , and the assault on her in the bathroom at school." (*See id.* ¶ 70, alleging that Maeve "again made [these] reports"; *but cf. id.* ¶¶ 50-69, addressing the period on and after Miller became principal on July 1, 2022, and reflecting that Maeve does not allege that she previously reported such incidents to Miller).

Miller was "silent" and did not "sympathize with [Maeve]" or "validate or deny [Maeve's] reports," but he did take notes and notified Maeve shortly thereafter that Centennial "hired a private investigator to investigate the issues [that she] had raised regarding bias

incidents at the school." (*Id.* ¶¶ 70-71.) Similar to September 22, 2022, Miller advised Maeve that she "could file a formal written complaint against any [d]istrict employees involved in those incidents." (*Id.* ¶¶ 70-71.) Miller also addressed his "goals for this investigation" with the president of the Centennial Education Association ("CEA"), who emailed Maeve and relayed that Miller was "concerned that Title IX violations were being committed at school both against students and [Maeve]." (*Id.* ¶ 78.)

On October 5, 2022, Miller completed his investigation on Roache's formal complaint and the September 22, 2022 incident. (*Id.* ¶ 73.) Miller provided Maeve with a Letter of Expectation, in which he rejected Roache's claim that Maeve's behavior "constitute[d] harassment or bullying" and stated that he could not "fully substantiate the severity of the concern based on the evidence [that he obtained, but Maeve's] conduct can be considered unprofessional during the interaction." (*Id.*; *cf. id.* ¶ 125, noting that Miller interviewed Sewell, who stated that "all the adults involved in th[e] conversation were behaving unprofessionally"). Miller added that going forward, Maeve needed to "stay clear of areas . . . where GSA was meeting." (*Id.* ¶ 73.)

On October 6, 2022, Maeve left work early because her son was ill. (*Id.* ¶ 75.) Maeve was unable to log into Centennial's absence management system (Frontline), and therefore asked a secretary to enter her absence. (*Id.*; *see also id.* ¶ 37, noting that Scully's April 15, 2022 Letter of Expectation addressed Maeve's "arrival time, absence reporting, and meeting participation"). On October 13, 2022, Miller scheduled a time to meet with Maeve and advised that Maeve was "welcome to bring a union representative, indicating [that] he contemplated disciplining [her]." (*Id.* ¶ 76.) During their meeting a few days later, Miller "criticized" Maeve's punctuality and attendance, and Maeve spoke about "her childcare issues, her need to miss work for her child's

illnesses, her disabilities, and how her disabilities contributed to her arrival times to work."[6]
(*Id.* ¶ 78.)

On October 14 and October 18, 2022, Miller made brief, unannounced visits to Maeve's
classroom to conduct "mini observation[s]." (*Id.* ¶¶ 50, 53, 77, 82.) Miller then met with Maeve
on October 19, 2022, and placed Maeve on administrative leave based in part on his mini
observations. (*Id.* ¶ 83.) During their meeting, Maeve also addressed her arrival times and
"reiterated to . . . Miller that her childcare issues and disabilities were contributing factors to her
arrival times at work." (*Id.*; *see also id.* ¶¶ 89-91, alleging that Miller investigated his "concerns"
while Maeve was on leave and Miller and Maeve continued to discuss leave-related issues
involving Maeve's "punctuality and attendance at scheduled work meetings" and mini
observations).

Miller completed his investigation on October 27, 2022, and met with Maeve and Deena
Currie, a guidance counselor and CEA's vice president and building representative on October
31, 2022. (*Id.* ¶¶ 83, 89-90.) Miller explained, among other things, that he was "going to fire"
Maeve after his October 18, 2022 mini observation but was giving Maeve a "chance to improve"
and wanted Maeve to "do restorative work with her classes" because he did not believe Maeve
had created a "culture of trust." (*Id.* ¶ 90.) Miller also provided Maeve with (1) a Letter of
Reprimand dated October 28, 2022, which addressed Maeve's "punctuality and attendance at
scheduled work meetings, falsely alleging that [she] had been late to her [first period class] on
multiple occasions," (2) a Letter of Direction dated October 28, 2022, which addressed Miller's
mini observations and included "significant inaccuracies" regarding Maeve's usage of approved

---

[6] Maeve alleges disability based on "one or more long-term and lifetime mental health
disabilities that substantially limit or impair one or more of her major life activities." (SAC ¶ 12.)

curriculum, feedback to students, and "time spent grading papers versus providing instruction,"
and (3) a Letter of Reprimand dated October 28, 2022, which addressed Miller's mini
observations and included "significant inaccuracies" and a "false[ ] claim[ ]" about a "common
behavior[ ]" for which Centennial's "other teachers [we]re not disciplined." (*Id.* ¶ 90; *see also
id.* ¶¶ 77, 82, 125, addressing certain underlying events and confirming the October 28, 2022
letter dates).

Also on October 31, 2022, Miller provided "minute-to-minute details" of his observations
when he submitted "Task: Mini-Observations and Feedback Collection Tool (Fully Revised
Rubric)" on "TalentEd," a platform that Centennial's human resources department oversees and
supervisors use for "observation notes and evaluations." (*Id.* ¶¶ 92-93, 120.) The minutes conflict
in unspecified ways with Miller's in-class notes, which Maeve received at a later date. (*Id.* ¶¶ 91,
93, 125.)

In early and mid-November 2022, Maeve missed a day of work and left work early one
day because she and her son were ill, notified the information and technology ("IT") department
that she could not access the intranet and received an error message (i.e., "Sorry, that username
already exists!") when she attempted to log on, continued to participate in Centennial's ongoing
investigation into her reported incidents of bias, and received notice from Miller that in the near
future, he planned to conduct a mini observation and needed to set up a "first round of formal
observations." (*Id.* ¶¶ 70-71, 96-102; *see also id.* ¶ 113, addressing Miller's formal observation
of Mx. Muth).

On November 18, 2022, Miller conducted his third mini observation and provided
"positive" feedback, and Maeve and Miller's assistant agreed to schedule a formal observation

on December 16, 2022, and a pre-observation meeting on December 15, 2022. (*Id.* ¶¶ 105, 112-13.)

On December 1, 2022, Maeve notified Miller that she would be fifteen minutes late because of "childcare issues." (*Id.* ¶ 108.) Miller responded that he wanted to meet with Maeve later that day to "discuss her arrival time for a staff meeting that had taken place [the previous day]." (*Id.*) With respect to any concerns about "punctuality and attendance," Maeve reiterated that "her childcare issues and . . . disabilities were contributing factors to her arrival times[.]" (*Id.*) Miller conducted mini observations that same day and the next day, December 2, 2022. (*Id.* ¶ 109.)

On December 14, 2022, Maeve notified Miller that she would be fifteen minutes late "due to her son's daycare being closed." (*Id.* ¶ 111.) When she arrived, Maeve "entered the library where staff meetings [are] normally held and realized [that staff was] having a holiday-inspired potluck instead of a staff meeting." (*Id.*) The following morning, Maeve "experienced a panic attack due to her disability" and notified Miller that she would be fifteen minutes late. (*Id.* ¶ 112.)

On December 15, 2022, Maeve missed her pre-observation with Miller because of a scheduling oversight. (*See id.* ¶¶ 112-13.) Maeve does not allege that she responded specifically to Miller's assistant's question about whether Maeve would be able to "check in before [her formal] observation" the next day, or at all to Miller's assistant's question about whether Maeve was able to "come by after school" during Miller's "open[ing] from 3-3:30 [p.m.]" (*Id.* ¶¶ 105, 112-13.) At 9:27 p.m. on December 15, 2022, Miller emailed Maeve and canceled Maeve's formal observation because Maeve had "not filled out the pre-observation form." (*Id.* ¶ 113.) Maeve alleges that Miller attended and provided positive feedback to Mx. Muth during a formal

observation, even though Mx. Muth had "not completed that form." (*Id.*) Maeve does not address whether Mx. Muth attended a pre-observation meeting or submitted a partially completed form. (*See id.*)

On December 16, 2022, Maeve and Poirier attended an after-school meeting with Miller, who wanted Maeve to "double-check his notes" because he was "missing [certain] times" after "pull[ing] the attendance," "match[ing] up" the time and date of Maeve's messages about being late, and "look[ing] at the cameras." (*Id.* ¶ 114.) After Miller "listed some days that he was missing," Maeve reviewed her phone and "corrected" Miller's "claim that [she] had not arrived at school until 8:02 a.m. one day" and explained that she suffered a panic attack after arriving at 7:45 a.m., "which made her later than she intended." (*Id.*) Miller "did not inquire more . . . [but] had heard [Maeve] explain that . . . [she occasionally] missed work meetings or arrived late to work meetings because of her disability." (*Id.*) When Poirier asked if Miller and Maeve had a flex-time arrangement like Maeve and Maeve's previous supervisor, Miller stated that the "directive" was that Maeve needed to be at work "every day at 7:30 [a.m.]" and that he was "collecting data," not denying Maeve a disability-related flex time accommodation "right now." (*Id.*)

On December 28, 2022, Maeve obtained a judgment changing her legal name and gender marker. (*Id.* ¶ 117.) The next day, Miller sent an "email letter" to Maeve in which he recommended Maeve's "immediate dismissal . . . from employment." (*Id.* ¶ 118.) Also on December 29, 2022, Maeve emailed Centennial's human resources department, seeking information on the "formal process for requesting workplace accommodations" under the ADA and having her name changed in Centennial's systems in accordance with the judgment that she obtained. (*Id.*)

On December 30, 2022, Centennial's director of human resources and assistant superintendent, Tasha Katsuda, Ph.D. ("Dr. Katsuda"), emailed Maeve a "Pre-Termination Hearing Notice." (*Id.* ¶¶ 35, 119.) Dr. Katsuda attached a "Summary of Concerns" that Miller sent to Maeve and "a formal notice" about a "pre-termination hearing" scheduled on January 5, 2023. (*Id.* ¶ 119.)

On January 1, 2023, Maeve emailed Centennial's IT department about the TalentEd platform. (*Id.* ¶ 120.) Maeve stated that she had "not been receiving emails or notifications from TalentEd" or "been able to access any notes that her evaluator . . . might have been posting," and her "TalentEd account might still be associated with her old email address," not the "new email alias" that she requested at the "start of the school year as part of her gender transition." (*Id.*) IT responded that there can be "issues with automated processes" whenever a "name change occurs" and asked Maeve to contact human resources, which "directly oversee[s]" TalentEd. (*Id.*)

On January 2, 2023, Maeve's therapist drafted a letter verifying Maeve's disability diagnosis and describing potential workplace accommodations, such as flex time, an option to attend staff meetings virtually, receiving materials in advance of staff meetings, and being able to "radio" for bathroom break classroom coverage because Maeve was uncomfortable using the restrooms near her class and preferred a secured staff restroom for "privacy and safety." (*Id.* ¶¶ 22, 121.)

On January 3, 2023, Maeve asked Dr. Katsuda for an update on the result of Centennial's Title IX investigation, if she was going to be able to review the findings before her hearing, and for a postponement if she could not do so. (*Id.* ¶ 122; *see also id.* ¶ 116, demonstrating that on December 22, 2022, Dr. Katsuda notified Maeve that Centennial's counsel received an

"investigative report," which it "would be review[ing] and sen[ding] to [her] sometime after winter break"). Around this time, Maeve learned that Centennial was planning to undertake a "three-day equity audit" based on "issues that [Maeve] brought to [Centennial's] attention." (*Id.* ¶ 124.)

On January 5, 2023, Maeve, Miller, Dr. Katsuda, and Centennial's superintendent, James Owens ("Owens"), attended a pre-dismissal hearing. (*Id.* ¶¶ 18-19, 124-25.) Maeve received several documents: (1) a Pre-Termination Hearing Agenda deadnaming Maeve, (2) Miller's Summary of Concerns and recommendation letter dated December 29, 2022, (3) Miller's Letter of Expectation dated October 5, 2022, and Miller's notes, surveillance footage, Maeve's and a former student's emails, and witness statements that Miller collected when he investigated the September 22, 2022 incident, (4) Miller's Letters of Reprimand and Expectation dated October 28, 2022, and notes that Miller never provided to Maeve, and (5) Scully's Letter of Expectation dated April 15, 2022. (*Id.* ¶ 125.) Maeve also submitted a "rebuttal letter" opposing Miller's recommendation. (*Id.*)

In a letter dated January 9, 2023, Owens notified Maeve that he "affirmed" Miller's recommendation to terminate Maeve's employment and based his decision on Maeve's "punctuality, failure to adhere to appropriate processes for absence reporting, lack of attendance at schedule[d] work meetings, unprofessional conduct, and insufficient instructional practice." (*Id.* ¶ 126.)

## II.    PROCEDURAL HISTORY

On May 16 and May 25, 2023, respectively, Maeve sent a tort claim notice to Centennial and filed a charge with the Oregon Bureau of Labor and Industries ("BOLI"), which later co-filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶¶ 4-

5.) About a year later, on May 31, 2024, Maeve received BOLI's ninety-day right-to-sue notice. (*Id.* ¶ 5.)

On August 27, 2024, Maeve timely filed this lawsuit against Centennial, asserting claims under Title VII, the ADA and FMLA, and ORS chapters 653 and 659A. (Compl. at 1-54, ECF No. 1.) After the parties stipulated to Maeve's filing of amended complaint on October 7, 2024, and extensions of Centennial's deadline to answer or file a responsive pleading, Centennial filed its first Rule 12(b)(6) motion to dismiss on November 13, 2024. (*See* ECF Nos. 6, 9; Def.'s Unopposed Mots. Extension Time at 1-2, ECF Nos. 5, 8; FAC at 1-54; Def.'s Mot. Dismiss ("Def.'s First Mot.") at 1-11, ECF No. 10.)

The Court held oral argument on Centennial's motion on February 4, 2025. (ECF No. 20.) The Court then issued an Opinion and Order on February 11, 2025, granting in part and denying in part Centennial's motion to dismiss and granting Maeve leave to amend if she was able to cure the deficiencies that the Court identified. *Maeve,* 2025 WL 458826, at *1, *28. The Court added that if Maeve elected not to amend, this case would proceed on Maeve's claims under the ADA, FMLA, Oregon Family Medical Leave Act ("OFLA"), OR. REV. STAT. §§ 659A.150-.186, Oregon Sick Leave Act ("OSLA"), OR. REV. STAT. § 653.641, and Oregon whistleblower statute, OR. REV. STAT. § 659A.199 (claims four and seven through ten). *Id.* at *28.

On March 12, 2025, Maeve moved under Rule 60 for reconsideration of the Court's Opinion and Order and filed a stipulated motion for an extension of her amended pleading deadline. (Pl.'s Mot. Recons. at 1-9, ECF No. 24; Pl.'s Unopposed Mot. Extension Time at 1-2, ECF No. 25.)

///

PAGE 21 – OPINION AND ORDER

Before Centennial filed a response, the Court docketed an order on March 24, 2025,

granting Maeve's stipulated motion to extend her amended pleading deadline to March 31, 2025,

and denying as moot Maeve's motion for reconsideration under Rule 60. (ECF No. 26, first

citing *Heineke v. Santa Clara Univ.*, 812 F. App'x 644, 645-46 (9th Cir. 2020); then citing FED.

R. CIV. P. 10(b); and then citing *Peshkepia-Cadena v. SunTrust Bank*, 644 F. App'x 715, 715

(9th Cir. 2016).)

In its order, the Court explained that it did not dismiss any claim with prejudice and

Maeve may clarify each separate count and form of relief on which she intended to proceed.

(ECF No. 26; *cf.* Pl.'s Mot. Recons. at 9, asking the Court to "allow [Maeve] to proceed" on her

fifth and sixth claims); *see also Heineke*, 812 F. App'x at 645-46 (reversing a denial of leave to

amend because although the plaintiff failed to "plead a distinct cause of action" under a federal

statute, the district "court's guidance . . . 'made no reference to . . . Rule 10(b)' . . . , and did not

specifically warn [the plaintiff] that failure to plead the . . . claim as a separate cause of action

would result in dismissal with prejudice" (quoting *Bautista v. Los Angeles County*, 216 F.3d 837,

841 (9th Cir. 2000))); FED. R. CIV. P. 10(b) ("If doing so would promote clarity, each claim

founded on a separate transaction or occurrence . . . must be stated in a separate count[.]"). The

Court also reminded the parties that failing to raise an argument in a motion or response may

result in waiver (or forfeiture). (*See* ECF No. 26); *cf. Unimax Commcn's, LLC v. T-Mobile US,

Inc.*, No. 24-6871, 2025 WL 3090751, at *1 (9th Cir. Nov. 5, 2025) ("[The plaintiff] waived its

unconscionability argument by failing to substantively address unconscionability in its

opposition to the motion to dismiss." (citing *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003))).[7]

On March 31, 2025, Maeve timely filed her second amended complaint, repleading and appending "additional factual allegations" to paragraphs 1 through 126 of her amended complaint and adding a common law claim for wrongful discharge. (SAC ¶¶ 127-38, 240-49.) Centennial responded by filing its second motion to dismiss under Rule 12(b)(6). (ECF Nos. 28-30.)

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Thus, "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

---

[7] The Ninth Circuit has noted that "jurists and litigants" often use the terms "waiver" and "forfeiture . . . interchangeably" but they are "not synonymous," as "[w]aiver is the 'intentional relinquishment or abandonment of a known right,' whereas forfeiture is the 'failure to make the timely assertion of a right.'" *Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025) (quoting *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017)); *see also Hebrard v. Nofziger*, 90 F.4th 1000, 1006 (9th Cir. 2024) ("[T]he failure to raise an argument in a timely fashion is a forfeiture not a waiver."). A court may review a forfeited issue "'when it is raised in the [opponent's] brief[,'] . . . [or] 'if the failure [properly] to raise the issue . . . did not prejudice the [opponent's] defense[.]'" *Lui*, 129 F.4th at 780 (first quoting *In re Riverside-Linden Inv. Co.*, 945 F.2d 320, 324 (9th Cir. 1991); and then quoting *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992)).

the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## DISCUSSION

Centennial moves to dismiss Maeve's second amended complaint on four principal grounds: (1) Maeve fails to state plausible claims of sex discrimination and retaliation under Title VII and ORS § 659A.030, (2) to the extent that Maeve "seeks relief other than reinstatement with backpay or related equitable relief," the Court should dismiss Maeve's disability retaliation claim under the ADA and disability retaliation and discrimination claims under ORS § 659A.109 and 659A.112, (3) Maeve fails to allege facts sufficient to state a plausible whistleblower claim under ORS § 659A.199, and (4) Maeve fails to allege facts sufficient to state a plausible claim for wrongful discharge in violation of public policy. (*See* Def.'s Mot. Dismiss Pl.'s Second Am. Compl. ("Def.'s Mot.") at 1-2, 5, 7, ECF No. 30; *see also* Def.'s Reply Supp. Mot. Dismiss Pl.'s Second Am. Compl. ("Def.'s Reply") at 1-6, ECF No. 35.)

## I.    PRELIMINARY MATTER

Before turning to the merits of Centennial's arguments, the Court must address a procedural issue: Maeve filed a declaration and exhibits in support of her response to Centennial's Rule 12(b)(6) motion. (*See* Pl.'s Resp. Def.'s Mot. Dismiss Pl.'s Second Am. Compl. ("Pl.'s Resp.") at 1, 4, 6, 8, ECF No. 33, citing and quoting Maeve's declaration and supporting exhibits; *see also* Decl. Elida Maeve ("Maeve Decl.") ¶¶ 1-8 & Exs. 1-3, ECF No. 34.) Centennial argues that the Court should exclude these extrinsic matters at the pleading stage and emphasizes that Maeve fails to demonstrate or argue otherwise. (Def.'s Reply at 2-3.) The Court agrees.

///

### A.    Applicable Law

"When presented with 'matters outside the pleadings' in connection with a motion to dismiss for failure to state a claim under Rule 12(b)(6)[,] . . . [a] court may choose to exclude such extrinsic matters and address the motion under the applicable Rule 12 standards, or it may convert the motion into 'one for summary judgment under Rule 56.'" *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1059 (9th Cir. 2023) (quoting FED. R. CIV. P. 12(d)). If the "court converts the motion to a summary judgment motion, the court must afford all parties 'a reasonable opportunity to present all the material that is pertinent to the motion[.]'" *Id.* (quoting FED. R. CIV. P. 12(d)).

"The 'pleadings' include more than just the complaint." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018). Courts "can consider 'exhibits attached to the complaint or matters properly subject to judicial notice.'" *Id.* (quoting *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)). Courts "may also consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Id.* (quoting *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015)). Furthermore, courts may consider any "facts in a plaintiff's complaint which have since been conclusively contradicted by the plaintiff['s] concessions[.]" *Id.* (simplified) (first quoting *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir. 1987); and then citing *McCorkle v. Bank of Am. Corp.*, 688 F.3d 164, 170, 172 (4th Cir. 2012)).

### B.    Analysis

The Court concludes that exclusion of Maeve's declaration and exhibits is warranted here.

///

The declaration that Maeve filed in support of her response to Centennial's motion expands on the factual allegations in Maeve's second amended complaint. For example, Maeve provides additional details in her declaration regarding (1) Miller's second in-class mini observation, which occurred on October 18, 2022, and (2) the October 19, 2022 meeting at which Miller initially placed Maeve on administrative leave. (*Compare* Maeve Decl. ¶¶ 2-3, *and* SAC ¶¶ 82-83, 86, 89-90, 93, 125.) In her declaration, Maeve also purports to authenticate the "relevant pages" of a collective bargaining agreement ("CBA") relating to disruptive students, which she attaches as Exhibit 1 and represents that she handed out to her students (some of whom were verbally abusing her) during Miller's second mini observation. (*See* Maeve Decl. ¶ 2 & Ex. 1 at 1-3; *but cf.* SAC ¶ 72, referencing a CBA "or contact with [Maeve's] union" and establishing a "Program of Assistance to identify specific deficiencies, expectations, corrective steps, additional [d]istrict resources with timelines for the plan and how the success of the plan will be measured").

Additionally, Maeve attaches letters as Exhibits 2 and 3 to her declaration. (*See* Maeve Decl. ¶¶ 7-8, Ex. 2 at 1-6 & Ex. 3 at 1-7.) These letters are dated March 3 and March 6, 2023 and appear to stem from a termination appeal process that postdates the events referenced in the second amended complaint. (*See* SAC ¶¶ 126-38, reflecting that before Maeve turned to her recently added allegations on flex-time schedules, mini observations, and comparators, Maeve's primary timeline of events ends on January 9, 2023, when Owens issued his letter notifying her that he "affirmed" Miller's recommendation to terminate her employment based on her "punctuality, failure to adhere to appropriate processes for absence reporting, lack of attendance at schedule[d] work meetings, unprofessional conduct, and insufficient instructional practice").

///

PAGE 26 – OPINION AND ORDER

Maeve does not argue that the Court may consider her declaration and exhibits under the doctrines of judicial notice or incorporation by reference or because she attached them to her second amended complaint. (*See* Pl.'s Resp. at 1, 4, 6, 8.) Rather, Maeve simply notes in passing that her second amended complaint alleges that she "submitted a rebuttal" regarding certain performance issues that Centennial raised at Maeve's pre-termination hearing held on January 5, 2023. (*Id.* at 4, citing SAC ¶ 125; *see also* SAC ¶ 125, identifying the documents that Maeve received at the pre-termination hearing before concluding by stating that Maeve "submitted a rebuttal letter," and then turning to Owens' January 9, 2023 letter and bases for affirming Miller's recommendation). Maeve suggests that Exhibit 2 to her declaration is that "rebuttal letter." (*See* Pl.'s Resp. at 8, quoting Maeve Decl. Ex. 2 at 3, i.e., Maeve's March 3, 2023 "rebuttal letter").

Maeve's one-time reference to a "rebuttal letter" in her second amended complaint fails to present the "characteristics [that the Ninth Circuit ha[s] described as sufficient for incorporation by reference into a complaint . . . , such as the complaint necessarily relying upon a document's contents, the document's authenticity not being in question, and there being no disputed issues as to the document's relevance." *Valdez v. United Airlines Holdings, Inc.*, No. 23-2825, 2025 WL 1513778, at *2 n.4 (9th Cir. May 28, 2025) (citing *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)). To be sure, Centennial "dispute[s] the accuracy of the contents of [Maeve's] letters." (Def.'s Reply at 2.) Centennial also argues that the assertions in Maeve's declaration are "subject to reasonable dispute" and "not documents on which [Maeve's] claims rest," and that Maeve does not rely on or refer extensively to the letters in her second amended complaint. (*Id.*)

///

Given these facts, the Court declines to consider the declaration and exhibits that Maeve submitted in support of her response to Centennial's motion to dismiss. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("How 'extensively' must the complaint refer to the document? This court has held that 'the mere mention of the existence of a document is insufficient to incorporate the contents of a document' under [circuit precedent]." (quoting *Coto Settlement*, 593 F.3d at 1038)); *Valdez*, 2025 WL 1513778, at *2 n.4 (making a comparable observation about "[n]one of the characteristics . . . sufficient for incorporation by reference into a complaint [being] present" (citing *Coto Settlement*, 593 F.3d at 1038)); *cf. Ramirez v. County of Riverside*, No. 5:21-cv-01155, 2022 WL 4227555, at *5 n.2 (C.D. Cal. Aug. 17, 2022) (noting that a "matter to be judicially noticed must also be relevant to the issues in th[e] case," and therefore denying the defendant's request for judicial notice "because it fail[ed] . . . adequately [to] explain why the[] [proffered] documents, let alone which facts contained within the[] documents, [we]re relevant for purposes of a Rule 12(b)(6) motion") (simplified), *findings and recommendation adopted*, 2022 WL 4225384, at *1 (C.D. Cal. Sept. 12, 2022).

## II.    TITLE VII AND ORS § 659A.030

Centennial moves to dismiss on the ground that Maeve fails to allege facts sufficient to state plausible sex discrimination and retaliation claims under Title VII and ORS § 659A.030. (*See* Def.'s Mot. at 5-7 & Def.'s Reply at 3-4, seeking dismissal of Maeve's first, second, and third claims).

### A.    Applicable Law

#### 1.    Anti-Discrimination Provisions

Title VII's "anti-discrimination" or "disparate-treatment" provision provides that "[i]t shall be an unlawful employment practice for [a covered] employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1); *see also Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308-09 (2025) (addressing Section 2000e-2(a)(1), also known as Title VII's "disparate-treatment provision"); *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1146-47 (9th Cir. 2024) (identifying Section 2000e-(2)(a)(1) as Title VII's "anti-discrimination provision").

Similarly, Oregon law provides that "[i]t is an unlawful employment practice . . . [f]or an employer, because of an individual's . . . sex, sexual orientation, [or] gender identity . . . [, to] discharge . . . [or] discriminate against the individual in compensation or in terms, conditions or privileges of employment." OR. REV. STAT. § 659A.030(1)(a), (b); *see also Miller v. State ex rel. Or. Racing Comm'n*, 445 P.3d 371, 385 (Or. Ct. App. 2019) (reviewing the "standards that govern . . . disparate treatment claim[s]" under state law and beginning at ORS § 659A.030(1)(a) and (1)(b)); *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 695 (9th Cir. 2017) (addressing the analysis applicable to the plaintiff's "discrimination claims" under ORS § 659A.030(1)(a) and (1)(b)").

## 2.    Anti-Retaliation Provisions

Title VII's "anti-retaliation provision" provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice [proscribed] . . . by this subchapter, or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024) (referring to Section 2000e-3(a) as Title VII's "anti-retaliation provision"); *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009) (noting that Title VII's

anti-retaliation provision's "two clauses" are known as the "opposition" and "participation"

clause).

Similarly, ORS § 659A.030(1)(f) provides that "[i]t is an unlawful employment

practice . . . [f]or any person to discharge . . . or otherwise discriminate against any other person

because [she] . . . has opposed any unlawful practice, or . . . filed a complaint, testified or

assisted in any proceeding under this chapter or has attempted to do so." OR. REV. STAT.

§ 659A.030(1)(f); *see also Xu v. LightSmyth Tech., Inc.*, No. 23-35423, 2024 WL 4562748, at *2

& n.1 (9th Cir. Oct. 24, 2024) (noting that "[o]n remand, the district should apply . . . the [Title

VII] retaliation standard outlined [therein] to [the plaintiff's] retaliation claim under [ORS]

§ 659A.030(1)(f)," and the plaintiff "brought her retaliation claim under Oregon law rather than

Title VII, but courts construe Oregon's anti-retaliation provision as 'directly analogous' to Title

VII's anti-retaliation provision" (quoting *Howard v. City of Coos Bay*, 871 F.3d 1032, 1049 (9th

Cir. 2017))).

### B.    Analysis

Centennial argues that Maeve failed to cure deficiencies that the Court identified in

dismissing her sex discrimination and retaliation claims under Title VII and ORS § 659A.030,

and therefore she fails to state such claims. (Def.'s Mot. at 5.) As explained below, the Court

disagrees.

#### 1.    Analytical Framework

"The Supreme Court has explained that the scope of actionable conduct under Title VII's

anti-discrimination provision is 'not coterminous' with that which is actionable under Title VII's

anti-retaliation provision." *Xu*, 2024 WL 4562748, at *2 (first quoting *Burlington N. & Santa Fe

Ry. Co. v. White*, 548 U.S. 53, 67 (2006); and then citing *Campbell v. Haw. Dep't of Educ.*, 892

F.3d 1005, 1021 (9th Cir. 2018)); *see also Campbell*, 892 F.3d at 1021 ("Title VII retaliation

PAGE 30 – OPINION AND ORDER

claims may be brought against a much broader range of employer conduct than substantive

claims of discrimination." (citing *White*, 548 U.S. at 67-68)). As a result, a district court must

separately analyze a plaintiff's claims under Title VII's anti-discrimination and retaliation

provisions. *See Xu*, 2024 WL 4562748, at *2 ("[T]he district court erred in not analyzing the

discrimination and retaliation claims under two distinct standards. . . . Because retaliation claims

have a different scope of actionable conduct, the district court erred by not conducting a separate

analysis.").

Although a district court must separately analyze discrimination and retaliation claims

under Title VII, the Ninth Circuit has "held that the substantive analysis for Title VII [disparate

treatement] claims also applies to [a plaintiff's] discrimination claims under [ORS]

§ 659A.030(1)(a), (b)." *Reynaga*, 847 F.3d at 695 (noting that for this reason, the previous Title

VII analysis applied equally to discrimination claims under Oregon law (citing *Dawson v. Entek

Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011))); *see also Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228

(9th Cir. 2021) ("Oregon courts assess [ORS §] 659A.030 claims under the same framework as

they do Title VII disparate treatment claims. . . . Because summary judgment was proper on [the

plaintiff's] disparate treatment claim, it was also proper on her [ORS] § 659A.030 claim." (citing

*Dawson*, 630 F.3d at 934-35)); *Mott v. Off. Depot, Inc.*, 390 F. App'x 658, 660 (9th Cir. 2010)

(analyzing the plaintiff's "sex discrimination claim[s] under Title VII and [ORS §] 659A.030"

together).

Courts also "analyze Oregon retaliation claims together with Title VII retaliation." *Xu*,

2024 WL 4562748, at *2 (citing *Meyer v. State ex rel. Or. Lottery*, 426 P.3d 89, 109 (Or. Ct.

App. 2018))); *see also Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034-35 (9th Cir.

2006) (analyzing the plaintiff's "retaliation claims under Title VII[] and ORS [§] 659A.030"

together); *Justice v. Rockwell Collins, Inc.*, 720 F. App'x 365, 366 (9th Cir. 2017) (noting that *Cornwell* "set[s] forth [the] elements and analysis for retaliation claims under Title VII and Oregon law").

Accordingly, the Court analyzes together Maeve's discrimination claims under Section 2000e-2(a) and ORS § 659A.030, and retaliation claims under Section 2000e-3(a) and ORS § 659A.030.

### 2. Maeve's Discrimination Claims

Maeve alleges sufficient facts to state plausible sex discrimination claims under Section 2000e-2(a) and ORS § 659A.030. The Court therefore denies Centennial's motion to dismiss on this ground.

To prevail under Title VII and ORS § 659A.030, "a plaintiff alleging that an employer engaged in discriminatory conduct adversely affecting [her] employment must establish a prima facie case[.]"[8] *Hittle v. City of Stockton*, 101 F.4th 1000, 1012 (9th Cir. 2024); *see also Dawson*, 630 F.3d at 934-35 (holding that the plaintiff's discrimination claims under Title VII and ORS § 659A.030 were subject to the same framework); *Karthauser v. Columbia 9-1-1 Commcn's Dist.*, No. 3:20-cv-00127-SI, 2023 WL 371649, at *1 (D. Or. Jan. 24, 2023) (explaining that the same elements are necessary "[t]o prove sex discrimination under both Title VII and its Oregon counterpart, ORS [§] 659[A].030(1)(a)"). A plaintiff can do so by demonstrating that: "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class

---

[8] At the pleading stage, the Court may (and does) only "use the prima facie elements as a guide to evaluate, holistically, whether the complaint contains sufficient factual content to put forward a 'plausible' or 'straightforward' case of discrimination." *Smith v. Nev. Dep't of Motor Vehicle Off.*, No. 24-5060, 2025 WL 1513776, at *2 n.2 (9th Cir. May 28, 2025) (quoting *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1050 (9th Cir. 2012)).

were treated more favorably *or* other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1155 (9th Cir. 2025) (first citing *Hittle*, 101 F.4th at 1011-12; and then citing *Lui*, 129 F.4th at 778).

In a recently published opinion, the Ninth Circuit addressed some of its "confusing" precedent on the "fourth part of the test for establishing a prima facie case" of employment discrimination, noting that it had "repeatedly" and at times necessarily "recited a truncated version of the test." *Lui*, 129 F.4th at 777-78. The Ninth Circuit explained that the truncated version of the fourth part of the test is "misleading because while it provides one basis for satisfying the fourth element, it leaves out the basis articulated in [a] Supreme Court[] opinion[,] [*see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993),] and reiterated in [a Ninth Circuit] opinion[, *see Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002)]." *Lui*, 129 F.4th at 777. In these cases, "the fourth part of the prima facie test required only that the position previously occupied by the plaintiff be filled by a person outside the protected class." *Id.* In other words, "[i]f a plaintiff satisfies that requirement, there is no additional or separate requirement under the fourth element that the person who filled the position have been 'similarly situated.'" *Id.*

Ultimately, the Ninth Circuit recognized that "[m]any of [its] sister circuits have articulated the fourth element of the . . . prima facie test as a catch-all requiring only that the adverse action occurred under circumstances giving rise to an inference of discrimination." *Id.* at 778 (simplified). The Ninth Circuit "adopt[ed]" this version of the test because its "overarching description of the standard capture[d] the essence of the various formulations of the test [that the Ninth Circuit] ha[d] been applying in [its] cases." *Id.* To summarize, then, "a Title VII plaintiff

who cannot show that her 'position remained open and the employer continued to seek applicants,' . . . or that her position 'was ultimately filled by a [person outside her protected class],' . . . can alternatively establish a prima facie case of discrimination by showing that she was treated less favorably than similarly situated individuals." *Id.* at 779 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506). Significantly, however, "[s]howing such differential treatment" is an "alternative means of satisfying," "not an additional requirement under," the test's fourth element. *Id.*

This Court previously dismissed Maeve's sex discrimination claims because her allegations failed adequately to support a plausible inference that Miller and Owens had a discriminatory intent or motive for recommending and affirming Maeve's termination. *See Maeve*, 2025 WL 458826, at *20, *27 (citing *Griffin v. Los Angeles County*, No. 21-55716, 2022 WL 17099125, at *1 (9th Cir. Nov. 17, 2022)); *see also Griffin*, 2022 WL 17099125, at *1 (affirming the dismissal of the plaintiff's Title VII discrimination claim because she "failed to allege facts sufficient to state a plausible claim," and observing that "the protected characteristic must be a motivating factor for the employment decision for a Title VII discrimination claim" (citing *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 847-48 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003))).

In support, the Court explained that Maeve's allegations suggested that after becoming principal, Miller immediately acted on Maeve's reports of bias incidents predating his time as principal and played a role in initiating an outside consultant's investigation, which resulted in a multi-day equity audit addressing issues that Maeve raised. *See Maeve*, 2025 WL 458826, at *20. The Court further explained that Maeve's allegations suggested that Miller's recommendation and Owens's affirmance were based in part on (1) conduct that Maeve's previous supervisor

(Scully) raised and deemed problematic months before Miller became Maeve's supervisor (i.e., absence reporting, meeting participation, etc.) and beyond the scope of Maeve's flex-time arrangement with Scully, (2) conduct that Maeve appeared largely to attribute to childcare and mental health issues, and (3) a statement from a security guard who witnessed and responded to the September 22, 2022 incident and believed that Maeve, Roache, and Gutierrez all behaved unprofessionally. *Id.*

The Court also explained that Maeve's comparator theory, which concerned the period predating Miller's tenure as principal and Maeve's supervisor, failed to convince the Court that dismissal was inappropriate because the above-described deficiencies obviated the Court's need to reach such a theory. *Id.* at *20-21 (citing *Kilpatrick v. HCA Hum. Res., LLC*, No. 22-5307, 2023 WL 1961223, at *3 (6th Cir. Feb. 13, 2023)); *see also Kilpatrick*, 2023 WL 1961223, at *3 (noting that the plaintiff argued that he "represent[ed] his own comparator because he was treated well before he came out as gay," and declining to reach this "comparator issue" because the plaintiff failed to raise a genuine issue of material fact as to whether the defendant's "valid non-discriminatory reason for his termination . . . [was] actually a pretext for unlawful discrimination"). In dismissing Maeve's sex discrimination claims, the Court also granted Maeve leave to amend because it was unable to find that she lacked the ability to cure. *Maeve*, 2025 WL 458826, at *21, *27.

In her second amended complaint, Maeve adds the following allegations in support of her discrimination claims:

- Maeve first learned that Miller replaced Scully as her direct supervisor and evaluator on September 27, 2022, when Scully responded to Maeve's text message regarding her flex-time arrangement and arrivals to work by stating,

"I am sharing this with [Miller] . . . so that he is aware of this communication. Please work out any flex time with him as he is your [new] evaluator." (SAC ¶ 132; *cf. id.* ¶ 123, noting that on January 3, 2023, Scully failed to respond to a related email).

- During the 2023-24 school year and his first year working as a teacher, Leaf Farley ("Farley"), a "cisgender male person" and "similarly situated employee," requested and his supervisor approved a flex-time arrangement. (*Id.* ¶ 127.) Like Farley, Stacie Fleck ("Fleck") and Kyla Luksic ("Luksic"), who are "cisgender wom[e]n" and "similarly situated employee[s]," also requested and their supervisors approved flex-time arrangements. (*Id.* ¶¶ 128-29.)

- With respect to "mini evaluations," Maeve is unaware of any "other teachers [who] experienced more than two [mini] observations per year," nor is she aware of "other similarly situated employees" outside of her "protected class" who were "subjected to observations on the last days of a quarter, when the students were engaged in review preparation rather than active learning." (*Id.* ¶ 130; *see also id.* ¶¶ 77, 82-83, 86, 89-90, 92-93, 99, 105, 109, 113, addressing Miller's mini observations between mid-October and December 2022, including Maeve's third and fourth mini observations on December 1 and December 2, when Maeve's classes were engaged in a "final review preparation for their summative assessments" and on the last day of the quarter, and the cancellation of Maeve's fifth mini observation scheduled on December 16).

- Maeve observed Jade Robinson ("Robinson"), a "cisgender female person" and "similarly situated employee," "arriving for work in a non-punctual manner on several occasions" and without being disciplined. (*Id.* ¶ 131.) Maeve also observed one of Centennial's coaches, a "cisgender male person" who "taught students in the weight room down the hall from [her] classroom," "routinely leave students unsupervised" and without being disciplined. (*Id.* ¶ 133.)

- Maeve often observed Vivian Ngo ("Ngo"), a "cisgender female person" and "similarly situated employee" who "taught physics in the [neighboring] classroom," leave her classroom of students "unattended without arranging for supervision" or being disciplined. (*Id.* ¶ 134.) Maeve also observed Craig Watts ("Watts") and Joel McKee ("McKee"), who are "cisgender individuals," "speaking with students in the hallway" and without being disciplined. (*Id.*)

- Ngo "used 'interactive notebooks' to teach lessons outside the approved curriculum," and Centennial never disciplined Ngo for teaching such lessons. (*Id.* ¶ 135; *see also id.* ¶¶ 91, 125-26, noting that Maeve received a Letter of Direction from Miller on October 27, 2022, which included "significant inaccuracies" regarding Maeve's use of the "approved curriculum" and later served as a basis for Miller's recommendation to terminate Maeve's employment).

- In mid-December 2022, the plan that Ngo prepared for her substitute, Steven Spector ("Spector"), included setting "up a Christmas movie on Disney+ for

[Ngo's] students to watch." (*Id.* ¶ 136.) Centennial never subjected Ngo to disciplinary action for arranging for her students watch a movie. (*Id.*) By comparison, "Miller cited [Maeve's] showing a movie to her students without prior approval as an example of [Maeve] not following [school] board policy." (*Id.*)

- In late 2022 or early 2023, Ngo was injured when a "fight broke out . . . in [her] classroom" and Centennial granted her request to receive a "radio for safety." (*Id.* ¶ 136.) By comparison, Centennial denied Maeve's "requests," even though students' "repeated incidents of hate speech" prompted her to ask an assistant principal for a "radio for her personal safety" and she expressed "concerns about campus security cameras' coverage" at "full staff meetings." (*Id.*)

"When considering plausibility, courts must . . . consider an 'obvious alternative explanation' for [the] defendant's behavior." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 682)); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (finding "no obvious alternative explanation, within the meaning of *Iqbal*") (simplified). Having considered Maeve's additional allegations and any obvious alternative explanation for Miller's recommendation to terminate Maeve's employment, the Court concludes that Maeve alleges facts sufficient to state plausible sex discrimination claims under Title VII and ORS § 659A.030. *See generally Scheibe v. ProSupps USA, LLC*, 141 F.4th 1094, 1100 (9th Cir. 2025) (explaining that "[a] plaintiff's allegations need not defeat every alternative explanation" and dismissal is warranted "only when [a] defendant's plausible alternative explanation is so convincing that [the] plaintiff's explanation is *implausible*" (quoting

PAGE 38 – OPINION AND ORDER

*Eclectic Props. E., LLC*, 751 F.3d at 996)); *see also Hittle*, 101 F.4th at 1014 (noting that in employment discrimination cases, a court "cannot infer . . . discrimination based on factual allegations that are just as much in line with the non-discriminatory explanation [the court] ha[s] identified" (quoting *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 276 (1st Cir. 2022) (Rule 12(b)(6))).

In seeking dismissal of Maeve's sex discrimination claims, Centennial focuses primarily on whether Maeve identifies sufficiently similar comparators in the above-described paragraphs. (*See* Def.'s Mot. at 5-7, describing Maeve's additional allegations as "primarily center[ed] on employees" who Maeve "alleges were similarly situated" to her and arguing that in "addition to having similar jobs, employees must also engage in conduct of similar severity in order to possibly serve as a similar situated comparator," and that Maeve fails adequately to allege as much; Def.'s Reply at 3-4, doing the same). The Court finds Centennial's comparator arguments unpersuasive.

Centennial argues that the Court "should follow" the Ninth Circuit's approach in *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641-42 (9th Cir. 2003), and "compare the seriousness of the conduct of the comparators and [Maeve,] even though the conduct may not be so stark as one employee being given [a] direct order and the other not." (Def.'s Reply at 3.) Importantly, however, the Ninth Circuit evaluated whether the plaintiff's comparators were "similarly situated" and received more favorable treatment at summary judgment, not the pleading stage. *See Vasquez*, 349 F.3d at 641-42 (holding that the "district court properly granted summary judgment on [the plaintiff's] disparate treatment claim"). While a Title VII plaintiff "may eventually have to proffer evidence that [s]he and [a comparator] were similarly situated at summary judgment, a plaintiff is not strictly required to allege all elements of a prima facia

discrimination case at the pleading stage." *Smith*, 2025 WL 1513776, at *2 (first citing *Sheppard*, 694 F.3d at 1050 n.2; and then citing *Maduka v. Sunrise Hosp.*, 375 F.3d 909, 912 (9th Cir. 2004)).

Also noteworthy is that a Title VII plaintiff's demonstration of "such differential treatment is not an *additional* requirement under the fourth element" of the test for establishing a prima facie case of discrimination; rather, "[i]t is . . . [simply] an alternative means of satisfying the fourth element." *Lui*, 129 F.4th at 779. Put another way, "the fourth element of the . . . prima facie test requires only that the adverse action occurred under circumstances giving rise to an inference of discrimination[.]" *Damiano*, 140 F.4th at 1155 (simplified) (quoting *Lui*, 129 F.4th at 778).

Centennial fails adequately to address this issue or construe all inferences from Maeve's well-pleaded factual allegations in her favor, as this Court is required to do. *See Hawkins*, 906 F.3d at 767 n.2 (addressing the standard of review under Rule 12(b)(6)); *cf. Damiano*, 140 F.4th at 1156 ("The district court erred by considering only whether [the] [p]laintiffs showed that they were treated differently from other teachers who caused the same level of disturbance. . . . [The] [p]laintiffs do not have to identify comparators; they can also make out a prima facie case by showing that other circumstances surrounding their terminations give rise to an inference of discrimination."); *see also id.* at 1156 n.24 ("In moving for summary judgment, [the] [d]efendants did not address—and the district court did not consider—whether, viewing the record in light most favorable to [the] [p]laintiffs, there is sufficient evidence of circumstances that give rise to an inference of discrimination. We decline to consider this question in the first instance.").

///

Centennial, for example, argues that "even if it is fair to infer" that "none" of Maeve's comparators were "terminated," Maeve's "newly added allegations" fail to establish that Centennial never disciplined them. (Def.'s Reply at 7.) Not so. It is reasonable to infer that these comparators were not disciplined because Maeve alleges that this is true to the "best [of her] knowledge," and does not allege that they lost their jobs like she did. (SAC ¶¶ 127, 130-31, 133-35.)

Centennial also argues that Maeve does not allege that Miller knew about these comparator employees' "conduct, which would be a necessary prerequisite to him disciplining those employees." (Def.'s Mot. at 7.) Relatedly, in addressing Ngo as a potential comparator, Centennial argues that Maeve's allegations about Miller's actions "still . . . nullify any inference that [his] . . . termination decision was motivated by [Maeve's] protected class status[.]" (*Id.* at 6.)

Contrary to Centennial's arguments, it is reasonable to infer that if Miller determined that he was "missing . . . times" on Maeve's attendance report by "look[ing] at the cameras" and comparing date and timestamps, Miller knew about other employees like Robinson, who Maeve observed "arriving for work in a non-punctual manner on several occasions." (SAC ¶¶ 114, 131.) It is also reasonable to infer that if a new principal thoroughly reviewed one employee's rule compliance, that principal likely engaged in other comparable reviews and thus knew about other employees committing the same or similar violations. Finally, it is unclear why (1) several employees worked on flex-time schedules during Miller's tenure, but Maeve was not allowed to do so, and (2) only Maeve underwent more than two mini observations (and in a less than sixty-day period).

///

PAGE 41 – OPINION AND ORDER

For all of these reasons, the Court concludes that Maeve alleges facts sufficient to state plausible sex discrimination claims under Title VII and ORS § 659A.030, and thus denies Centennial's motion to dismiss on this ground. *See Smith*, 2025 WL 1513776, at *3 ("To summarize, [the plaintiff's] complaint establishes 'an entirely plausible scenario of employment discrimination.' . . . In other words, [the plaintiff] has pleaded 'enough details about the subject matter of the case to present a story that holds together[.]'" (quoting *Sheppard*, 694 F.3d at 1050)).

### 3.    Maeve's Retaliation Claims

Centennial moves to dismiss Maeve's second amended complaint on the ground that she fails to allege facts sufficient to state plausible retaliation claims under Title VII and ORS § 659A.030(1)(f). (*See* Def.'s Mot. at 5-7; Def.'s Reply at 3-4; Pl.'s Resp. at 2-6; *cf.* SAC ¶¶ 150, 163, alleging that Centennial retailed against Maeve because she "opposed . . . unlawful discrimination").

As discussed, Title VII prohibits retaliation against any individual "because [s]he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). "To establish a prima facie case of retaliation, [a plaintiff] must show that '(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two.'" *Lui*, 129 F.4th at 782 (quoting *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008); *see also Xu*, 2024 WL 4562748, at *2 ("[C]ourts analyze Oregon retaliation claims together with Title VII retaliation." (citing *Meyer*, 426 P.3d at 109)); *Karthauser*, 2023 WL 371649, at *2 (addressing a plaintiff's claims under Title VII's opposition clause and explaining that the same three elements are necessary "[t]o prove retaliation under both Title VII and its Oregon counterpart, ORS [§] 659A.030(1)(f)"); *Meyer*, 426 P.3d at 109 (describing a prima facie case of retaliation under Title VII in a comparable way

and how "[t]he elements of a prima facie case under ORS [§] 659A.030(1)(f) are substantially similar").

"[A] plaintiff making a retaliation claim under [Section] 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see also Tsur v. Intel Corp.*, No. 3:21-cv-00655-SI, 2021 WL 4721057, at *14 (D. Or. Oct. 8, 2021) ("The protected activity must be the but-for cause of the adverse employment action. . . . Oregon law requires a similar showing."). The Court previously dismissed Maeve's retaliation claims on the ground that she failed to plead facts that supported a plausible inference that her allegedly protected activity was a but-for cause of Miller's recommendation to terminate her employment. *See Maeve*, 2025 WL 458826, at *22, *27. The Court also granted Maeve leave to amend her retaliation claims. *Id.*

The parties dispute whether Maeve's amended retaliations claims cure the deficiency that the Court previously identified, relying on the same arguments that the Court addressed in evaluating Maeve's sex discrimination claims. (*See* Def.'s Mot. at 5-7; Def.'s Reply at 3-4 & Pl.'s Resp. at 2-6, disputing generally whether Maeve alleges the requisite connection between her protected class or activity and any adverse employment action). "A plaintiff is subjected to an adverse employment action because of her opposition to an unlawful employment practice if the adverse employment action would not have occurred but for that opposition." *Karthauser*, 2023 WL 371649, at *2 (citing *Bostock*, 590 U.S. at 656); *see also Bostock*, 590 U.S. at 656 ("Th[is] form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause. . . . In other words, a but-for test directs [courts] to change one thing at a time and see if the outcome changes. If it does, [courts] have found a but-for cause.") (citation omitted).

For the same reasons discussed above, the Court concludes that Maeve's additional allegations, which concern Centennial's differing treatment of other employees' similar requests and conduct during Miller's tenure as principal, Maeve's opposition to related practices, and Miller's knowledge of Maeve's arrangements with her previous supervisor and evaluator, are sufficient at this stage to give rise to an inference of but-for causation. *See Xu*, 2024 WL 4562748, at *2 ("Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." (citing *Bell v. Clackamas County*, 341 F.3d 858, 865-66 (9th Cir. 2003))); *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) (explaining that "[t]o make out [a retaliation] claim, [the plaintiff] had to show that her protected conduct was a but-for cause—but not necessarily the only cause—of her termination" (citing *Villiarimo*, 281 F.3d at 1064-65)); *cf. Gage v. Mayo Clinic*, No. 23-4410, 2025 WL 1733503, at *2 (9th Cir. June 23, 2025) ("[A]lthough the temporal proximity between [the plaintiff's protected activity] and the termination of her hiring process might otherwise give rise to an inference of causation . . . , the [operative pleading] alleges facts that make this inference implausible." (citing *Bell*, 341 F.3d at 865)).

Accordingly, the Court concludes that Maeve states plausible retaliation claims under Title VII and ORS § 659A.030(1)(f), and therefore denies Centennial's motion to dismiss on this ground.

## III.    ADA AND PARALLEL STATE LAW

In her fifth claim, Maeve alleges that Centennial violated the ADA by retaliating against her for engaging in protected activity. (SAC ¶¶ 178, 180.) In her sixth claim, Maeve alleges that Centennial violated (1) ORS § 659A.109 by firing her "in retaliation for invoking protected

activity," and (2) ORS § 659A.112 by "terminat[ing] [her] because of her disability[.]"[9]

(*Id.* ¶¶ 188, 190.) Centennial moves to dismiss Maeve's fifth and sixth claims to the "extent

[Maeve] seeks relief other than reinstatement with backpay or related equitable relief." (Def.'s

Mot. at 7.)

### A.    Applicable Law

"Claims under the ORA are [generally] evaluated using the same legal standard as the

federal ADA." *Kelly v. Boeing Co.*, 848 F. App'x 692, 694 n.1 (9th Cir. 2021) (citing *Snead v.*

*Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001)); *see also* OR. REV. STAT.

§ 659A.139(1) (addressing construction of ORS §§ 659A.103 to 659A.144 and providing that

these provisions "shall be construed to the extent possible in a manner that is consistent with any

similar provisions of the federal [ADA]"). Thus, courts often address "ADA and ORA claims

together." *Kelly*, 848 F. App'x at 694 n.1; *see also Kimmons v. First Transit, Inc.*, No. 3:21-cv-

00768-SB, 2023 WL 5836029, at *24 (D. Or. Sept. 8, 2023) (addressing "ADA and ORA

---

[9] Maeve's sixth claim only refers generally to the Oregon Rehabilitation Act ("ORA")
and the ORA's definitions of a "disabled person" and "employer," but it appears to be comprised
of both disability retaliation and discrimination claims under ORS § 659A.109 and 659A.112.
(*See* SAC ¶¶ 184-93), *cf. Cullen v. Clean Water Servs.*, 344 Or. App. 228, 235 (2025) ("[The]
[p]laintiff raised multiple employment claims in his complaint, all of which stem from [his
former employer's] treatment of his disability of depression. To prove those claims, [the]
plaintiff was required to demonstrate that an adverse employment action was undertaken because
of a protected characteristic (in this case, his disability), ORS [§] 659A.112, or because he
engaged in a protected activity (in this case, seeking accommodation for his disability), ORS
[§] 659A.109."); *Trautner v. State*, 326 Or. App. 458, 459 (2023) ("[The] [p]laintiff asserted
employment discrimination and retaliation claims, ORS [§] 659A.112 and ORS
[§] 659A.109[.]"); OR. REV. STAT. § 659A.109 (making it unlawful to "discriminate against an
individual with respect to hire or tenure or any term or condition of employment because the
individual has applied for benefits or invoked or used the procedures provided for in ORS
[§§] 659A.103 to 659A.145 or has given testimony under the provisions of ORS [§§] 659A.103
to 659A.145"); OR. REV. STAT. § 659A.112(1) ("It is an unlawful employment practice for any
employer to refuse to hire, employ or promote, to bar or discharge from employment or to
discriminate in compensation or in terms, conditions or privileges of employment on the basis of
disability.").

discrimination claims together"); *Hanson v. Or. Legis. Assembly*, No. 3:21-cv-00780-SI, 2023
WL 22196, at *12-13 (D. Or. Jan. 3, 2023) (evaluating the plaintiff's "retaliation claims under
the ADA and Oregon law" together and dismissing the claims sua sponte based on ADA
precedent).

### B. Analysis

#### 1. Relevant Procedural History

Before turning to the parties' arguments, the Court briefly recounts the relevant
procedural history.

In its initial motion, Centennial argued that Maeve's fifth and sixth claims under the
ADA and ORA were subject to the "same legal standards." (Def.'s First Mot. at 8, citing *Kelly*,
848 F. App'x at 694 n.1.) Centennial also presented arguments indicating that the Court should
either dismiss Maeve's fifth and sixth claims in their entirety or in part. (*Id.* at 2, 8; Def.'s First
Reply Supp. Mot. Dismiss ("Def.'s First Reply") at 2, 5, ECF No. 15.) For example, Centennial
"move[d] the Court for an order dismissing [Maeve's] Fifth and Sixth Claims for Relief for
failure to state a claim," arguing that Maeve's "Fifth and Sixth Claims for Relief seek remedies
that are not available under Title I of the [ADA] . . . or the [ORA, and] . . . [a]ccordingly, those
claims should be dismissed." (Def.'s First Mot. at 2-3.) Centennial also argued that "[b]ecause
[Maeve] does not seek relief that can be granted by the Court, [Maeve's] Fifth and Sixth Claims
for Relief should be dismissed." (*Id.* at 8.) Furthermore, Centennial concluded by requesting
dismissal of both claims, without qualification. (*Id.* at 11.)

At the same time, Centennial also noted that Maeve styled her "Fifth Claim [as] fully
premised on alleged retaliation" and Maeve styled her "Sixth Claim for Relief [as] partially
premised on retaliation." (*Id.* at 8, citing FAC ¶¶ 167, 178.) Relatedly, Centennial argued that
(1) "[m]onetary relief is not available for retaliation claims premised on Title I of the ADA or the

PAGE 46 – OPINION AND ORDER

[ORA]," (2) "[f]ormer employees . . . lack standing to seek equitable relief on such claims for anything other than reinstatement" and Maeve did "not seek reinstatement as an equitable remedy," and thus (3) the Court should dismiss Maeve's "Fifth and Sixth Claims for Relief . . . to the extent that they seek monetary damages for an alleged violation of Title I of the ADA or the [ORA] . . . because monetary relief is not available by law for such claims and [Maeve, a former employee, did] not seek reinstatement as an equitable remedy." (*Id.*, first citing *Kimmons*, 2023 WL 5836029 at *30-31, which cited *Hanson*, 2023 WL 22196, at *12-13; and then citing FAC ¶¶ 178, 181.)

Maeve provided a two-sentence response. First, Maeve "recognize[d] Ninth Circuit precedent concerning money damages for retaliation claims under Title I [of the ADA]." (Pl.'s Resp. Def.'s First Mot. Dismiss ("Pl.'s First Resp.") at 6, ECF No. 13.) In other words, Maeve recognized *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261 (9th Cir. 2009), in which the Ninth Circuit held that "punitive and compensatory damages are not available for ADA retaliation claims[, and] [b]ecause such claims are limited to the equitable relief specified in 42 U.S.C. §2000e-5(g)(1), . . . [a plaintiff is] not entitled to a jury trial on . . . ADA retaliation claims." *Id.* at 1270-71; *cf. Kimmons*, 2023 WL 5836029, at *30-31 (reflecting that this Court relied on *Alvarado* and *Hanson* in a recent case in which Maeve's counsel represented the plaintiff); *Hanson*, 2023 WL 22196, at *12-13 (demonstrating that the district court relied largely on *Alvarado*).

Second, Maeve argued that contrary to Centennial's argument, she requested "equitable relief, including, but not limited to, a finding that [Centennial] violated the ADA." (Pl.'s First Resp. at 6, citing FAC ¶ 170; *cf.* FAC ¶ 170, reflecting that Maeve alleged only that she was

"entitled to equitable relief, including, but not limited to, a finding that [Centennial] violated the ADA").

Centennial addressed Maeve's two-sentence response in its reply. (Def.'s First Reply at 2, 5.) Centennial argued that Maeve's Fifth and Sixth Claims for Relief did "not seek any remedy available to [Maeve] and should be dismissed," Maeve's response did not "adequately identify the facts or legal authorities necessary to overcome the defects" that Centennial identified, and Maeve "concedes that monetary relief is not available for her Fifth and Sixth Claims for Relief." (*Id.*)

After the parties completed their briefing, the Court held oral argument on Centennial's initial motion to dismiss. The Court asked Maeve's counsel about the absence of any request for reinstatement and potential mootness and advisory nature of the only pled form of equitable relief upon which she relied in her response (i.e., a declaration that Centennial violated the ADA). Maeve's counsel represented that he recalled this Court's recent opinion in *Kimmons,* the amended complaint did not include an allegation related to or request for reinstatement, he advised Centennial's counsel during conferral that Maeve was seeking reinstatement but he elected not to amend to add a reinstatement request because he knew that Centennial's other motions were forthcoming, and if he received a chance to amend, he would add Maeve's request for reinstatement as an available form of relief. More generally, Maeve's counsel also represented that if the Court found that he failed adequately to plead any claim, he would welcome an opportunity to make additional changes because he could and would allege other supporting facts.

Significantly, and like his written response, Maeve's counsel made no reference at oral argument to Maeve's sixth claim under the ORA being comprised of independent causes of

action: (1) a retaliation claim under ORS § 659A.109, and (2) a discrimination claim under ORS § 659A.112. Nor did Maeve's counsel address the remedies available under each of these claims compared to the ADA or the extent to which he pled such available remedies, thus undermining Centennial's suggestion that the Court should dismiss Maeve's fifth and sixth claims in their entirety.

One week later, the Court issued an Opinion and Order "limited to the forms of relief that the parties raised in their motion papers, and [did not] address issues related to other forms of equitable relief, such as[, but not limited to,] nominal damages."[10] *Maeve*, 2025 WL 458826, at *15 n.9. Relying on Maeve's counsel's arguments and "recognition of circuit precedent concerning money damages for retaliation claims under [ADA] Title I," the Court granted Centennial's motion to dismiss Maeve's fifth and sixth claims to the extent that she requested "compensatory damages." *Maeve*, 2025 WL 458826, at *11, *13 (simplified) (citing *Alvarado*, 588 F.3d at 1264-65, 1269-70). After doing so, the Court turned to the only pled form of equitable relief upon which Maeve relied: a finding or declaration that Centennial "violated the ADA's anti-retaliation provision." *Id.* at *13-14. The Court determined that Maeve's request for declaratory relief was moot and explained, among other things, that as Maeve's counsel acknowledged at oral argument (i.e., counsel postponed amendment to add a request for reinstatement), Maeve presented no allegations from which the Court could infer that (1) its

---

[10] "Given [its] neutral role, [a court typically] will not develop legal arguments for a party, instead addressing only properly presented and sufficiently developed arguments." *Murphy v. Elec. & Elevator Bd.*, 338 Or. App. 448, 449-50 (2025). Thus, courts often "limit [them]selves to addressing the arguments that are properly presented and at least minimally sufficiently developed in [a party's] briefing." *Id.*; *see also id.* at 450 (noting that the court had previously rejected a "conclusory" argument because "it [was] not [the] court's function to speculate as to what a party's argument might be[, nor was it the court's] proper function to make or develop a party's argument when that party ha[d] not endeavored to do so itself") (simplified).

"finding" or declaration that Centennial violated the ADA's anti-retaliation provision might affect Centennial's behavior toward Maeve or impact the parties' relationship beyond this litigation, (2) Maeve had any reasonable expectation of working for Centennial in the future, or (3) there was a reasonable expectation that Centennial's challenged conduct would affect Maeve in the future. *Id.* at *14-15 (citing *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 863-68, 871 (9th Cir. 2017)).

For these reasons, and given the allegations before it and the arguments that the parties properly presented and sufficiently developed, the Court dismissed Maeve's fifth and sixth claims and granted Maeve's counsel's request to amend to allege additional facts and address matters that the parties discussed during conferral. *See id.* at *11, *13-15, *28 (granting leave to amend complaint if Maeve believed that she could cure any "pleading deficiencies discussed herein"). Considering Maeve's counsel's arguments and representations, the Court added that if Maeve elected not to file an amended complaint, the case would proceed on her "claims under the ADA, FMLA, OFLA, OSLA, and ORS § 659A.199 (claims four and seven through ten)." *Id.* at *28.

Despite this procedural history, Maeve's counsel did not promptly file an amended pleading. Instead, Maeve's counsel moved for an extension and for reconsideration under Rule 60. (Pl.'s Mot. Recons. at 1-9; Pl.'s Unopposed Mot. Extension Time at 1-2.) Maeve's counsel argued that Centennial's initial motion "concerned only claim five and part of claim six," emphasizing that unlike Maeve's ADA claims (and others), Maeve's amended complaint, which spanned fifty-four pages and included ten titled "claim[s] for relief" and 231 paragraphs, presented Maeve's state disability discrimination and retaliation claims as a single combined cause of action (and without any direct citation to the statutory section that Centennial allegedly

violated). (Pl.'s Mot Recons. at 1-2; *see also* FAC ¶¶ 174-84; *cf. id.* ¶¶ 127-31) (bold and caps omitted).

Additionally, Maeve's counsel emphasized that the Court failed to discuss this aspect of Maeve's sixth claim and yet advised that if Maeve elected not to file a second amended complaint, this lawsuit would proceed only on claims four and seven through ten, and that Maeve's counsel did not "agree that state law damages are controlled by federal law," an issue that the parties never raised. (Pl.'s Mot Recons. at 1-2.) Unlike his response and oral arguments, Maeve's counsel included a detailed discussion on the remedies available under federal and state disability discrimination and retaliation law, how the Court erred in dismissing Maeve's fifth and sixth claims in their entirety because Maeve requested available equitable relief in the form of back pay, and unlike the federal ADA, Oregon law allows plaintiffs to recover, among other things, back pay and compensatory damages in disability discrimination and retaliation cases. (*Id.* at 2-8.)

Before Centennial filed a response to Maeve's motion for reconsideration, the Court issued an order on March 24, 2025, granting Maeve's stipulated motion to extend her amended pleading deadline to March 31, 2025, and denying as moot Maeve's motion for reconsideration under Rule 60. (ECF No. 26, first citing *Heineke*, 812 F. App'x at 645-46; then citing FED. R. CIV. P. 10(b); and then citing *Peshkepia-Cadena*, 644 F. App'x at 715); *see also Heineke*, 812 F. App'x at 645-46 (reversing a denial of leave to amend because although the plaintiff failed to "plead a distinct cause of action" under a federal statute, the district "court's guidance . . . 'made no reference to . . . Rule 10(b)' . . . , and did not specifically warn [the plaintiff] that failure to plead the . . . claim as a separate cause of action would result in dismissal with prejudice" (quoting *Bautista*, 216 F.3d at 841)); FED. R. CIV. P. 10(b) ("If doing so would promote clarity,

PAGE 51 – OPINION AND ORDER

each claim founded on a separate transaction or occurrence . . . must be stated in a separate count[.]").

The Court explained that it did not dismiss any claim with prejudice and Maeve may clarify each claim and form of relief on which she intended to proceed. (ECF No. 26); *cf. Unimax Commcn's, LLC*, 2025 WL 3090751, at *1 (finding that a plaintiff "waived" its "claims for equitable estoppel and waiver or modification of the contract by failing to raise th[o]se arguments in its opening brief," and its "unconscionability argument by failing to substantively address unconscionability in its opposition to the [defendant's] motion to dismiss" (first citing *Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012); and then citing *Carroll*, 342 F.3d at 945)).

### 2.    Disposition

Centennial now moves for a second time to dismiss Maeve's fifth and sixth claims (i.e., Maeve's claims for disability retaliation under the ADA and retaliation and disability discrimination under Oregon law) "for failure to state a claim." (Def.'s Mot. at 2; *cf.* SAC ¶¶ 177-84.) Centennial seeks dismissal of Maeve's fifth and sixth claims "to the extent that [Maeve] seeks relief other than reinstatement with backpay or related equitable relief." (Def.'s Mot. at 7.)

Centennial's arguments concern Maeve's allegations in paragraph 179, 189, and 191 of her second amended complaint. (*Id.* at 7; Def.'s Reply at 4.) Centennial initially argues that Maeve "still appears" to seek "compensatory damages" under her ADA retaliation claim and that such "relief is not available" to Maeve. (Def.'s Mot. at 7-8 & Def.'s Reply at 4, citing SAC ¶ 179.)

Centennial's arguments regarding Maeve's ADA retaliation claim rely on an inaccurate quotation: "As a result of [Centennial's] unlawful employment actions, [Maeve] suffered, and

continues to suffer, *emotional distress* economic and non-economic damages." (Def.'s Mot. at 7 & Def.'s Reply at 4, purporting to quote SAC ¶ 179, ECF No. 27, as to Maeve's "Title I claim") (emphasis added). In fact, Maeve alleges only that "[a]s a result of [Centennial's] unlawful employment actions, [she] suffered, and continues to suffer, economic and non-economic damages." (SAC ¶ 179.)

Further, and unlike her previous complaint and response, Maeve now makes clear that the "equitable relief" that she seeks includes "reinstatement with back pay or any other equitable relief (such [as] front pay to cover any gap period)," a "finding that [Centennial] violated the ADA," and an "order enjoining [Centennial] from engaging in the unlawful employment practice" at issue. (*Id.* ¶ 180; *see also* Pl.'s Resp. at 6-8, responding and also incorporating Maeve's motion for reconsideration to "avoid duplicative briefing"). Maeve adds in a footnote that she "requests compensatory damages as part of her wrongful discharge claim." (SAC at 50 n.1.)

Congress has "made available compensatory and punitive damages in the context of disability claims brought under specified sections of the ADA." *Bayer*, 861 F.3d at 863 (first citing *Alvarado*, 588 F.3d at 1264; and then citing 42 U.S.C. § 1981a(a)(2)). However, "[b]ecause Congress did not specify . . . that such damages were to be available in the context of ADA claims brought under [42 U.S.C.] § 12203, [the Ninth Circuit has] held that such claims remain 'redressable only by equitable relief[.]'" *Id.* (quoting *Alvarado*, 588 F.3d at 1264-70); *see also Alvarado*, 588 F.3d at 1264 (addressing "the ADA's anti-retaliation provision, 42 U.S.C. § 12203(a)").

Specifically, the Ninth Circuit has held that "punitive and compensatory damages are not available for ADA retaliation claims[, and that] such claims are limited to the equitable relief

specified in 42 U.S.C. § 2000e-5(g)[.]" *Alvarado*, 588 F.3d at 1270 (holding as much and

adopting the "Seventh Circuit's reasoning" (citing *Kramer v. Banc of Am. Sec.*, 355 F.3d 961,

965-66 (7th Cir. 2004))); *see also id.* at 1268 ("This limitation is unsurprising because ADA

retaliation claims have been historically redressed solely by equitable relief pursuant to 42

U.S.C. § 2000e-5(g)(1)." (citing *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1067-69 (9th

Cir. 2005))).

　　　　Maeve alleges and confirms that she seeks only equitable relief available in ADA

retaliation cases:

> [A] court may enjoin the respondent from engaging in such unlawful employment
> practice, and order such affirmative action as may be appropriate, which may
> include, but is not limited to, reinstatement or hiring of employees, with or
> without back pay (payable by the employer . . . for the unlawful employment
> practice), or any other equitable relief as the court deems appropriate. . . .

42 U.S.C. § 2000e-5(g)(1); *see also Lutz*, 403 F.3d at 1069 (holding that "there is no right to

have a jury determine the appropriate amount of back pay under . . . the ADA" and "back pay

remains an equitable remedy to be awarded by the district court in its discretion," and observing

that the ADA incorporates "Title VII's back pay remedy," i.e., Section 2000e-5(g)); *Bayer*, 861

F.3d at 866 (noting that in the ADA context, "money damages in the form of front pay are

equitable when awarded in lieu of injunctive reinstatement" (citing *Pollard v. E.I. du Pont de

Nemours & Co.*, 532 U.S. 843, 849-51 (2001))); *Traxler v. Multnomah County*, 596 F.3d 1007,

1011-12 (9th Cir. 2010) (holding that in the related FMLA context, "front pay is an equitable

remedy that must be determined by the court, both as to the availability of the remedy and the

amount of any award"); Ninth Circuit Manual of Model Jury Civil Jury Instructions § 12.14

(2025) (commenting on these cases and the availability of ADA damages and noting that

"precedent indicates" but has "not directly addressed" that "front pay is also within the discretion

of the court, not the jury").

In sum, the Court denies Centennial's motion to dismiss Maeve's fifth claim (ADA retaliation) because Maeve seeks available equitable relief. *See Teutscher v. Woodson*, 835 F.3d 936, 954 (9th Cir. 2016) (explaining that "[r]einstatement and front pay are alternative remedies, which cannot be awarded for the same period . . . because front pay is the 'monetary equivalent' of reinstatement," and adding that "[d]uplicative recovery is easily avoided when only equitable relief is at issue" because a "district court may craft an award comprising exclusively reinstatement, exclusively front pay, or interim front pay until reinstatement occurs") (simplified).

With respect to Maeve's disability retaliation and discrimination claims under ORS § 659A.109 and 659A.112, Centennial suggests that Maeve is not entitled to recover damages for "emotional distress" and "economic damages" like "past and future wages, past and future benefits, and other expenses." (*See* Def.'s Mot. at 7-8, citing SAC ¶¶ 189, 191; Def.'s Reply at 4, challenging "emotional distress" damages; SAC ¶¶ 180, 190, making nearly identical requests for equitable relief under both Maeve's ADA retaliation and state disability-based claims). In support, Centennial relies on this Court's previous decisions in this case and *Kimmons*. (Def.'s Mot. at 8.)

Neither of the decisions on which Centennial relies addressed the question presented here because, as discussed above and at oral argument, neither the circumstances nor the parties' arguments necessitated the Court's evaluation of whether and the extent to which federal and Oregon law may differ on damages and equitable relief. *See Karthauser*, 2023 WL 371649, at *8-10 (evaluating federal and Oregon law regarding front pay and back pay and identifying a "departure" that conflicted with oft-cited and still applicable "case law generally interpreting Oregon's employment discrimination laws to be essentially equivalent" to federal counterparts)

(simplified). Given Maeve's recent clarifications, the legal authorities upon which Centennial relies fail to support its argument that it is entitled to dismissal of Maeve's disability retaliation and discrimination claims under ORS §§ 659A.109 and 659A.112. If any disputes remain at summary judgment, however, Centennial may revisit those issues with sufficiently developed arguments.

For these reasons, the Court also denies Centennial's motion to dismiss Maeve's sixth claim.

## IV.    WHISTLEBLOWING

Centennial moves to dismiss on the ground that Maeve fails to allege facts sufficient to state a plausible whistleblower claim under ORS § 659A.199. (Def.'s Mot. at 2, 8-9; Def.'s Reply at 4-5.)

### A.    Applicable Law

ORS § 659A.199 makes it unlawful for private and public employers to discriminate or retaliate against employees who, in good faith, report a violation of a state or federal law, rule, or regulation:

> It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment *for the reason* that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation.

*Ossanna v. Nike, Inc.*, 445 P.3d 281, 292 (Or. 2019) (quoting OR. REV. STAT. § 659A.199(1));

*see also McClusky v. City of North Bend*, 549 P.3d 557, 520 (Or. Ct. App. 2024) ("ORS [§] 659A.199 . . . .'provide[s] protections against retaliation to the employees of private employers' who are not covered by [the public employee whistleblower statute,] ORS [§] 659A.203, and . . . 'suppl[ies] additional protections to employees of public employers' by

allowing for another cause of action to be available for a broader range of protected conduct than afforded by ORS [§] 659A.203." (quoting *Burley v. Clackamas County*, 446 P.3d 564, 568 (Or. Ct. App. 2019))).

"By its terms, [ORS § 659A.199] protects good faith reports of *any* illegal activity and does not require that the reported activity be attributable to the employer." *Burley*, 446 P.3d at 567; *McClusky*, 549 P.3d at 566 (same). "Thus, for example, the statute protects an employee who reports illegal conduct by a fellow employee, even if that conduct could not be deemed to be conduct of the employer itself." *Burley*, 446 P.3d at 567. At the same time, "[h]owever, ORS [§] 659A.199 does require that the employer' adverse employment action be taken 'because' of or 'for the reason that' the employee reported a violation of law." *McClusky*, 549 P.3d at 567 (quoting *Ossanna v. Nike*, 415 P.3d 55, 62 (Or. Ct. App. 2018), *aff'd*, 445 P.3d 281 (Or. 2019)); *see also Ossanna*, 415 P.3d at 62 (reiterating that "'for the reason that' is synonymous with 'because'").

ORS § 659A.199 also "requires 'a subjective, good-faith belief that the reported information is evidence of unlawful activity.'" *Cuddigan-Placito v. State Accident Ins. Fund*, 560 P.3d 715, 725 (Or. Ct. App. 2024) (quoting *Folz v. State ex rel. Or. Dep't of Transp.*, 404 P.3d 1036, 1039-40 (Or. Ct. App. 2017)); *McClusky*, 549 P.3d at 565 ("ORS [§] 659A.199 applies a subjective, good faith standard to employees who report *perceived* violations of the law." (quoting *Boyd v. Legacy Health*, 507 P.3d 715, 723 (Or. Ct. App. 2022))). As a result, "an employee has engaged in protected activity under that provision if the employee has reported information that he or she subjectively believes is a violation of a state or federal law, rule, or regulation and has a good faith basis for that belief." *Boyd*, 507 P.3d at 723. Importantly, it is "irrelevant whether hindsight proves that a violation of law in fact occurred," because Oregon

courts "look to what the employee knew at the time of the report." *McClusky*, 549 P.3d at 565 (citing *Hall v. Oregon*, 366 P.3d 345, 351 (Or. Ct. App. 2015)). It is also irrelevant whether the employee "identif[ied] the specific provision[] of law that [has] been violated," because the employee need only "articulate facts that may constitute a violation of law." *Id.* (citing *Walker v. State ex rel. Or. Travel Info. Council*, 484 P.3d 1035, 1047 (Or. 2021)); *see also Cuddigan-Placito*, 560 P.3d at 725 ("What constitutes a 'report' under ORS [§] 659A.199 is synonymous with 'disclosure,' which . . . mean[s] 'to make known or to open up to general knowledge.'") (citation omitted).

### B.    Analysis

Centennial argues that the Court should dismiss Maeve's whistleblower claim because Maeve fails plausibly to allege a causal link between her reporting activity and discharge. (Def.'s Mot. at 8-9.)

In its initial decision, the Court granted in part and denied in part Centennial's motion to dismiss Maeve's whistleblower claim under ORS § 659A.199. *See Maeve*, 2025 WL 458826, at *28. To the extent it granted the motion, the Court relied on its reasons for finding implausible Maeve's sex discrimination and retaliation claims, noting that Maeve's whistleblower claim was "premised in part on Maeve's and Miller's meeting on September 29, 2022, at which Maeve told Miller for the first time about 'gender and sex bias incidents and crimes [that] she had experienced in the previous school year.'" *Id.* (quoting Am. Compl. ¶ 228). This was notable because Maeve's allegations suggested that "Miller immediately acted on [her] reports of bias incidents predating his time as principal and played a role in initiating an outside consultant's investigation, which resulted in a multi-day equity audit addressing issues that [she] raised." *Id.* at *20.

///

In its pending motion, Centennial argues that Maeve's newly added allegations "do not touch on this [September 29, 2022] meeting," "allege new conduct on . . . Miller's part," "correct the deficiency" that the Court identified, or suggest that a "report of a violation of law was [a] motivating factor in [Maeve's] termination. (Def.'s Mot. at 8-9; Def.'s Reply at 3-4.) The Court disagrees.

The Court must (and once again does) analyze Maeve's whistleblower claim separately from her retaliation claim under Title VII, as these claims "cover different categories of conduct" and "can produce divergent results." *Xu*, 2024 WL 4562748, at *3 (first citing *White*, 548 U.S. at 68; then citing *Summerfield v. Or. Liquor Control Comm'n*, 472 P.3d 231, 242-43 (Or. 2020); and then citing *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1097 (D. Or. 2015)). "To prove a violation [under ORS § 659A.199], a plaintiff must establish a causal link between her complaints about the violation of a law . . . , and [the] defendant's adverse employment actions[.]" *Rohrer v. Oswego Cove, LLC*, 482 P.3d 811, 816 (Or. Ct. App. 2021) (simplified).

Taken together, Maeve's previous and new allegations are sufficient at this stage to infer such a causal link. Contrary to Centennial's arguments, Maeve's new allegations concern Centennial's differing treatment of other employees' similar requests and conduct during Miller's tenure as principal, Maeve's opposition to practices related to the terms, conditions, or privileges of her employment (flex-time work schedules, etc.), and Miller's knowledge of Maeve's arrangements with her previous supervisor and evaluator. *See generally Summerfield*, 472 P.3d at 242 (emphasizing that Oregon's "whistleblowing statute covers only a subset of th[e] conduct [covered under ORS § 659A.030(1)(f)]; specifically, [ORS § 659A.199] covers conduct that relate[d] to the 'terms, conditions, or privileges of employment'" (quoting OR. REV. STAT.

§ 659A.199(1))). Accordingly, the Court concludes that Maeve states a plausible whistleblower claim.

For these reasons, the Court denies Centennial's motion to dismiss Maeve's claim under ORS § 659A.199.

## V.    WRONGFUL DISCHARGE

Centennial argues that Maeve fails to allege facts sufficient to state a claim for wrongful discharge in violation of public policy. (Def.'s Mot. at 2, 9-10; Def.'s Reply at 5-6.) The Court disagrees.

### A.    Applicable Law

The "general rule" in Oregon is that "an employer may discharge an employee at any time, for any reason, unless doing so violates a contractual, statutory or constitutional requirement." *Sheppard*, 694 F.3d at 1049 (first quoting *Yeager v. Providence Health Sys. Or.*, 96 P.3d 862, 865 (Or. Ct. App. 2004); and then citing *Estes v. Lewis & Clark Coll.*, 954 P.2d 792, 796 (Or. Ct. App. 1998)). The common law "tort of wrongful discharge provides an exception to this general rule." *Id.* (citing *Estes*, 954 P.2d at 796). Under this exception, an employee may bring a wrongful discharge claim when (1) her "discharge [was] for exercising a job-related right that reflects an important public policy," or (2) "she was discharged 'for fulfilling some important public duty.'" *Id.* at 1051 & n.3 (first quoting *Yeager*, 96 P.3d at 865; and then quoting *Babick v. Or. Arena Corp.*, 40 P.3d 1059, 1062 (Or. 2002)); *see also Lamson v. Crater Lake Motors, Inc.*, 173 P.3d 1242, 1246-47 (Or. Ct. App. 2007) ("Unless [the] plaintiff can demonstrate that his discharge was based on one of those exceptions to the at-will employment rule, his discharge is not actionable at common law."), *aff'd*, 216 P.3d 852 (Or. 2009).

///

PAGE 60 – OPINION AND ORDER

"To recover on [a] . . . common-law wrongful discharge claims, [a] plaintiff must establish that the protected activity [in which she] engaged . . . was a substantial factor in the decision to terminate [her] employment." *Boyd*, 507 P.3d at 725 (first citing *Ossanna*, 415 P.3d at 62; and then citing *Estes*, 954 P.2d at 796). Under Oregon law, "[a] substantial factor is a factor that made a difference." *Ossanna*, 445 P.3d at 293-94 (quoting jury instructions involving the "substantial-factor causation requirement," which defined this factor and were not "legally incorrect").

### B.    Analysis

Centennial argues Maeve fails to allege facts sufficient to state a wrongful discharge claim. (Def.'s Mot. at 9-10; Def.'s Reply at 5-6.) Similar to the claims discussed above, Centennial argues that Maeve fails to state such a claim because she fails plausibly to allege that any protected conduct was a "factor that made a difference" in Centennial's decision to terminate her employment. (Def.'s Mot. at 10; Def.'s Reply at 5.) The Court disagrees for the reasons explained above. Thus, the Court denies Centennial's motion to dismiss Maeve's wrongful discharge claim.

## CONCLUSION

For the reasons stated, the Court DENIES Centennial's second motion to dismiss (ECF No. 30).

**IT IS SO ORDERED.**

DATED this 12th day of December, 2025.

HON. STACIE F. BECKERMAN
United States Magistrate Judge